**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

AMERICAN TRANSIT INSURANCE COMPANY,

Plaintiff,

\_\_\_\_ CV \_\_\_\_

- against –

BRADLEY PIERRE, MARVIN MOY, M.D.,
RUTLAND MEDICAL P.C., WILLIAM A. WEINER,
D.O., NEXRAY MEDICAL IMAGING, P.C. d/b/a
SOUL   RADIOLOGY MEDICAL IMAGING and
JOHN DOES 1-15,

Defendants.

---

## COMPLAINT

Plaintiff American Transit Insurance Company ("American Transit"), by and through its

attorneys, Greenberg Traurig, LLP, for its Complaint against Defendants Bradley Pierre ("Pierre"),

Marvin Moy, M.D. ("Moy"), Rutland Medical P.C. ("Rutland"), William A. Weiner, D.O.

("Weiner"), and Nexray Medical Imaging, P.C. d/b/a Soul Radiology Medical Imaging

("Nexray"), John Does 1-15 (the "John Doe Defendants," and together with the other defendants,

"Defendants"), hereby alleges as follows on personal knowledge as to itself and information and

belief as to all other matters:

### NATURE OF THE ACTION

1.      This is an action pursuant to the Racketeer Influenced and Corrupt Organizations

Act ("RICO"), 18 U.S.C. § 1961 *et seq.* and other applicable laws, rules, and regulations, and the

common law, to seek redress for the illegal scheme that Defendants have perpetrated for well over

a decade against American Transit, the largest taxi and livery No-Fault liability insurer in New

York.  During that time, Defendants have presented to American Transit and demanded payment

for numerous false, inflated, and otherwise fraudulent No-Fault claims. As detailed below, as part of the rampant fraud that is permeating the No-Fault insurance industry, a cadre of purported medical providers and their agents have built an industry on bilking insurance carriers, here American Transit, out of millions of dollars by filing, pursuing, and obtaining recovery for false insurance claims, in many instances where the claimant has suffered no injury at all, the treatment allegedly received is not required, or it far exceeds what is medically necessary to treat the injury sustained. The perpetrators of this scheme hide behind the inordinate volume of No-Fault claims, the dated system that resolves them in a superficial way given their volume, and the knowledge that the carriers cannot possibly detect, much less protect themselves against, the fraud that lies within this deluge of claims.

2.      By this action American Transit seeks redress for one such scheme by which Defendants submitted, and caused to be submitted to American Transit for payment, thousands of fraudulent No-Fault insurance reimbursement claims for medically unnecessary, non-existent, and what would otherwise be non-reimbursable healthcare services, including for purported examinations, computerized range of motion and muscle strength testing, physical performance testing, outcome assessment testing, physical therapy services, electrodiagnostic testing, acupuncture services, chiropractic services, radiological tests, and magnetic resonance imaging. These claims were for services Defendants represented to American Transit were legitimately and necessarily provided to New York automobile accident victims covered by insurance policies issued by American Transit. In truth, the services were either not provided or not necessary, but Defendants told American Transit otherwise and concealed the truth. All told, Defendants' scheme has caused American Transit to pay out millions of dollars in false claims.

3.      Defendants perpetrated their scheme by using medical professional corporations Defendants Rutland and Nexray to generate and process a high volume of patients by paying

referral sources hundreds of thousands of dollars in illegal kickbacks. It has surfaced only recently, as the federal government has separately sued Defendants for their wrongful conduct.

4. As reported in the federal indictment in *United States v. Pierre*, No. 1:22-cv-00019-PGG (S.D.N.Y.) (hereinafter, the "Criminal Action"), Defendant Pierre was an architect of the scheme by paying bribes to 911 operators, and hospital employees, among others, in exchange for the referral of automobile accident victims to Rutland, a No-Fault medical mill in New York. Rutland, in turn, referred patients to Nexray, a CT scan and x-ray provider, for unnecessary diagnostic imaging. Pierre has since pled guilty to conspiracy to commit bribery and conspiracy to defraud the Internal Revenue Service. Weiner has since pled guilty to conspiracy to commit healthcare fraud and to defraud the United States.

5. As part of the scheme, the Defendants provided patients with medically unnecessary treatment not tied to an accident victim's actual physical condition and then billed for these medically unnecessary procedures. In short, Defendants subjected patients to medical services they did not need for the sole purpose of billing American Transit and receiving payment. Defendants exploited the insureds' No-Fault insurance benefits and billed for huge volumes of medical services provided solely for profit and without regard for genuine patient care.

6. Rutland is purportedly owned by Defendant Moy, but upon information and belief, is actually owned and controlled by Pierre—an unlicensed layperson—through his management company, Medical Reimbursement Consultants Inc. ("MRC"). Nexray is nominally owned by Weiner, but upon information and belief, is actually owned and controlled by Pierre through his management company, MRC. Rutland and Nexray fraudulently held themselves out as properly licensed professional corporations that are entitled to reimbursement under Article 51 of the Insurance Law in violation of the New York State Department of Financial Services ("DFS")

regulations and the New York State Court of Appeals holding in *State Farm Mutual Auto. Ins. Co. v. Mallela*, 827 N.E.2d 758 (N.Y. 2005).

7.     Pierre controls Rutland and Nexray in violation of New York law because non-physicians—like Pierre—are prohibited from owning or controlling medical professional corporations in New York.  *See United States v. Weiner*, No. 1:22-cr-00019-PGG at ECF 367 (S.D.N.Y. Jan. 11, 2024).

8.     Defendants' fraudulent scheme was exposed in 2022, when Pierre, Moy, Weiner and other conspirators were indicted in the United States District Court for the Southern District of New York in the Criminal Action and arrested on charges of conspiracy to commit healthcare fraud, conspiracy to commit money laundering, conspiracy to commit Travel Act bribery, aggravated identity theft, and conspiracy to defraud the United States.

9.     The indictment, superseding indictments, and informations filed in the Criminal Actions detail the Defendants' scheme to defraud No-Fault insurance providers, including American Transit, in the tens of millions of dollars.

10.     Here, American Transit seeks recovery of the millions of dollars Defendants stole from it through their fraudulent scheme.  It seeks a declaration that it was and is not legally obligated to pay reimbursement of the more than $2,300,000.00 in No-Fault insurance claims that have been submitted by or on behalf of Rutland and Nexray, as they are the product of this illegal scheme.  As alleged herein, and as will be shown at trial:  Rutland and Nexray had and have no right to receive payment for any bills presented to American Transit because of the illicit scheme, including because the services they purported to provide were and are not medically necessary and were provided—to the extent they were provided at all—pursuant to fraudulent protocols designed solely to charge prescribed fees to financially enrich the Defendants, rather than to treat or otherwise benefit the patients who purportedly were injured and receiving treatment;  they are the

result of unlawful kickback and referral arrangements in violation of federal and state laws; and they are part of the scheme controlled in part by an unlicensed principal—Pierre—rendering void all bills presented through this scheme.

11.     As discussed below, the Defendants, at all relevant times, knowingly (a) engaged together in a scheme to defraud American Transit using unlawful kickback and referral arrangements in violation of New York law; (b) ordered and provided medical services pursuant to fraudulent protocols designed solely to maximize charges to American Transit, and not because they were medically necessary or designed to treat the patients who were subjected to them; and (c) presented to American Transit for payment thousands of No-Fault claims for the alleged cost of treatment reimbursement, even though they also knew that a substantial part of those claims was false, in that the services were either not performed or medically unnecessary and that they were not eligible to receive payment for those claims.

12.     American Transit reasonably relied on the representations that Rutland, Nexray, and their principals Pierre, Moy, and Weiner made to it, including representations in the bills and other claims records mailed to American Transit, representations that the charges reflected in such documents were true and correct, and representations that the medical procedures for which they sought reimbursement had, in fact, occurred and were medically necessary.  As alleged herein, such representations were knowingly false when made by Defendants in that the services had not been performed, were medically unnecessary, and/or the reimbursement sought was far in excess of what the services actually cost.

13.     Based on such representations, American Transit paid Rutland and Nexray's No-Fault claims, which, to date, exceed $2,300,000.00.  American Transit has been damaged by Defendants' No-Fault scheme, in that it has paid out millions of dollars in false claims.  As a result of the Defendants' scheme, American Transit has incurred damages of more than $3,240,000.00.

14.     Defendants' fraudulent scheme has continued uninterrupted since in or about 2008, as Defendants, including through their agents, continue to seek to recover for these fraudulent bills submitted to American Transit, including through litigation against American Transit.

15.     In this action for (a) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq.*; (b) common-law fraud; (c) unjust enrichment and (d) violations of New York Public Health Law § 238-a, American Transit seeks to recover all monies wrongfully paid to Rutland, Nexray, Pierre, Moy, and Weiner as a result of their submission of millions of dollars of fraudulent bills presented to and paid by American Transit.

16.     American Transit also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not obligated to make any payments to Rutland or Nexray in connection with any No-Fault claims they have submitted to American Transit.

## THE PARTIES

### A.     Plaintiff American Transit Insurance Company

17.     Plaintiff American Transit Insurance Company is duly organized and existing under the laws of the State of New York and has its principal place of business in Brooklyn, New York. At all times relevant to the allegations contained in this Complaint, American Transit has been and is authorized to conduct business in the State of New York.

18.     American Transit is engaged in the writing of automobile insurance policies in the State of New York and provides specialized insurance coverage for the taxi and livery commercial auto industry, particularly No-Fault insurance coverage.  American Transit is the one of the largest No-Fault insurers for the taxi and livery commercial automobile service industry in New York.

19.     This is not the first time when American Transit has been a victim of insurance fraud.  It has on several other occasions been forced to commence litigation in both federal and state courts to protect its rights against this fraud and to preserve its business.  These suits include

*American Transit Insurance Company v. Albis, et al.* (Index No. 656455/2018) (N.Y. Sup. Ct. N.Y. Cnty.); *American Transit Insurance Company v. Koppel, et al.* (Index No. 603360/2018) (N.Y. Sup. Ct. Nassau Cnty.); *American Transit Insurance Company v. Akpan, et al.* (Case No. 18-cv-04420) (E.D.N.Y.); *American Transit Insurance Company v. Bilyk, et al.* (Case No. 19-cv-5171) (E.D.N.Y.); *American Transit Insurance Company v. Advanced Comprehensive Laboratory, LLC, et al.* (Case No. 21-cv-413) (E.D.N.Y.); *American Transit Insurance Company v. Allbody Healing Supplies LLC, et al.* (Case No. 22-cv-5200) (E.D.N.Y.); *American Transit Insurance Company v. Medsource Solutions, Inc., et al.* (Case No. 22-cv-5317) (E.D.N.Y.); *American Transit Insurance Company v. QBS Solutions, et al.* (Case No. 22-cv-6585) (E.D.N.Y.).

### B. Defendant Bradley Pierre

20.     Upon information and belief, Defendant Bradley Pierre resides in and is a citizen of the State of New Jersey.

21.     Upon information and belief, Pierre is not authorized to practice medicine in the State of New York.  Upon information and belief, Pierre is not a licensed medical practitioner.

22.     Contrary to law, Pierre upon further information and belief has owned and controlled medical facilities that engaged in fraudulent billing to American Transit, including Rutland and Nexray in New York.

23.     According to the indictment in the Criminal Action, Pierre is an architect of the fraudulent billing scheme involving Rutland and Nexray and has pled guilty to conspiracy to commit bribery and conspiracy to defraud the Internal Revenue Service in that case.

### C. Defendant Marvin Moy, M.D.

24.     Upon information and belief, at all relevant times, Defendant Moy resides in and is a citizen of the State of New York.  Moy was and is licensed to practice medicine in the State of New York.

25.     Beginning in or about 2009, and numerous times thereafter, Moy represented himself to American Transit to be the sole officer, director, and shareholder of Rutland.  Upon information and belief, since at least 2009, Moy ceded operation and management over Rutland to Defendant Pierre.

26.     In or about October 13, 2022, Moy allegedly disappeared during a fishing trip onboard a recreational vessel approximately 16 miles off the coast of Long Island, New York. According to a "Letter of Presumed Death" issued by the United States Coast Guard, Moy was not found in the ensuing search.  The letter was intended to document "the loss and presumptive death of Marvin Moy, in lieu of a Death Certificate."  Notwithstanding his disappearance, and alleged sole ownership and control of Rutland, Rutland continues through attorneys to prosecute insurance collection cases against American Transit.

27.     Moy is a named defendant in the Criminal Action concerning the criminal prosecution of the Nexray/Rutland fraudulent billing scheme.

**D.     Defendant William A. Weiner, D.O.**

28.     Upon information and belief, at all relevant times, Defendant Weiner has resided in and is a citizen of the State of New York. Upon information and belief, Weiner is licensed to practice medicine in the State of New York.

29.     Beginning in 2011 and numerous times thereafter, Weiner represented himself to American Transit to be the sole office, director, and shareholder of Nexray.  Upon information and belief, at least since 2008, Weiner ceded operation and management of Nexray to Defendant Pierre.

30.     On January 16, 2024, Weiner pled guilty in Criminal Action of one count of conspiracy to commit healthcare fraud and to defraud the United States, in violation of 18 U.S.C. § 371.

**E.      Defendant Rutland Medical, P.C.**

31.      Defendant Rutland is organized as a professional corporation under New York law.

32.      Rutland's principal place of business is 145 E 98th Street, 1st Floor, Brooklyn, New York 11212.

33.      Rutland is an enterprise whose activities affect interstate commerce.

34.      Upon information and belief, at lease since in or around 2008, Pierre and Moy have participated in the operation and management of Rutland.

35.      Rutland was and is registered under Moy's name and medical license.  Upon information and belief, Rutland was and is in truth owned and controlled by Pierre during the course of this scheme.

36.      As alleged herein, Rutland's bills for services that it presented to American Transit were and are fraudulent because the medical services it provided were medically unnecessary, excessive, and designed not to provide No-Fault claimants with medical care they needed but rather to maximize No-Fault payments paid to it by American Transit.

37.      As alleged herein, Rutland violated numerous applicable New York licensing requirements by (a) allowing unlicensed persons to own and control the entity, (b) billing for fraudulent and/or unnecessary medical services, including to American Transit, and (c) treating patients with standardized procedures without regard for the need for those procedures.

38.      Rutland violated N.Y. Public Health Law Section 238, which prohibits certain health care providers, including providers providing radiological services, from referring the performance of such services to those with whom they have financial relationships.  Rutland violated N.Y. Pub. Health L. § 238-a(1)(a) by referring patients to other providers with which it has a financial relationship, including Nexray.

39.     Rutland was and is therefore not eligible to collect No-Fault payments from American Transit under New York's No-Fault laws.

**F.      Defendant Nexray Medical Imaging, P.C. d/b/a Soul Radiology Medical Imaging**

40.     Defendant Nexray is organized as a professional corporation under New York law.

41.     Upon information and belief, Nexray's principal place of business is 135-25F 79th Street, Suite 2B, Howard Beach, New York 11414.

42.     Nexray is an enterprise whose activities affect interstate commerce.

43.     Upon information and belief, at least since in or around 2008, Weiner and Pierre operated and managed Nexray.

44.     Nexray was registered under Weiner's name and medical license, but upon further information and belief, Nexray was owned and controlled by Pierre during the course of this scheme.

45.     As alleged herein, Nexray billed American Transit for unnecessary and/or excessive diagnostic radiology services throughout the course of this scheme.

46.     As alleged herein, Nexray's bills for services that it presented to American Transit were and are fraudulent because the radiological services it provided were medically unnecessary, excessive, and designed not to provide No-Fault claimants with medical care they needed but rather to maximize No-Fault payments paid to it from American Transit.

47.     Nexray violated numerous applicable New York licensing requirements by (a) allowing unlicensed persons to own and control the entity, (b) billing insurance carriers, including American Transit, for fraudulent and/or unnecessary medical services, and (c) treating patients with standardized procedures without regard for the need for those procedures.

48.     Nexray was and is therefore not eligible to collect no-fault payments from American Transit under New York's No-Fault laws.

**G.     John Doe Defendants**

49.     John Does 1-15 are individuals and entities whose names are not yet known to American Transit, and who have conspired to and did assist in the fraudulent and unlawful conduct alleged in this Complaint.  These individuals and entities will be added as defendants when their names and the extent of their participation become known through discovery.

## JURISDICTION AND VENUE

50.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, as the claims arise under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act.  *See* 18 U.S.C. § 1962(c).

51.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

52.     Venue in the Eastern District of New York is proper pursuant to 28 U.S.C. § 1391(b)(2), as the District where Plaintiff maintains its principal place of business and where a substantial amount of the activities providing the basis for this Complaint occurred.

## FACTS COMMON TO ALL CLAIMS

**A.     New York's No-Fault Statutory and Regulatory Framework**

53.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary professional healthcare services.

54.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, *et seq.*) (collectively the "No-Fault laws"), motor vehicle insurers are required to provide

coverage to persons involved in motor vehicle accidents, regardless of fault. These benefits are known as "No-Fault benefits."

55.     New York law mandates that No-Fault benefit coverage in the amount of $50,000.00 be available to each eligible claimant.  However, under The New York City Taxi and Limousine Commission (TLC) rules, which are applicable to  both medallion taxicabs and for-hire vehicles, owners of such vehicles must maintain bodily injury liability coverage for injury to one person in a motor vehicle accident in an amount not less than $100,000 per person and for injury to two or more persons for injury in an accident in an amount of not less than $300,000 and to maintain personal injury protection (No-Fault) coverage in an amount of not less than $200,000 per person.  The No-Fault insurance policies issued by American Transit at issue in this case are subject to these rules.

56.     Each eligible insured person (i.e., "claimant") may use such No-Fault benefits as a source of compensation for any "basic economic loss" incurred as the result of a motor vehicle accident.

57.     Under New York's No-Fault laws, "basic economic loss" is defined to include "all necessary expenses" for an array of professional healthcare services, including the evaluations, treatments, injections, and surgical procedures purportedly provided by the defendants. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

58.     A claimant may assign their No-Fault benefits to third parties, such as professional healthcare service providers.

59.     Pursuant to a duly executed assignment of benefits, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary healthcare services rendered, using the claim form required by the New York State Department of Insurance

(known by its title "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly known as an "NF-3").

60.     The NF-3 form is important documents in the insurance industry. This form represents and certifies that the provider's request for payment is not materially false, misleading, or fraudulent. 11 N.Y.C.R.R. § 65.3-11(a); N.Y. Ins. Law § 403(d).

61.     No-Fault automobile insurance was intended to be a form of coverage designed to be useful to the consumer and to provide medical coverage, lost wages, and other benefits to people injured in automobile accidents so that they can recover from their injuries with minimal disruption in their lives.

62.     For approximately twenty years, commencing with its inception in 1974, the No-Fault system functioned to the benefit of the consumer with premiums that were generally affordable.

63.     Since the mid-1990s, however, New York's No-Fault coverage has been targeted by perpetrators of fraud.  An increasingly large number of such persons have gone into business with the purpose of abusively billing the New York No-Fault system.  The New York Court of Appeals commented in upholding changes to the Insurance Department's No-Fault regulations that the No-Fault system has been targeted by and is permeated with fraud.  As the Court of Appeals explained in *Matter of Medical Society of New York v. Serio,* 100 N.Y.2d 854, 768 N.Y.S.2d 423 (2003), the fraud has included staged accidents, billing for unnecessary services, and organized crime involvement.  *Id.* at 861-62, 768 N.Y.S.2d at 731.

64.     The problem continues.  DFS explained in its March 15, 2016 Health Care Insurance Fraud Report (the "Report") that health care fraud has serious adverse impacts on the public, consumers, and the insurers.  According to DFS, this fraud includes medical providers that bill for services that were not provided or that were unnecessary, and constituted the majority of

all health care fraud in New York. DFS noted that insurers are required to investigate fraud and have a plan for the investigation and initiation of civil actions. In the transmittal of the Report to the Governor, DFS reported that No-Fault insurance fraud costs the public in New York "hundreds of millions of dollars" in insurance costs.

65.     The abusive practices set forth herein not only drive up the cost of insurance and place its availability at risk, they place in peril the quality of health care available to the public.

66.     New York law prohibits licensed healthcare services providers from paying or accepting kickbacks in exchange for patient referrals. *See, e.g.*, N.Y. Pub. Health Law 238.

67.     Therefore, under the New York No-Fault laws, a healthcare services provider is not eligible to receive personal injury protection ("PIP") benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered or allows unlicensed laypersons to share in the fees for the professional services.

68.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable laws and regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

69.     Pursuant to New York Insurance Law § 403, the NF-3s form submitted by a healthcare services provider to American Transit, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false

information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

70.     Further, under New York's No-Fault laws and regulations, medical providers are not eligible to seek or receive payment under Insurance Law § 5102 if they fail to meet any New York State licensing requirement necessary to perform such service in New York.

71.     An insurer may withhold No-Fault benefit payments to a medical provider if there is a "willful and material failure" by the provider to abide by licensing and incorporation statutes. *Mallela*, 827 N.E.2d at 761; N.Y.C.R.R. § 65-3.16(a)(12).

72.     Parties may "look beyond the face of licensing documents" to demonstrate illegal ownership and control.  *Id.*  Factors that may be considered when determining actual control of a medical provider include one-sided agreements, control of assets, profit sharing, and the extent of the nominal owner's role in the entity's business.  *See Andrew Carothers, M.D., P.C. v Progressive Ins. Co.*, 979 N.Y.S.2d 439, 443-44 (2d Dep't 2013).

73.     A medical provider's illegal corporate practice "may support a finding that the provider is not an eligible recipient of reimbursement under 11 N.Y.C.R.R. § 65-3.16(a)(12) without meeting the traditional elements of common-law fraud."  *Andrew Carothers, M.D., P.C. v. Progressive Ins. Co.*, 128 N.E.3d 153, 163 (N.Y. 2019).

**B.     Defendants' Fraudulent Scheme**

74.     Defendants' scheme surfaced in January 2022, when Moy, Pierre, and Weiner were indicted in the Criminal Action on charges of conspiracy to commit healthcare fraud, conspiracy to commit money laundering, conspiracy to commit Travel Act bribery, and aggravated identify theft.  A superseding indictment was filed on June 26, 2023 (the "Superseding Indictment").

75.     As set forth in the indictment, "[f]rom at least in or about 2008 up to and including in or about 2021," Pierre, Moy, Weiner, and other co-conspirators "participated in a criminal scheme to exploit insurance programs designed to protect motor vehicle accident victims."

76.     As set forth in the Superseding Indictment, Pierre recruited medical practitioners to open No-Fault clinics from at least 2008 through 2021.  These clinics fell into two groups: the No-Fault clinics that conduct initial evaluations of patients and prescribed specialized care, such as Rutland, and MRI facilities—such as Nexray—that provide medical imaging services.

77.     These No-Fault clinics "were not owned, operated, and controlled by licensed medical practitioners as is required by law."  (Superseding Indictment ¶ 15.)  Pierre "was the actual owner, operator, and controller" of the No-Fault clinics.  (*Id.*)

78.     Pierre "received the majority of the [c]linics' proceeds and decided how much the nominal owners would be paid."  (*Id.*)

79.     Pierre "possessed the checkbooks and pre-signed checks from the [c]linic's bank accounts; controlled the debit and credit cards for the [c]linics."  (*Id.*)

80.     Pierre "controlled hiring and firing of the [c]linic's employees; invested the initial funds to establish the Clinics."  (Superseding Indictment ¶ 15.)

81.     Pierre "identified the locations for the [c]linics; negotiated the rent for the [c]linics' leases."  (*Id.*)

82.     Pierre "chose the attorneys that would represent the [c]linics in arbitration, litigation, and sworn depositions before insurance companies."  (*Id.*)

83.     Pierre arranged for the No-Fault clinics to use Moy "to conduct painful and medically unnecessary electrodiagnostic testing" on patients including electromyography and nerve conduction velocity testing.  (*Id.* ¶ 16.)

84.     As set forth in the Superseding Indictment, Pierre "profited every step of the way." In addition to receiving the majority of the proceeds of the No-Fault clinics, Pierre required the No-Fault clinics to refer patients to a network of pharmacies, attorneys, and medical specialists "handpicked" by Pierre for one reason – "they paid [Pierre] millions of dollars for illegal referrals." (Superseding Indictment ¶ 17.)

85.     According to the Superseding Indictment, Pierre engaged in the following illegal activities:

a.  Pierre steered hundreds of patients from the clinics to Nexray.  (*Id.* ¶¶ 18-19.)

b.  Nexray purported to be operated and controlled by a licensed physician—Weiner—but in practice, Pierre owned, operated, and controlled Nexray.  (*Id.*)

c.  Pierre received the majority of Nexray's proceeds.  (*Id.*)

d.  Pierre controlled Nexray's bank accounts.  (*Id.*)

e.  Pierre influenced the hiring and firing of Nexray's employees.  (*Id.*)

f.  Pierre identified the locations for Nexray's facilities.  (*Id.*)

g.  Pierre negotiated the rent for Nexray's leases.  (*Id.*)

h.  Pierre chose the attorneys that would represent Nexray in arbitration, litigation, and sworn depositions before insurance companies.  (*Id.*)

86.     Pierre further arranged for a network of No-Fault doctors and attorneys to refer patients to Nexray for medical care—often through bribery—in addition to the No-Fault clinics under his control.  (*Id. ¶¶* 18-19.)

87.     To boost referrals to Nexray, Pierre, and Weiner "agreed to falsify clinical findings of injuries on MRI reports and pressure radiologists working for Nexray to exaggerate findings of injuries in their own reports."  (*Id.* ¶ 20.)

88.     These false clinical findings allowed referring physicians and attorneys to bill for additional benefits under the No-Fault laws and obtain larger legal settlements and judgments. (Superseding Indictment ¶ 20.)

89.     Pierre arranged for physicians, including Moy and Weiner "to lie under oath to insurance companies to conceal the healthcare fraud scheme."  (*Id.* ¶ 21.)

90.     Pierre, Moy, and Weiner were aware that insurance companies would deny reimbursement for the No-Fault clinics if Moy and Weiner testified truthfully about the medical necessity of treatments and Pierre's control of the Clinics. (*Id.* ¶ 21.)

91.     Pierre arranged for Moy and Weiner to falsely state under oath, among other things, that Pierre was solely a lender for Rutland and Nexray and Pierre played no role in referring patients to the clinics.  (*Id.* ¶ 21.)

92.     Pierre, Moy, and Weiner laundered the proceeds of the No-Fault scheme to conceal the operation.  (Superseding Indictment ¶ 22.)

93.     To conceal the scheme, Pierre relied on co-conspirators to set up shell companies, which he then paid using one of the companies he controlled, Marketing 4 You.  (*Id.* ¶ 23.)

94.     To conceal his receipt of the No-Fault scheme proceeds, Pierre caused the No-Fault clinics to transfer the proceeds from the scheme to his own company, Medical Reimbursement Consultants ("MRC").  (*Id.* ¶ 24.)  The payments were falsely described as loan repayments.  (*Id.* ¶ 25.)

95.     As part of these phony financing arrangements, Pierre purportedly gave loans to Moy and Weiner "in return for a percentage of any money later paid by insurance companies." (*Id.* ¶ 26.)  In reality, Moy and Weiner directly paid Pierre in excess of at least $2.4 million of what Pierre was entitled to receive under the phony agreements.  (*Id.*)

C. **Fraudulent Billing for Unnecessary Medical Services**

96.     As part of the scheme, Rutland and Weiner submitted bills to American Transit for as many services as possible—even for services that were medically unnecessary—to enrich Pierre, Moy, Weiner, and others.  This scheme is described in further detail below.

1.     The Initial Examinations: Gateway to the Scheme

97.     As part of Defendants' fraudulent scheme, Rutland, through Moy, provided virtually every patient with a purported initial examination.  These initial examinations were used to provide phony diagnoses so that Defendants could use them as a false basis to refer patients to obtain medically unnecessary exams, tests, or procedures.  Defendants then billed American Transit for these medically unnecessary follow-up examinations, chiropractic services, injections, electrodiagnostic testing, and related services.

98.     The charges for the reported initial examinations were fraudulent in that the initial examinations—to the extent they were performed at all—were part of a scheme to use the examinations merely as a gateway to referring patients to obtain more expensive lucrative exams, tests, and procedures that could be billed to American Transit.

99.     The charges for the purported initial examinations also were fraudulent in that they misrepresented the nature of and justifications for the purported examinations.  For example, as described in the case studies below, in certain instances claimants went to the emergency room following the alleged motor vehicle accident in question and were released the same day with no material injury, no surgery, no prescriptions for pain medication, and no referrals for imaging or testing.   Yet, shortly thereafter upon examination by Moy, many of these same patients who had been released by hospitals suddenly needed referrals for expensive imaging, physical therapy, neurological testing, and other services.

2. <u>Fraudulent Chiropractic Services</u>

100. Defendants' scheme involved Rutland's and Moy's provision of and billing for a highly templated and generic regimen of often unnecessary chiropractic care that was accompanied by a barrage of overlapping, redundant, and unnecessary diagnostic tests, the results of which Rutland and Moy routinely disregarded and ignored.

101. These tests and services were not provided based on any medical necessity or request of the patient. For example, patient I.V., whose treatment is described below, was provided with repeated chiropractic services at Rutland, in addition to various tests, imagining, and office visits, even though the patient had been seen and received MRI imaging at a hospital immediately following the relevant motor vehicle accident.

102. The tests and services, including but not limited to those received by the patients described the paragraphs below, were administered as a means to (a) maximize Rutland's profits through the submission of billing to American Transit and (b) justify the provision of additional, excessive, and medically unnecessary treatment, all of which was purposely provided as part of the Defendants' scheme involving unlawful referrals and to provide unnecessary services and bill American Transit for those services.

103. Rutland, by Moy and Pierre, promoted, administered, and billed for these chiropractic services and related diagnostic tests.

3. <u>Fraudulent Electrodiagnostic Testing</u>

104. A central part of the Defendants' scheme was also to fraudulently provide and bill for unnecessary and excessive electrodiagnostic ("EDX") testing. EDX testing is generally used in the clinical evaluation of patients with disorders of the peripheral and/or central nervous system.

105. EDX testing involves multiple studies performed by a healthcare provider, such as (a) electromyography studies, which evaluate the health of muscles and the nerve cells that control

them and (b) nerve conduction studies, which measure how fast an electrical impulse moves through the nerve. EDX is used to help a practitioner evaluate symptoms, generate a proper diagnosis, and monitor patient response to treatments.

106. EDX testing is not to be administered uniformly across a patient population. Because proper EDX testing should involve the use of a patient-specific approach, the nature and scope of the testing should change (and evolve) based on the condition of the particular patient, and as the testing is administered to a patient.

107. Here, the EDX testing provided by Moy (or those Rutland employees or agents acting under Moy's direction and control) provides a clear example of the Defendants' sham treatment protocol in which the same litany of services was provided to patients regardless of the patients' condition, age, gender, or prior medical history.

108. For example, the use of electromyography was so excessive that many Rutland patients that underwent EDX were subjected to (and thus subsequently billed for) this testing on all four limbs, which is exceedingly rare and uncommon.

109. Not only was Rutland and Moy's barrage of testing redundant and unnecessary, it also posed a serious risk of harm to patients because (a) patients were most often needlessly subjected to these invasive tests, (b) the tests yielded incorrect or inaccurate findings and diagnoses, and (c) Moy often disregarded or ignored the results of the tests causing Rutland patients to not receive proper care.

110. This barrage of testing also created significant unnecessary expense.

### i.    Fraudulent Nerve Conduction Studies

111. In a legitimate clinical setting, nerve conduction studies are administered to measure nerve conduction by stimulating the nerves with a small electrical current.

112.    Nerve conduction studies involve both F-Wave ("F-Wave") and H-Reflex ("H-Reflex") studies.  F-wave studies are used to examine the transmission of stimulation sites in the arm and leg and related motor neuron responses.  H-Reflex studies involving stimulation of a nerve and recording the reflex electrical discharge from a muscle in limb, and evaluates other nerve impulses.

113.    Nerve conduction studies typically confirm whether the nerves are functioning properly.

114.    Nerve conduction studies should be applied in a dynamic (meaning patient by patient) rather than by using a generally applicable protocol; in other words, the format and application of these studies should vary from patient to patient and should also be based on the patient's symptoms, findings and suspect diagnosis determined by the professional.

115.    Dynamic decision making regarding each individual test is required by the provider to properly administer EDX testing such as nerve conduction studies.

116.    According to the American Medical Association ("AMA"), the use of dynamic decision-making in electrodiagnostic testing, such as nerve conduction studies, is a prerequisite to obtain reimbursement for electrodiagnostic CPT coding.

117.    Contrary to the AMA's requirements, Moy administered nerve conduction studies without regard to his patient's symptoms, findings or suspect diagnoses as evidenced by the virtually identical justifications he recorded for administering nerve conduction studies to his patients, without regard to the varying medical conditions of these patients.

118.    Moy failed to tailor his EDX testing to each individual patient and instead followed a pre-determined protocol approach when using nerve conduction studies, which resulted in both the over-utilization of nerve conduction studies and the administration of the same studies to most of Rutland's patients.

119.    Moy administered nerve conduction studies to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for Rutland and for Moy.

120.    As a direct result of Moy's protocol approach to nerve conduction studies—including (a) his overutilization of the studies, (b) misinterpretation of the results, (c) misrepresentation of the diagnoses, and (d) his failure to utilize the results in his patients' treatment plans—the charges submitted to American Transit by Ruland for nerve conduction studies were excessive and not compensable under New York No-Fault laws.

121.    The studies listed in <u>Exhibit A</u> (i.e., the nerve conduction studies billed by Rutland under CPT codes 95903 and 95904) demonstrate Moy's intentional and grossly irresponsible pattern and practice of misusing nerve conduction studies in connection with Rutland patients in order to generate billing for services and to present false billing statements to American Transit.

122.    Because the nerve conduction studies administered to Rutland patients were excessive unwarranted, and presented by a company owned or controlled by a person who is not a licensed physician, each charge submitted to American Transit by Rutland for these studies is not compensable under New York No-Fault laws.

123.    American Transit is entitled to recover all payments it made to Rutland for such nerve conduction studies, including, but not limited to those listed in <u>Exhibit A</u>.

124.    As to Rutland's bills for nerve conduction studies presented to American Transit that remain unpaid, American Transit is under no obligation to pay them because those studies were excessive, not warranted, presented by a company owned or controlled by a person who is not a licensed physician, and are therefore not compensable under New York's No-Fault laws.

*ii.      Fraudulent Electromyography Studies*

125.    Electromyography studies measure electrical activity in specific muscles and are often performed in conjunction with nerve conduction studies.

126.    Electromyography studies involve the insertion of a needle into various muscles—the studies can be performed on any muscle accessible to an electromyography needle. Electromyography testing is invasive, as very fine needles are inserted into several muscles.  The needles have a microscopic electrode that picks up electronical signals from the muscles.  If the muscles are found to be functioning normally, then an inference is created that the connection between the motor nerve and the spinal cord is normal.

127.    An abnormal result from an electromyography study indicates, among other possibilities, the presence of problems with the nerve root near the spinal cord, or with the peripheral nerve near the muscle.

128.    Similar to nerve conduction studies, the use of electromyography studies should vary from patient-to-patient; otherwise, the testing provider risks reaching an incorrect diagnosis if the same muscles are being tested in the same number and sequence across the entire patient population.

129.    As such, electromyography studies should be used with a dynamic (patient by patient) rather than general protocol approach.

130.    Because each patient should be evaluated based upon their individual needs, electromyography studies should be limited and reserved for when specific outcomes are being investigated, such as when a single limb's muscles are being reviewed for radiculopathy, which is the pinching of a nerve root in the spinal column.

131.    Furthermore, the muscles selected for electromyography studies should present the least amount of pain possible for the patient. As such, the testing provider should know how to test each muscle and know how to best limit the amount of pain for her or his patient.

132.    Regardless of these proscriptions, Rutland and Moy used a protocol approach when administering electromyography studies to Rutland patients and did not tailor the electromyography studies to the specific, individualized needs of each patient.

133.    Testing in this manner is not just excessive and medically unnecessary, but it can also harm the patient because of the risk of pain, bleeding, infection and nerve injury associated with these tests.

134.    Rutland and Moy subjected Rutland patients to needless and unwarranted (and sometimes painful) electromyography studies as part of a pre-determined protocol that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for Rutland and for Moy.

135.    As a direct result of Rutland and Moy's protocol approach to electromyography studies—including (a) his overutilization of these studies, (b) misinterpretation of the results, (c) misrepresentation of the diagnoses, and (d) his failure to utilize the results of these studies in his patients' treatment plan—the charges submitted to American Transit for electromyography studies were excessive and not compensable under New York No-Fault laws, including, but not limited to, those listed in Exhibit B.

136.    The electromyography studies billed by Rutland under CPT code 95861 demonstrate Moy's intentional and grossly irresponsible pattern and practice of misusing electromyography studies in connection with Rutland patients.

137.    American Transit is entitled to recover all payments it made to Rutland for such electromyography studies, including, but not limited to those listed in Exhibit B.

138.    As to Rutland's bills for electromyography studies presented to American Transit that remain unpaid, American Transit is under no obligation to pay them because those studies were excessive, not warranted, presented by a company owned or controlled by a person who is not a licensed physician, and therefore not compensable under New York's No-Fault laws.

### iii.    Fraudulent H-Reflex Tests

139.    An H-Reflex is a reflectory reaction of muscles after electrical stimulation of sensory fibers in their innervating nerves.  An H-Reflex is performed using an electric stimulator.

140.    While H-Reflex can occur in multiple mixed nerves, H-Reflex testing is best practiced clinically only through stimulation of the tibial nerve.

141.    H-Reflex testing is rarely practiced on additional mixed nerves and even then it is mainly for research purposes, not for patient diagnosis.

142.    Upper limb H-Reflex testing in the median nerve is not a common clinical practice; indeed, it borders on experimental and its routine use is below the standard of care.

143.    As such, H-Reflex testing dictates that a dynamic approach, rather than a set protocol, is needed for its diagnosis and use.

144.    Ignoring the standard of care and reasonable practice, Moy used H-Reflex testing on both the upper limbs and lower limbs when treating virtually every Rutland patient that underwent H-Reflect testing.

145.    Rutland and Moy's abuse of H-Reflex testing is illustrated by billing for hundreds and hundreds of these tests on patients already receiving other, similar tests.  For example, Dr. Moy regularly used H-Reflex tests in several lower limb studies, even where they were not

medically necessary.  There was no basis for all of these tests, as standard electromyography studies and nerve conduction studies are more than adequate for diagnoses.

146.    The uniform provision of H-Reflex testing demonstrates that Moy ordered these tests as part of a scheme to prescribe expensive treatments so that Rutland could bill American Transit for them without regard to individualized needs of his patients.

147.    In at least one instance, Moy also made a diagnosis that was contrary to the H-Reflex test that he ordered.  This occurred in the lower limb study of patient L.J., in which the given diagnoses included left L5-S1 radiculopathy. The H reflex testing should have shown the left H reflex delayed in latency by at least two milliseconds. Instead, the right H reflex was longer by 1.34 milliseconds. The H reflex result was contrary to Moy's diagnosis of left L5-S1 radiculopathy.  By failing to recognize and report these critical findings, Moy did not meet the standard of care and placed these patients at risk of receiving the wrong medical treatment.

148.    Rutland and Moy subjected Rutland patients to needless and unwarranted (and sometimes painful) H-Reflex tests as part of a scheme that was intentionally employed to (a) generate billing for otherwise unnecessary services, (b) create a false foundation for the provision of additional tests and services, and (c) produce profits for Rutland and for Moy.

149.    The H-Reflex testing administered to Rutland patients by Moy (or those Rutland employees or agents working under his direction and control) was excessive and not medically necessary, and the results were materially misrepresented.

150.    As a direct result of Rutland's and Moy's protocol approach to H-Reflex tests—including (a) his overutilization of these studies, (b) misinterpretation of the results, (c) misrepresentation of the diagnoses; and (d) his failure to utilize the results of these studies in his patients' treatment plan—the charges submitted to American Transit for H-Reflex tests were excessive and not compensable under New York No-Fault laws.

151.    The services listed in <u>Exhibit C</u> (i.e., the H-Reflex tests billed by Rutland under CPT code 95934) demonstrate Rutland and Moy's intentional and grossly irresponsible pattern and practice of misusing H-Reflex tests in connection with Rutland patients, by employing them to virtually the entire Rutland patient population, regardless of medical necessity, and misdiagnosing the results of those tests.

152.    American Transit is entitled to recover all payments it made to for such H-Reflex tests, including, but not limited to those listed in <u>Exhibit C</u>.

153.    As to Rutland's bills for H-Reflex presented to American transit that remain unpaid, American Transit is under no obligation to pay them because those tests were excessive, not warranted, presented by a company owned or controlled by a person who is not a licensed physician, and therefore not compensable under New York's No-Fault laws.

<em>iv.        Fraudulent Range of Motion Testing</em>

154.    Spinal range of motion ("ROM") occurs in three separate segments of the spine: cervical, thoracic, and lumbar.  It can become impaired in automobile accidents.

155.    Testing is used to measure spinal ROM in three planes of motion.  ROM testing is typically initially performed by a series of manual tests.

156.    Rutland and Moy administered computerized ROM testing, a far more expensive procedure, when a manual determination of a patient's ROM in the initial evaluation was sufficient and constitutes the standard of care.

157.    As a direct result of Rutland's and Moy's protocol approach to ROM tests— including (a) his overutilization of these tests, (b) misinterpretation of the results, (c) misrepresentation of the diagnoses; and (d) his failure to utilize the results of these tests in his patients' treatment plan—the charges submitted to American Transit for ROM tests were excessive and not compensable under New York No-Fault laws.

28

158.    For these reasons, the charges submitted by Rutland for ROM testing were false and fraudulent and, therefore, not compensable.

159.    Because the charges for the ROM tests administered to Rutland patients were false and fraudulent because they were medically unnecessary, presented by a company owned or controlled by a person who is not a licensed physician, and/or otherwise billed improperly, each charge submitted to American Transit by Rutland for these tests is not compensable under New York No-Fault laws, including, but not limited to, the ROM tests billed by Rutland under CPT code 95851 that are listed in Exhibit D.

160.    American Transit is entitled to recover all payments it made to Rutland for such ROM tests, including, but not limited to those listed in Exhibit D.

161.    As to Rutland's bills for ROM tests presented to American Transit that remain unpaid, American Transit is under no obligation to pay them because the charges for those tests were misrepresented and false, and, therefore, not compensable under New York's No-Fault laws.

*v.      Fraudulent Manual Muscle Testing*

162.    Manual muscle testing ("MMT") is generally utilized to measure a patient's muscle strength by applying opposing, resistant forces against the body of the patient, who is attempting to move against this force.

163.    As the standard of care in a clinical setting, MMT is used only on a case-by-case basis.

164.    Moy provided virtually the same justification for providing MMT for each of his patients.  For each patient, he issued the same boilerplate "Letter of Medical Necessity for Computerized Range of Motion & Manual Muscle Test" that did not take into the account the individual medial needs of each patient.  Each letter stated that "these assessments must be made on a monthly basis to monitor progress and efficient treatment."  But these tests were never used

29

for that purpose and were conducted for the sole purpose of billing American Transit. Rutland's billing for MMT is false and fraudulent because multiple charges under the same CPT code were submitted for a particular patient, even though the testing was conducted in the same session on the same patient.

165. Because the muscle testing was unnecessary and because the associated charges for this testing were false and fraudulent, including being presented by a company owned or controlled by a person who is not a licensed physician, the bills submitted to American Transit by Rutland for muscle testing (i.e., the charges billed by Rutland under CPT code 95831) are not compensable under New York No-Fault laws, including, but not limited to, those listed in Exhibit E.

166. American Transit is entitled to recover all payments it made to Rutland for such testing, including, but not limited to those tests listed in Exhibit E.

167. As to Rutland's bills presented to American Transit that remain unpaid (including, but not limited to, billing by Rutland under CPT code 95831, American Transit is under no obligation to pay them because the services were unnecessary and unwarranted, because the charges for those tests were misrepresented and false, and because they were invoiced by a company owned or controlled by a person who is not a licensed physician, they are not compensable under New York's No-Fault laws.

### 4.   Fraudulent Diagnostic Imaging

168. Imaging includes provision of x-ray photography, MRIs, and CT scans, which are used to examine internal conditions of the human body.

169. MRI testing is an imaging technique that can produce high quality images of the muscle, bone, tissue, and nerves inside the human body. MRIs often are used following auto accidents to diagnose abnormalities in the nerve roots through the images of the nerves, nerve roots, and surrounding areas.

170.     Early imaging (i.e., shortly following an injury) is indicated for the evaluation of spinal or musculoskeletal injuries where there is a concern for a fracture, a dislocated joint, or a spinal injury with impending neurological compromise.

171.     Early imaging may also be warranted if there is a concern for infection or malignancy.

172.     In the case of low impact motor vehicle accidents, early imaging studies for patients are only warranted in limited circumstances.

173.     Nonetheless, Rutland and Moy referred patients for early diagnostic imaging without any indication that such imaging was necessary at the outset of their care.

174.     Despite the absence of indications for early imaging, Moy ordered multiple MRI scans at the initial examination of Rutland patients before they were afforded any meaningful opportunity to undergo a course of conservative treatment.  Moy also ordered MRIs even where patients had already had imaging performed at hospitals following their motor vehicle incidents, without any indication additional MRIs were warranted.

175.     Moy also ordered MRI scans for asymptomatic areas of multiple Rutland patients.

176.     Moy systemically referred patients to Nexray for imaging, including MRIs, regardless of where patients lived or the specific type of imaging necessary.

177.     In several instances, Moy ordered MRIs of the head, spine, and peripheral joint on initial visits.  For example, for one patient, J.J., Moy ordered seven MRIs at the initial examination, which only occurred three weeks post-accident.  Moy's typical practice was to order an MRI on any body part where a patient said they were having pain.  With respect to J.J., it is unlikely all seven MRIs were medically indicated particularly given that J.J. was still working as a home health aide at the time of her examination.

178.    The letters of medical necessity that Rutland submitted to support the MRIs were also boilerplate and failed to describe patients' clinical situations correctly.  For example, for patient J.J., the letter stated that J.J. had a head injury and "head pain," yet the initial exam report indicated that the patient had only "intermittent" headache without blurred vision or tinnitus. Further, the letter of medical necessity for J.J. stated that J.J. was "on a comprehensive rehabilitation program," and yet she had not had any physical therapy or any other rehabilitation treatments prior to the MRI.

179.    Rather, Rutland and Moy knowingly prescribed medically unnecessary and unwarranted imaging.  Further, Rutland and Nexray were under Pierre's control and knowingly participated in a scheme whereby Rutland referred patients for medically unnecessary imaging so that Nexray could conduct these expensive tests and bill American Transit for them, all to Defendants' benefit.

180.    Because the imaging was unnecessary and because the associated charges for this testing were false and fraudulent, including being presented by a company owned or controlled by a person who is not a licensed physician, the bills submitted to American Transit by Nexray for imaging are not compensable under New York No-Fault laws, including, but not limited to, those listed in Exhibit F.

181.    American Transit is entitled to recover all payments it made to Nexray for such testing, including, but not limited to those tests listed in Exhibit F.

182.    American Transit is entitled to recover all payments it made to Nexray for such imaging.

183.    As to Nexray's bills for imaging presented to American Transit that remain unpaid, American Transit is under no obligation to pay them because the imaging was unnecessary, and

because the bills were presented by a company owned or controlled by a person who is not a licensed physician, and therefore not compensable under New York's No-Fault laws.

### D. Specific Examples of Fraudulent Billing by Defendants

184.   Medical records of particular patients obtained by American Transit confirm Defendants' fraud and repeatedly subjecting their patients to unnecessary medically unnecessary procedures and billing American Transit for those services.   These services were intentionally provided for the purpose of generating billing to American Transit and enriching Defendants.

### a. Patient D.W. (claim no. TNC17000535-301)

185.   Patient D.W was allegedly involved in a motor vehicle accident on December 1, 2017.

186.   D.W. was taken to the hospital for evaluation.   X-rays were taken of D.W.'s right hip and knee.   No fractures were identified and she was released from the hospital the same day with instructions to rest.

187.   Despite any indication that early imaging was warranted, on January 3, 2018, Nexray purportedly took two MRIs of D.W.'s right shoulder and brain.   Nexray billed American Transit for these MRIs, which were medically unnecessary.

188.   There were no reports of any injuries to D.W.'s shoulder or brain.   D.W. never claimed she sustained trauma or impact to her head.   No physical examination of the head was ever conducted to determine whether there were any head bruises, lacerations, abrasions, and/or bleeding.   Defendant Weiner noted that the MRI of the brain was "unremarkable."

189.   The documented indication for the shoulder MRI was "pain status post injury" but Weiner did not document the location of the pain or explain why D.W. would need a shoulder MRI.   That indication is also contrary to the hospital records of the diagnosis following the alleged accident.

190.    On January 5, 2018, Nexray purportedly took MRIs of D.W.'s right knee and hip. Weiner documented the indication for these services as "[p]ain status post injury."  There were no indications for knee or hip MRIs at this time.  Nexray billed American Transit for these services. which were medically unnecessary.

191.    On January 17, 2018, Nexray purportedly took MRIs of D.W.'s lumbar and cervical spine MRIs.  The documented indication for the MRIs was "pain, MVA" but Weiner did not document the location of the purported pain.  Nexray billed American Transit for these services. which were medically unnecessary.

192.    Weiner documented "L4-L5 disc bulging," for the purpose of subjecting D.W. to further unnecessary medical services.  This diagnosis was false and made to generate billing to American Transit.  The MRIs allegedly performed on D.W. for which Nexray billed American Transit were not justified or medically necessary, as D.W. did not exhibit any symptoms (e.g., fracture, impending neurologic compromise infection, or malignancy) that would require such diagnostic testing.

193.    As alleged herein, Nexray's bills and the representations therein were false and fraudulent, in that the services for which it sought reimbursement were medically unnecessary and/or the result of overcharging for such services.

**b.    Patient E.H. (claim no. 101359902)**

194.    Patient E.H. was purportedly involved in an automobile accident as a pedestrian on or around December 10, 2017.

195.    He was taken by ambulance to the hospital, where he was examined and underwent diagnostic testing.  The hospital performed X-rays on his knees and shoulder.  No fracture or instability was noted.

196.    E.H. was admitted to the hospital, was treated with medication, provided a cane and an arm sling, and was subsequently released home the following day.

197.    Three days later, on December 14, 2017, Rutland purportedly evaluated E.H.  As a result of the initial evaluation, Rutland recorded non-specific neurological findings.  Despite this, Rutland recorded that E.H. should undergo "a course of physical therapy treatments," as well as MRI testing, chiropractic care, and acupuncture.  This was unnecessary.

198.    On December 28, 2017, Rutland purportedly conducted initial chiropractic physical examination of E.H.  Despite no concerning orthopedic signs warranting additional treatment, Rutland recommended E.H. attend chiropractic treatment 3-4 times per week and receive monthly re-evaluations.   Rutland billed American Transit for these services, which were medically unnecessary.

199.    On January 9, 2018, Weiner purportedly conducted MRI of E.H.'s left knee, which was unnecessary.  Moy was the referring physician.  The documented indication for this MRI was "[p]ain status post injury" but, Weiner did not indicate the location of the purported pain.  Nexray billed American Transit for this MRI, which was medically unnecessary.

200.    On January 17, 2018, Weiner purportedly conducted MRIs of E.H.'s right knee and cervical spine, which were unnecessary.  Moy was the referring physician.  The documented indication for the right knee MRI was "[p]ain status post injury" but Weiner did not indicate the location of the purported pain.  The documented indication for the cervical spine MRI was "[p]ain following MVA" but, Weiner did not indicate the location of the purported pain.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

201.    Rutland then billed American Transit for a follow-up visit with E.H. on January 31, 2018.  Rutland and Moy recorded non-specific motor changes and no reflex or sensory exam.

35

Despite no concerning findings, Rutland and Moy recommended ROM/MMT testing, physical capacity testing, outcome assessment testing, and physical therapy for E.H.

202.    On February 1, 2018, Weiner purportedly conducted an MRI of E.H.'s right shoulder.  The referring physician was Moy.  Weiner documented the indication as "[p]ain status post injury" but did not indicate the location of the purported pain.  Nexray billed American Transit for this MRI, which was medically unnecessary.

203.    On February 14, 2018 Moy purportedly conducted an electromyography study on E.H. Rutland billed American Transit for this electromyography study, which was medically unnecessary.

204.    On February 20, 2018, Rutland purportedly treated E.H. and billed American Transit for a chiropractic re-examination of E.H., which was medically unnecessary.  Despite no concerning orthopedic signs warranting additional treatment, Rutland recommended a three-week treatment plan and evaluation in four to six weeks.

205.    On February 26, 2018, Rutland purportedly conduced MMT (neck, shoulder, and knees) on E.H.  Rutland billed American Transit for these services, which were medically unnecessary.

206.    On March 13, 2018, Rutland purportedly treated E.H. and again billed American Transit for a follow-up visit with E.H.  Rutland recorded the same findings and recommendation as on January 31, 2018.  Despite reporting non-specific motor changes and no reflex or sensory exam, Rutland again recommended ROM/MMT testing, physical capacity testing, outcome assessment testing, and physical therapy.

207.    On April 10, 2018, American Transit was billed for Lidocaine Patches prescribed by a Rutland physician, which were medically unnecessary.  Rutland recorded that E.H. was on

36

"conservative care," which is not consistent with use of this medication.  Furthermore, the injuries reported by E.H. would not require this type of medication.

208.    In total, as to purported treatment of E.H., Rutland billed American Transit 58 bills for 40 visits and Nexray billed American Transit 4 bills for 3 visits.

209.    Because the testing, treatment, medication, and services billed to American Transit by Rutland and Nexray were medically unnecessary, Rutland's and Nexray's bills for E.H. are false, and thus are not compensable under New York's No-Fault laws.

c.    **Patient S.S. (claim no. 1044824-01)**

210.    Patient S.S. was allegedly involved in a motor vehicle accident in November 2018.

211.    S.S. sustained no lacerations or loss of consciousness.  S.S. was taken from the scene of the alleged accident to the emergency room where x-rays of both her shoulders and both knees were taken.  These x-rays did not indicate any fractures.  S.S. was discharged the same day and with instructions to rest.

212.    S.S. presented to the ER again approximately six days after her alleged accident because of purported pain in her knees.  X-rays were performed on both knees, but the x-rays did not indicate any fractures.  An x-ray was also taken of S.S.'s left shoulder.  The x-rays did not indicate any fractures or injuries.

213.    Moy purportedly examined S.S. on November 29, 2018.  Rutland billed American Transit for this evaluation.  Moy recommended MRIs and x-rays even though S.S. did not exhibit any symptoms warranting such diagnostic testing.

214.    On November 9, 2018, Nexray purportedly performed MRIs of S.S.'s left and right knees.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

215.    On November 9, 2018, Nexray purportedly performed on SS MRIs of S.S.'s left and right shoulders.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

216.    Moy subsequently referred S.S. for additional MRIs.

217.    On December 17, 2018, Nexray purportedly conducted four MRIs on S.S.'s cervical spine, a right hand, and right and left hip on December 17, 2018.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

218.    On December 26, 2018, Nexray purportedly conducted two MRIs on S.S.'s right and left hip.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

219.    Moy purportedly treated S.S. and billed American Transit for a follow up evaluation with S.S.

220.    On January 3, 2019, Rutland purportedly conducted on S.S. ROM testing, outcome assessment testing, and physical capacity testing.  Rutland billed American Transit for this testing, which was medically unnecessary.

221.    On January 4, 2019, Nexray purportedly conducted two MRIs on S.S.'s cervical and lumbar spine on January 4, 2019.  Nexray billed American Transit for this testing, which was medically unnecessary.

222.    On March 1, 2019, Nexray performed an MRI of S.S.'s right hand.  Nexray billed American Transit for this testing, which was medically unnecessary.

223.    In total, Nexray purportedly conducted 13 MRIs on various parts of S.S.'s body, even though none of these MRI's were medically necessary and used solely to generate billing from American Transit.

224.    Because the services billed to American Transit by Rutland and Nexray were medically unnecessary, and presented by companies owned or controlled by a person who is not a

licensed physician, Rutland and Nexray's bills for S.S. are false and are not compensable under New York's No-Fault laws.

### d.      Patient P.A. (claim no. 1043121-02)

225.    Patient P.A. was allegedly involved in a motor vehicle accident on November 7, 2018.

226.    Because the alleged accident was low-impact, P.A. did not present to the hospital for evaluation.  There is no indication in any medical record that P.A. had any fracture or instability.

227.    Moy purportedly evaluated P.A. on November 19, 2018.  Despite the lack of any indication of injury, Rutland and Moy referred P.A. to Nexray for cervical and lumbar spine MRIs. Moy also referred P.A. for acupuncture services, despite the lack of any indication that acupuncture services were appropriate or necessary for P.A.'s treatment.

228.    On November 12, 2018, Rutland purportedly provided chiropractic services to P.A. Rutland billed American Transit for these services, which were medically unnecessary.

229.    On November 13, 2018 and January 22, 2019, Rutland purportedly conducted on MMT on P.A.  Rutland billed American Transit for these services, which were medically unnecessary.

230.    On November 15, 2018 and January 23, 2019, Rutland purportedly conducted on ROM testing on P.A.  Rutland billed American Transit for these services, which were medically unnecessary.

231.    On November 19, 2018, Rutland purportedly treated P.A. and billed American Transit an initial examination at which time Moy prescribed a course of physical therapy treatments for P.A.

232.     On November 19, 2018, Rutland also purportedly treated P.A. for electrical stimulation on P.A.  Rutland billed American Transit for this testing tests, which was medically unnecessary.

233.     On November 20, 2018, Rutland purportedly conducted on performance testing on P.A.  Rutland billed American Transit for this testing, which was medically unnecessary.

234.     On December 12, 2018, Rutland also purportedly performed outcome assessment testing on P.A.  Rutland billed American Transit for this testing, which was medically unnecessary.

235.     On December 12, 2018, based on Rutland's referrals, P.A. was also provided with additional acupuncture services.  Rutland billed American Transit for this testing, which was medically unnecessary.

236.     Rutland and Moy referred P.A. for cervical and lumbar spine MRIs. On December 17, 2018, Nexray purportedly performed an MRI on P.A.'s cervical and lumbar spine.  Weiner documented the indication for these MRIs as "[Pain status post injury]."  Weiner did not indicate where P.A. experienced this alleged pain.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

237.     On December 17, 2018, Nexray purportedly performed x-rays of P.A.'s cervical spine, lumbar spine, and thoracic spine.  There was no indication that P.A. had any fractures in his cervical spine, lumbar spine, or thoracic spine.  Nexray billed American Transit for this imaging, which was medically unnecessary.

238.     On January 10, 2019, Rutland purportedly performed on P.A. electromyography and nerve conduction velocity testing.  Rutland billed American Transit for these MRIs, which were medically unnecessary.

239.     On January 17, 2019, Nexray purportedly performed on P.A. an MRI and x-ray of P.A.'s hip.  Nexray billed American Transit for this imaging, which were medically unnecessary.

240.     On January 17, 2019, Rutland purportedly performed outcome assessment testing on P.A.  Rutland billed American Transit for this testing, which was medically unnecessary.

241.     On January 22, 2019, Rutland purportedly performed MMT on P.A.  Rutland billed American Transit for this testing, which was medically unnecessary.

242.     On January 23, 2019, Rutland purportedly performed on ROM testing on P.A. for the cervical and lumbar spine.  Rutland billed American Transit for this testing, which was medically unnecessary.

243.     Moy referred P.A. for additional MRIs.  On January 28, 2019, Nexray purportedly provided P.A. an MRI and x-ray of P.A.'s left hip and billed American Transit for those services. The same imaging was taken just days before so there would have been no reason to subject P.A. to further left hip imaging.  Nexray billed American Transit for this imaging, which was medically unnecessary.

244.     On January 29, 2019, Rutland purportedly performed performance testing on P.A. Rutland billed American Transit for this imaging, which was medically unnecessary.

245.     On February 28, 2019, Rutland purportedly performed outcome assessment testing on PA.  Rutland did not indicate in its notes what this additional testing would contribute to P.A.'s course of treatment. Rutland billed American Transit for this imaging, which was medically unnecessary.

246.     On August 8, 2019, Rutland purportedly performed ROM testing on P.A. of the lumbar spine.  Rutland billed American Transit for this service, which was medically unnecessary.

247.     On August 22, 2019, Rutland purportedly performed on P.A. performance testing. Rutland billed American Transit for this testing, which was medically unnecessary.

248.     Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a

licensed physician, Rutland and Nexray's bills for P.A. are false and are not compensable under New York's No-Fault laws.

### e.    Patient A.C. (claim no. 1028221-01)

249.    Patient A.C. was allegedly involved in a motor vehicle accident on May 10, 2018.

250.    A.C. was taken to the hospital, given unspecified pain medication, and released the same day.

251.    Rutland evaluated A.C. on May 14, 2018 and referred A.C. to Nexray for cervical spine and thoracic spine MRIs.  A.C. was also referred to physical therapy treatment 3-4 times per week, chiropractic treatment, and acupuncture.

252.    On June 5, 2018, Rutland purportedly performed on A.C. ROM testing (cervical spine and thoracic spine).  The results of these tests were not utilized in the treatment plan for A.C. Rutland billed American Transit for this testing, which was medically unnecessary.

253.    On June 8, 2018, Rutland purportedly performed on A.C. MMT (neck extension and trunk extension).  The results of these tests were not utilized in the treatment plan for A.C. Rutland billed American Transit for this testing, which was medically unnecessary.

254.    On June 28, 2018, Rutland purportedly performed on A.C. needle electromyography (upper and lower extremities), nerve conduction studies, and an H-reflex study. The result of these tests were not utilized in the treatment plan for A.C.  Rutland billed American Transit for this testing, which was medically unnecessary.

255.    On June 8, 2018, Weiner performed MRIs of A.C.'s cervical spine and thoracic spine.

256.    On June 22, 2018, Weiner performed an MRI of A.C.'s lumbar spine on June 22, 2018.

257.    The documented indication for these MRIs was "[p]ain status post injury" but Weiner did not indicate the location of the alleged pain.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

258.    On June 15, 2018, July 13, 2018, and August 24, 2018, Rutland purportedly performed on A.C. outcome assessment testing.   Rutland billed American Transit for these tests, which were medically unnecessary.

259.    On July 6, 2018, Rutland purportedly performed on A.C. ROM testing (cervical spine and lumbar spine).  Rutland billed American Transit for these tests, which were medically unnecessary.

260.    On July 20, 2018 and August 31, 2018, Rutland purportedly performed on A.C. performance testing.  Rutland billed American Transit for this testing, which was medically unnecessary.

261.    On August 28, 2018, Rutland purportedly performed on A.C. MMT (neck extension, trunk extension, and shoulder extension).  Rutland billed American Transit for these tests, which were medically unnecessary.

262.    Moy referred A.C. for a right shoulder MRI and on July 24, 2018, Weiner performed an unnecessary right shoulder MRI on A.C.  The documented indication for the MRI was "[p]ain status post injury" but Weiner did not indicate the location of the alleged pain.

263.    On or about August 11, 2018, A.C. underwent a treatment by Dr. Andrew J. Dowd, who was convicted in December 2018 for mail fraud, wire fraud, conspiracy to commit mail and wire fraud in connection with, among other things, his performance of hundreds of medically unnecessary surgeries.

264.    Rutland submitted at least 68 bills to American Transit for A.C.'s treatment and Nexray submitted four bills.

265.     Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a licensed physician, Rutland and Nexray's bills for A.C. are false and are not compensable under New York's No-Fault laws.

        **f.**      **Patient T.C. (claim no. 100980102)**

266.     Patient T.C. was allegedly involved in a motor vehicle accident on October 26, 2017.

267.     T.C. was taken to the hospital where x-rays of her cervical spine, thoracic spine, and lumbar spine were taken as well as a CT scan of her head.

268.     Moy evaluated T.C. on November 2, 2017 and referred T.C. to Nexray for cervical spine, thoracic spine, lumbar spine, left shoulder, and left and right knee MRIs, despite the lack of any indication warranting such early diagnostic testing.

269.     On November 2, 6, 14, and 17, 2017, Rutland purportedly provided T.C. with physical therapy treatment, which included four therapeutic massages and four electrical stimulation sessions.  Rutland billed American Transit for this treatment, which was medically unnecessary.

270.     On December 7, 2017, Rutland purportedly conducted on T.C. MMT (neck extension, trunk extension, shoulder extension, and knee extension).  Rutland billed American Transit for these services, which were medically unnecessary.

271.     On December 14, 2017, Rutland purportedly conducted on T.C. performance testing.  Rutland billed American Transit for this testing, which was medically unnecessary.

272.     On January 30, 2018, Rutland purportedly conducted on T.C. outcome assessment testing.  The results of these tests were never utilized in the treatment plan for T.C.  Rutland billed American Transit for this testing, which was medically unnecessary.

273.    On February 21, 2018, Moy performed on T.C. needle electromyography (upper and lower extremities), nerve conduction studies, and an H-reflex study.  The results of these tests were not utilized in T.C.'s treatment plan.  Rutland billed American Transit for this testing, which was medically unnecessary.

274.    On February 12, 2018, Rutland purportedly conducted on T.C. ROM testing (cervical spine, lumbar spine, shoulder extension, and knee extension).  The results of these tests were not utilized in T.C.'s treatment plan.  Rutland billed American Transit for this testing, which was medically unnecessary.

275.    On February 15, 2018, Rutland purportedly conducted on T.C. MMT (neck extension, trunk extension, shoulder extension, and knee extension).  The results of these tests were not utilized in T.C.'s treatment plan.  Rutland billed American Transit for this testing, which was medically unnecessary.

276.    On March 13, 2018 and May 7, 2018, Rutland purportedly conducted on T.C. outcome assessment testing.  The results of these tests were not utilized in T.C.'s treatment plan. Rutland billed American Transit for this testing, which was medically unnecessary.

277.    Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a licensed physician, Rutland and Nexray's bills for T.C. are false and are not compensable under New York's No-Fault laws.

### g.    Patient D.L. (claim no. 1043632-03)

278.    Patient D.L. was allegedly involved in a motor vehicle accident on November 7, 2018.  D.L. did not go to the hospital.

279.    Rutland evaluated D.L. the next day and noted that D.L. had a "total" impairment and referred D.L. to a psychotherapist, chiropractor, and an acupuncturist.  Rutland also referred

D.L. for MRIs of this brain cervical spine, lumbar spine, and left knee even though there was no need for early diagnostic testing.

280.    On November 8, 2018, Rutland purportedly provided to D.L. physical therapy and chiropractic treatment.  Rutland billed American Transit for this treatment, which was medically unnecessary.

281.    On or about November 8, 2018, Weiner performed MRIs of D.L.'s cervical spine, lumbar spine, brain, left shoulder, and left knee and took x-rays of D.L.'s cervical spine and lumbar spine.  Nexray billed American Transit for this imaging, which was medically unnecessary.

282.    On November 15, 2018 and December 21, 2018, Rutland purportedly performed MMT (neck extension, trunk extension, shoulder extension, and knee extension).  The results of these services were never utilized in the treatment plan for D.L.  Rutland billed American Transit for these services, which were medically unnecessary.

283.    On November 19, 2018, Rutland purportedly performed on D.L. performance testing.  The results of these tests were never utilized in the treatment plan for D.L.  Rutland billed American Transit for this testing, which was medically unnecessary.

284.    On December 12, 2018, Rutland purportedly performed on D.L. outcome assessment testing.  The results of these tests were never utilized in the treatment plan for D.L.  Rutland billed American Transit for this testing, which was medically unnecessary.

285.    On December 6, 2018, December 7, 2018, December 12, 2018, December 13, 2018, December 14, 2018, and December 17, 2018, Rutland purportedly provided to D.L. chiropractic treatment.   Rutland billed American Transit for this testing, which was medically unnecessary.

286.    Moy referred D.L. to Nexray for brain and shoulder MRIs, even though there was no indication that MRIs were necessary for D.L.'s treatment.

287.   On December 21, 2018, Weiner purportedly performed MRIs of D.L.'s brain and left shoulder.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

288.   Moy referred D.L. for cervical spine and lumbar spine MRIs despite the lack of any indication that MRIs were necessary for D.L.'s treatment.

289.   On January 4, 2019, Weiner purportedly performed MRIs of D.L.'s cervical spine and lumbar spine.  The documented indication for these MRIs was "[p]ain status post injury" but Weiner did not indicate the location of the alleged pain.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

290.   On January 14, 2019, Rutland purportedly performed on D.L. ROM testing (right/left knee, cervical spine, lumbar spine, and shoulder extension).  The results of these tests were not utilized in the treatment plan for D.L.  Rutland billed American Transit for these services, which were medically unnecessary.

291.   On January 4, 2019, Weiner purportedly took x-rays of D.L.'s cervical spine and lumbar spine.  The documented indication of these two x-rays was "[p]ain status post injury" but Weiner did not indicate the location of the alleged pain.  These x-rays were unnecessary as there was no indication that D.L. had a fracture.  Nexray billed American Transit for these x-rays, which were medically unnecessary.

292.   On January 9, 2019, Moy purportedly performed needle electromyography, nerve conduction studies (upper and lower extremities), and an H-reflex study on D.L.  The results of these tests were not utilized in D.L.'s treatment plan. Rutland billed American Transit for these tests, which were medically unnecessary.

293.   Moy referred D.L. to Nexray for an MRI of his left knee.  On February 22, 2019, Weiner purportedly performed an MRI of D.L.'s left knee.   Nexray billed American Transit for this MRI, which was medically unnecessary.

294.    Rutland submitted at least 42 bills to American Transit for its purported treatment of D.L. and Nexray submitted seven bills.

295.    Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a licensed physician, Rutland and Nexray's bills for D.L are false and are not compensable under New York's No-Fault laws.

### h.    Patient A.W. (claim no. 10717041)

296.    Patient A.W. was allegedly involved in a motor vehicle accident on October 29, 2019.

297.    Moy evaluated A.W. the next day.  Moy noted that A.W. had a "total" disability and that she was "not fit for duty."

298.    Moy referred A.W. to a psychotherapist, chiropractor, and acupuncturist and for MRIs of her cervical spine, thoracic spine, lumbar spine, and the left shoulder.

299.    On October 31, 2019, Rutland purportedly conducted on A.W. MMT (neck extension, trunk extension, and shoulder extension).  Rutland billed American Transit for these services, which were medically unnecessary.

300.    On November 5, 2019, Rutland purportedly conducted on A.W. performance testing.  Rutland billed American Transit for these services, which were medically unnecessary.

301.    On November 12, 2019, Rutland purportedly conducted on A.W. ROM testing (cervical spine, lumbar spine, and shoulder extension).  The results of these tests were never utilized in the treatment plan for A.W.  Rutland billed American Transit for these services, which were medically unnecessary.

302.    On November 20, 2019, after Moy referred A.W. to Nexray for MRIs, Nexray purportedly performed MRIs on A.W. of the cervical and lumbar spine. Weiner documented the

indication as "pain status post injury," but Weiner did not indicate the location of the pain. Nexray falsely recorded that there was "straightening of the physiologic lordosis consistent with pain and/or spasm." Nexray also falsely recorded that A.W. had disc herniation. Nexray billed American Transit for these MRIs, which were medically unnecessary.

303. On November 27, 2019, Nexray purportedly performed an MRI on A.W.'s left shoulder. The documented indication was "pain status post injury" but Weiner did not indicate the location of the pain. Nexray billed American Transit for this MRI, which was medically unnecessary.

304. On November 27, 2019, Nexray purportedly performed on A.W. x-rays of the cervical and lumbar spine. The documented indication was "pain status post injury" but Weiner did not indicate the location of the pain. Weiner documented that there was "foraminal narrowing L5-S1" and noted that this "correlate[d] clinically and neurologically and consider MRI as appropriate." Nexray billed American Transit for these x-rays, which were medically unnecessary.

305. On December 2, 2019, Rutland purportedly performed on A.W. outcome assessment testing. Rutland billed American Transit for this testing, which was medically unnecessary.

306. On December 4, 2019, Rutland purportedly performed on A.W. needle electromyography and nerve conduction studies. Rutland billed American Transit for this testing, which was medically unnecessary.

307. On December 6, 2019, Rutland purportedly performed on A.W. performance testing. Rutland billed American Transit for this testing, which was medically unnecessary.

308. On December 11, 2019, Rutland purportedly performed on A.W. outcome assessment testing. Rutland billed American Transit for this testing, which was medically unnecessary.

309.    On December 26, 2019, Rutland purportedly performed on A.W. ROM testing (cervical and lumbar spine and shoulder extension).  The results of these tests were never utilized in the treatment plan for A.W.  Rutland billed American Transit for this testing, which was medically unnecessary.

310.    Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a licensed physician, Rutland and Nexray's bills for A.W. are false and are not compensable under New York's No-Fault laws.

### i.    Patient R.S. (claim no. 1087141)

311.    Patient R.S. was allegedly involved in a motor vehicle accident on August 19, 2020.

312.    The same day, R.S. was taken to the hospital where she received a CT scan of her head.

313.    On August 27, 2020, Rutland evaluated R.S. and referred her to Nexray for MRIs of her cervical spine, lumbar spine, left shoulder, right shoulder, and left knee.

314.    On August 27, 2020, August 28, 2020, September 1, 2020, September 3, 2020, September 4, 2020, September 9, 2020, and September 10, 2020, Rutland provided unnecessary physical therapy treatment to R.S., including at least seven therapeutic massages and seven electrical stimulation sessions.  Rutland billed American Transit for these treatments, all of which were medically unnecessary.

315.    On September 3, 2020, Rutland purportedly conducted MMT (neck extension, trunk extension, shoulder extension, and knee extension) on R.S.  The results of these tests were never utilized in the treatment plan for R.S.  Rutland billed American Transit for this testing, which was medically unnecessary.

316.     On September 24, 2020, Rutland purportedly conducted ROM testing (right/left knee, cervical spine, lumbar spine, and shoulder extension) on R.S.  The results of these tests were never utilized in the treatment plan for R.S.  Rutland billed American Transit for this testing, which was medically unnecessary.

317.     On September 17, 2020, Rutland purportedly conducted performance testing on R.S.  The results of these tests were never utilized in the treatment plan for R.S.  Rutland billed American Transit for this testing, which was medically unnecessary.

318.     Rutland referred R.S. to Nexray for cervical spine, lumbar spine, and right shoulder MRIs.  On September 30, 2020, Weiner performed MRIs of R.S.'s cervical spine, lumbar spine, and right shoulder.  The documented indication was "[p]ain status post injury," but Weiner did not indicate the location of the alleged pain.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

319.     Rutland also referred R.S. to Nexray for an MRI of her right knee.  On October 5, 2020, Weiner performed an MRI of R.S.'s right knee.  The documented indication again was "[p]ain status post injury," but Weiner did not indicate the location of the alleged pain.  Nexray billed American Transit this MRI, which was medically unnecessary.

320.     On October 14, 2020, Moy conducted needle electromyography (upper and lower extremities) and motor and sensory nerve conduction on R.S.  The results of these tests were not utilized in R.S.'s treatment plan.  Rutland billed American Transit for these tests, which were medically unnecessary.

321.     Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a licensed physician, Rutland and Nexray's bills for R.S. are false and are not compensable under New York's No-Fault laws.

#### j.       Patient I.V. (claim no. 1084559)

322.     Patient I.V. was allegedly involved in a motor vehicle accident on May 23, 2020.

323.     I.V. was taken to the hospital where she had an MRI and x-ray of her left knee.  She was released the same day.

324.     Rutland evaluated I.V. on June 11, 2020 and referred I.V. to Nexray for MRIs of her lumbar spine and left knee.

325.     On June 11, 2020 and on June 16, 2020, June 17, 2020, June 24, 2020, and June 25, 2020, Rutland also purportedly provided I.V. with physical therapy treatment, which included five therapeutic massages and five electrical stimulation sessions.  Rutland billed American Transit for these services, which were medically unnecessary.

326.     On June 17, 2020, June 24, 2020, and June 25, 2020, Rutland purportedly provided I.V. with chiropractic treatment.  There is no indication these treatments were necessary for I.V.'s treatment plan.  Rutland billed American Transit for these treatments, which were medically unnecessary.

327.     Pursuant to Rutland's referral, on June 23, 2020, Nexray purportedly performed on I.V. a lumbar spine MRI.  The documented indication for the MRI was "[p]ain status post injury" but Nexray did not indicate the location of the alleged pain.  Nexray billed American Transit for this MRI, which was medically unnecessary.

328.     The same day, Weiner purportedly performed on I.V. an MRI of the left knee.  The documented indication for this MRI was "[p]ain status post injury" but Weiner did not indicate the location of the pain.  Nexray billed American Transit for this MRI, which was medically unnecessary.

329.     On June 25, 2020 and August 27, 2020, Rutland purportedly performed on I.V. MMT (neck, trunk extension, shoulder extension, and knee extension).  The results of the MMT

were not used in I.V.'s treatment plan.  Rutland billed American Transit for this testing, which was medically unnecessary.

330.    On July 8, 2020, Rutland purportedly performed on I.V. ROM testing (right/left knee, cervical spine, and shoulder extension).  The results of the ROM were not used in I.V.'s treatment plan.   Rutland billed American Transit for this testing, which was medically unnecessary.

331.    On July 16, 2020 and September 10, 2020, Rutland purportedly performed on I.V. performance testing.  The results of the performance testing were not used in I.V.'s treatment plan. Rutland billed American Transit for this testing, which was medically unnecessary.

332.    On June 29, 2020, July 1, 2020, July 8, 2020, July 9, 2020, July 13, 2020, July 14, 2020, July 16, 2020, August 5, 2020, August 10, 2020, August 11, 2020, August 13, 2020, August 17, 2020, September 1, 2020, September 2, 2020, September 3, 2020, September 8, 2020, September 10, 2020, September 11, 2020, October 2, 2020, October 6, 2020, October 7, 2020, October 8, 2020, October 14, 2020, October 15, 2020, October 17, 2020, November 4, 2020, November 5, 2020, November 6, 2020, November 11, 2020, November 12, 2020, and November 13, 2020, Rutland purportedly performed chiropractic treatment on I.V.  Rutland billed American Transit for these treatments, which were medically unnecessary.

333.    On July 29, 2020, Rutland purportedly performed on I.V. needle electromyography, nerve conduction studies, and an H-Reflex study.  The results of these tests were never used by Rutland or any other medical provider in the treatment plan for I.V.  Rutland billed American Transit for these tests, which were medically unnecessary.

334.    On September 3, 2020, Rutland purportedly conducted on I.V. ROM testing (right/left knee and lumbar spine).  Rutland billed American Transit for this testing, which was medically unnecessary.

335.     On September 17, 2020, Rutland purportedly conducted on I.V. MMT (ankle, neck extension, trunk extension, and knee extension).  Rutland billed American Transit for this testing, which was medically unnecessary.

336.     On September 30, 2020, Rutland purportedly conducted on I.V. outcome assessment testing.  Rutland billed American Transit for this testing, which was medically unnecessary.

337.     On October 2, 2020, Rutland purportedly conducted on I.V. MMT (trunk and knee). Rutland billed American Transit for this testing, which was medically unnecessary.

338.     Rutland also purportedly conducted numerous follow up evaluations.  Rutland billed American Transit for these evaluations, which were medically unnecessary

339.     Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a licensed physician, Rutland and Nexray's bills for I.V. are false and are not compensable under New York's No-Fault laws.

### k.     Patient L.J. (claim no. 1068535-02)

340.     Patient L.J. was allegedly involved in a motor vehicle accident on or around September 22, 2019.

341.     L.J. was a back seat passenger and wore a seatbelt.

342.     L.J. did not present to the emergency room after the alleged accident.

343.     Rutland billed American Transit for an examination of L.J. on October 2, 2019.

344.     Rutland also referred L.J. for MRIs of the cervical spine, lumbar spine, left shoulder, and right knee, which were medically unnecessary.

345.    Between October 2, 2019 and October 16, 2019, Rutland purportedly provided L.J. with physical therapy services and billed American Transit for them.  This therapy was medically unnecessary.

346.    Between October 3, 2019 and October 15, 2019, Rutland purportedly provided L.J. with chiropractic services.  These services were medically unnecessary.

347.    On October 4, 2019, Rutland purportedly provided performance testing on L.J. This testing was medically unnecessary and the results of this test were never used in L.J.'s treatment plan.

348.    On October 9, 2019, Rutland purportedly provided MMTs for L.J.   This test was medically unnecessary and the results of this test were never used in L.J.'s treatment plan.  Rutland billed American Transit for these services, which were medically unnecessary.

349.    On October 11, 2019, Nexray purportedly provided L.J. with MRIs of the left shoulder and right knee.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

350.    On October 15, 2019, Rutland purportedly performed ROM testing on L.J for the right/left knee, cervical and lumbar spine, and for shoulder extension.   Rutland billed American Transit for these services, which were medically unnecessary.

351.    On October 30, 2019, Rutland purportedly performed needle electromyography (lower and upper extremities), nerve conduction studies, and H reflex study (lower) on L.J. on October 30, 2019.   Rutland billed American transit for these tests, which were medically unnecessary.

352.    On November 5, 2019 and December 12, 2019, Rutland purportedly performed performance testing on L.J. Rutland billed American Transit for this testing,  which was medically unnecessary.  The results of these tests were never utilized in the treatment plan for L.J.

353.    On November 7, 2019, December 9, 2019, and January 20, 2020, Rutland purportedly performed outcome assessment testing on L.J.  Rutland billed American Transit for this testing, which was medically unnecessary.   The results of these tests were never utilized in the treatment plan for L.J.

354.    On November 12, 2019, December 24, 2019, and January 23, 2020, Rutland purportedly performed on L.J. ROM testing (right/left knee, cervical and lumbar spine, and shoulder extension).  Rutland billed American Transit for these services, which were medically unnecessary.

355.    On November 19, 2019 and December 18, 2019, Rutland purportedly performed on L.J. MMT (neck extension, trunk extension, shoulder extension, and knee extension).  Rutland billed American Transit for these services, which were medically unnecessary.

356.    Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a licensed physician, Rutland and Nexray's bills for L.J. are false and are not compensable under New York's No-Fault laws.

### l.    Patient G.R. (claim no. 1084692-02)

357.    Patient G.R. was allegedly involved in a motor vehicle accident on May 29, 2020.

358.    G.R. was a passenger and was taken to the hospital.  There is no indication in any medical record that G.R. had any fractures.

359.    The same day, May 29, 2020, Rutland evaluated G.R. and referred him to Nexray for MRIs of the brain, left shoulder, and right knee MRIs.  Rutland billed American Transit for a consultation with G.R.

360.     On June 15, 2020 and August 19, 2020, Rutland purportedly performed on G.R. MMT (neck extension, trunk extension, shoulder extension and knee extension).  Rutland billed American Transit for these tests, which were medically unnecessary.

361.     On June 23, 2020, Rutland purportedly performed on G.R. performance testing and ROM testing (right/left knee, cervical and lumbar spine, and shoulder extension).  Rutland billed American Transit for these tests, which were medically unnecessary.

362.     On August 24, 2020, Rutland purportedly performed ROM testing on G.R.  Rutland billed American Transit for this test, which was medically unnecessary.

363.     As a result of Rutland's referrals to Nexray, on June 29, 2020, July 27, 2020, and July 28, 2020, Nexray purportedly performed on G.R. MRIs of the left shoulder, right knee, and brain.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

364.     On August 26, 2020, Rutland purportedly conducted outcome assessment testing on G.R.   Nexray billed American Transit for this test, which was medically unnecessary.  The results of these tests were never utilized in the treatment plan for G.R.

365.     Moy referred G.R. to Nexray for additional MRIs.  On September 2, 2020, Nexray purportedly provided G.R. an MRI of the cervical spine and lumbar spine.  Nexray billed American Transit for this MRI, which was medically unnecessary.

366.     On October 7, 2020, Rutland purported performed on G.R needle electromyography (lower and upper extremities), motor and sensory nerve conduction, and neuromuscular junction studies.  Rutland billed American Transit for this test, which was medically unnecessary.

367.     On November 11, 2020, Rutland purportedly performed outcome assessment testing on G.R.  Rutland billed American Transit for this testing, which was medically unnecessary.

368.    Because the services billed to American Transit by Rutland were medical unnecessary, Rutland's bills for G.R. are false and are not compensable under New York's No-Fault laws.

      **m.    Patient E.J. (claim no. 680163-04)**

369.    Patient E.J. was allegedly involved in a motor vehicle accident on June 16, 2017 as a backseat passenger.  Following the accident, E.J. was taken to the hospital, where E.J. received C.T. Scans.

370.    On July 11, 2017, nearly a month later, Rutland purportedly conducted an initial examination on E.J.  Rutland billed American Transit for the initial examination.  Rutland also referred E.J. to Nexray for MRs of the cervical spine, lumbar spine, and left and right shoulder.

371.    On August 3, 2017, Rutland purportedly performed on E.J. MMT (trunk extension, neck extension, and shoulder extension).  Rutland billed American Transit for this testing, which was medically unnecessary.

372.    Per Rutland's referral, on August 16, 2017, Nexray purportedly performed MRI's on E.J. on the left and right shoulder.  The documented indication was "pain status post injury" but there was no indication of the location of the pain.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

373.    On August 17, 2017, Nexray purportedly performed MRIs on E.J. on the cervical spine and lumbar spine.  The documented indication was "pain status post injury" but there was no indication of the location of the pain.  Nexray billed American Transit for these MRIs, which were medically unnecessary.

374.    On August 17, 2017, Rutland purportedly performed outcome assessment testing on E.J.  The results of this tests was never utilized in the treatment plan for E.J.  Rutland billed American Transit for this testing, which was medically unnecessary.

375.     On August 24, 2017, Rutland purportedly performed on E.J. needle electromyography (upper and lower extremities), nerve conduction studies, and an H reflex study. Rutland billed American Transit for these studies, which were medically unnecessary.

376.     On November 2, 2017, Rutland purportedly performed on E.J. ROM testing (cervical spine and lumbar spine).  Rutland billed American Transit for this testing, which was medically unnecessary.

377.     On November 16, 2017 and March 6, 2018, purportedly performed on E.J. MMT (trunk extension, neck extension, and shoulder extension).  Rutland billed American Transit for this testing, which was medically unnecessary.

378.     On November 30, 2017 Rutland purportedly performed on E.J. performance testing.  Rutland billed American Transit for this testing, which was medically unnecessary.

379.     On December 7, 2017 and January 10, 2018, Rutland purportedly performed on E.J. outcome assessment testing.  The results of these tests were never utilized in the treatment plan for E.J.  Rutland billed American Transit for this testing, which was medically unnecessary.

380.     On December 12, 2017, Rutland purportedly performed on E.J. ROM testing (shoulder extension, cervical spine and lumbar spine).  Rutland billed American Transit for this testing, which was medically unnecessary.

381.     Because the services billed to American Transit by Rutland and Nexray were medical unnecessary, and presented by companies owned or controlled by a person who is not a licensed physician, Rutland and Nexray's bills for G.R. are false and are not compensable under New York's No-Fault laws.

### E.     American Transit's Justifiable Reliance

382.     Each bill submitted to American Transit by Rutland and Nexray was verified pursuant to Insurance Law § 403.

383.     Moy and Weiner, as duly licensed physicians, were legally and ethically obligated to act honestly and with integrity, and to act in accordance with all other aspects of their oath as licensed medical professionals.

384.     To induce American Transit to promptly pay Rutland's and Nexray's patient bills, the Defendants submitted (or caused to be submitted) to American Transit NF-3 forms certifying that Rutland and Nexray were eligible to be reimbursed under New York's No-Fault laws.

385.     To induce American Transit to promptly pay the fraudulent charges for the medical evaluations, diagnostic testing, diagnostic medical imaging, and/or other treatment purportedly provided to patients of Rutland and Nexray, the Defendants hired attorneys to pursue collection of the fraudulent charges from American Transit, including the prosecution and defense of claims.

386.     These attorneys have routinely filed and continue to file time-consuming and expensive lawsuits and arbitration matters against American Transit to collect a substantial part of the false claims alleged herein. As alleged in the indictment in the Criminal Action, Pierre selected attorneys to pursue the fraudulent Nexray and Rutland bills they had presented to insurance companies.

387.     American Transit is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to American Transit in support of the charges at issue (which have turned out to be fraudulent), combined with the material misrepresentations described above, were designed to and did cause American Transit to justifiably rely on them when determining to pay them.

388.     The Defendants concealed from American Transit the truth regarding Rutland and Nexray's reimbursement eligibility under New York law, purporting that such billed were eligible for payment when, in fact, they were not as the bills were presented by companies owned or controlled by a person who is not a licensed physician.

389.    In reliance on these misrepresentations, American Transit paid money to Rutland and Nexray to satisfy the bills Defendants presented to its detriment.

390.    American Transit would not have paid these monies had the Defendants provided true and accurate information about the Defendants' reimbursement eligibility under New York law, including the lack of necessity of the services provided.

391.    American Transit has paid in excess of $3,240,000.00 to Nexray, Rutland and others in reasonable reliance on the Defendants' false medical documentation and false representations contained therein regarding Rutland and Nexray's eligibility for reimbursement under New York's No-Fault laws.

**F.    Specific Allegations of Mail Fraud Racketeering Activity**

392.    Pierre, Moy, Weiner, and others working through and with Rutland and Nexray, created, prepared, and submitted (or caused to be created, prepared, and submitted) false medical documentation to American Transit and intentionally violated the laws of the United States by devising and intending to devise schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and in placing or causing to be placed, in a post office and/or authorized depository for mail matter, things to be sent and delivered by the United States Postal Service in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing, and attempting, such fraudulent schemes.

393.    Unless otherwise pled to the contrary, all documents, notes, reports, health insurance claim forms, medical diagnoses, CPT code tally sheets, referrals, letters, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

394.    Every automobile insurance claim detailed within involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, and insurance claim payments.

### i.        The Rutland RICO Enterprise

395.    Through the course of their operating, management and use of the Rutland enterprise, Pierre (through MRC) Moy and their agents either (a) personally used the U.S. Mail to further their fraudulent scheme by causing false medical bills and records from Rutland to be mailed to American Transit and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of Rutland's business by sending NF-3s to American Transit.

396.    At all relevant times, Pierre (through MRC) and Moy caused Rutland to certify falsely that it was eligible to be reimbursed under New York's No-Fault laws each time that Rutland mailed (or was caused to mail) a demand for payment (i.e., bill) to American Transit.

397.    Pierre's operation, management, and/or control of Rutland combined with his unlawful receipt of Rutland's fees and profits, rendered Rutland ineligible for No-Fault reimbursement under New York law.

398.    Because Pierre (a non-physician) unlawfully participated in the operation, management, and/or control of Rutland, Moy and Pierre purposely caused Rutland to make a material misrepresentation each and every time that Rutland mailed (or caused to mail) a document to American Transit claiming eligibility for reimbursement.

399.    Because (a) Pierre participated in the operation and control of Rutland, (b) Moy and Pierre purposely caused Rutland to seek No-Fault reimbursement from American Transit (even though Rutland was not lawfully entitled to such reimbursement), and (c) Rutland used the U.S. Mail to seek reimbursement, Moy and Pierre committed mail fraud.

400.    Rutland's provision of unnecessary medical services to patients also rendered it ineligible to receive payment from American Transit under New York law.

401.    At all relevant times, Moy, Pierre and their agents working with them, knew that Rutland, MRC, Rutland's billing companies, a patient, a claimant, an insurance carrier, patient's attorney, another medical provider, or American Transit would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Rutland.

402.    American Transit estimates that the unlawful operation of the Rutland enterprise generated thousands of mailings.

### ii.    The Nexray RICO Enterprise

403.    Through the course of their operating, management, and use of the Nexray enterprise, Pierre (through MRC), Weiner, and their agents either (a) personally used the U.S. Mail to further their fraudulent scheme by causing false medical bills and records from Nexray to be mailed to American Transit and/or counsel for the claimants, or (b) acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of Nexray's business by sending NF-3s to American Transit.

404.    At all relevant times, Pierre (through MRC) and Weiner caused Nexray to certify that it was eligible to be reimbursed under New York's No-Fault laws each time that Nexray mailed (or was caused to mail) a demand for payment (i.e., bill) to American Transit.

405.    Pierre's operation, management, and/or control of Nexray combined with his unlawful receipt of Nexray's fees and profits, rendered Nexray ineligible for No-Fault reimbursement under New York law.

406.    Because Pierre (a non-physician) unlawfully participated in the operation, management, and/or control of Nexray, Weiner and Pierre purposely caused Nexray to make a

misrepresentation each and every time that Nexray mailed (or caused to mail) a document to American Transit claiming eligibility for reimbursement.

407.    In *United States of America v. Anthony Rose, et al.*, No. 19-cr-00789-PGG (S.D.N.Y.) ("*United States v. Rose*") numerous individuals were indicted for paying bribes to 911 operators, medical personnel, New York Police Department officers, and others in exchange for information regarding motor vehicle accident victims, who could be contacted and steered to medical providers.  As alleged in the indictment and evidenced in the filings in that case, Anthony Rose ("Rose"), who ran the scheme, set up a fully staffed call center in order to contact the patients and to steer them to a network of medical clinics (and lawyers) in New York and New Jersey.

408.    Government affidavits unsealed years later in the case, include references to wiretaps detailing the massive scope of the patient referral scheme, and identify numerous layperson controllers, including Pierre, and fraudulent clinic locations.

409.    The wiretaps showed that Pierre was communicating with another layperson, Nathaniel Coles ("Coles") in 2016 about the possibility of setting up additional medical clinics. The affidavit refers to Pierre as a "known player in the medical- mill business." *United States v. Rose*, ECF 398-4, Exhibit A at 821-822 (Affidavit of New York State Police Investigator Paul Schneeloch ("Schneeloch"), dated December 8, 2016).

## COLES 3 TELEPHONE (917-567-0235)

*Clinics*

29. As discussed below, members of these medical mill operations are attempting to expand into the Buffalo, New York area; however, the Buffalo clinic may not be the only additional clinic that Coles is attempting to set up as it appears he may be trying to set up one in Linden Center (located in Jamaica, New York), with Bradley Pierre and Jean Pierre, and had been attempting to open another one on Merrick Blvd in Queens.[27]

Linden Clinic

30. On November 16, 2016, Coles received a call on the above-captioned Coles 3 phone (telephone

number 917-567-0235) from an unidentified male (believed to be Bradley Pierre) using telephone number 917-757-0755.[28]  The U/M asked Coles if he was going to be around "today." Coles told the U/M he would be "out that way" at 12. The U/M told Coles to go by the Linden Center around 12 pm.

31. At approximately 12:00 p.m., DFS Inv. Desroy Jeffrey observed Coles' Range Rover (plate D87GEP) parked in the parking lot at Soul Radiology, 135-25 79th Street, Queens, New York, (which is in the Linden Center Shopping Mall). At approximately 1:22 p.m., Coles and an unidentified black male (possibly Bradley Pierre) exited Soul Radiology and stood on the sidewalk in front of the office talking. After a couple of minutes they moved and continued their discussion next to Coles' Range Rover. At approximately 1:26 p.m., the U/M left Coles and went back inside Soul Radiology and about a minute later Coles left in his Range Rover heading westbound on Linden Blvd. At approximately 2:00 p.m., a furniture truck pulled up to Soul Radiology and two unidentified Hispanic males from the truck started to move boxes and furniture into the office. Approximately thirty minutes later, the unidentified black male who had been talking to Coles drove off in a 2015 Mercedes Benz with New York Registration GXJ3413, which is registered to Bradley Pierre of 2 Richmond Rd #3J, Lido Beach, New York. Additionally, another unidentified black male exited Soul Radiology and drove off in a 2016 BMW X5 leased to a Jean A Pierre of 175 West 48th Street, Apt. 1, Bayonne, New Jersey.

32. According to Inv. Jeffrey, and the photographs he took, it appears that a new clinic/office is opening at this location. It is unclear whether Soul Radiology is being set up to open/reopen, or if a separate clinic is being set up adjacent to Soul Radiology. It is also currently unclear

---

[28] Coles 3 Telephone, Reference # 1,271; Rose has also been in touch with this same U/M and calls him "Bradley" – see Rose Telephone, Reference # 3,132; Per NICB SA Tom McCourt, Bradley Pierre is a known player in the medical- mill business. He is involved in Rutland Medical and a billing office in Elmont, amongst other locations.

410.     On June 28, 2021, Coles pleaded guilty to one count of conspiracy to engage in a bribery scheme, and admitted to running an illegal medical clinic and engaging in unlawful referrals.

411.     The facts alleged showed that Pierre was also in personal contact with Rose.  *See id.* Exhibit A at 991.  Pierre paid Rose in exchange for Rose's referral of patients to Pierre's clinics.

> 95. As explained in prior affidavits, Rose continues to collect money from clinic managers for the referral of the leads who are converted into "willing participants" (clients).  As shown in call 8666 on December 9, 2016, a conversation between Rose and his partner (believed to be Jelani Wray), in which Rose asked Wray to tell Bradley, presumed to be Bradley Pierre (who is believed to be a manager of a medical-mill clinic located in Valley Stream, New York), to give Rose's checks (presumed to be a payment for the referral of clients to Bradley's clinic) to Wray as Wray was going to see Bradley that day.  On December 15, 2016, Rose spoke with Bradley, who advised that he (Bradley) "gave "JR (believed to be Jelani Wray) that paperwork yesterday," and, although they spoke in the interim between these calls and had not mentioned the checks in any of those calls, these "paperwork" could possibly refer to the checks Rose and Bradley discussed the prior week.[112]

(*Id.* at 991.)

412.     As the Government has made clear in the Criminal Action, the fraudulent clinic locations include Rutland and Nexray, and that Pierre was communicating with Weiner via text messages for years as well as other Nexray staff members.

413.     On January 16, 2024, Weiner pled guilty in the Criminal Action to one count of conspiracy to commit healthcare fraud and to defraud the United States, in violation of 18 U.S.C. § 371.  As set forth in the Superseding Information, Weiner, together with "others known and unknown, willfully and knowingly . . . did execute and attempt to execute a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of a health care benefit program in connection with the delivery of and payment for health care benefits, items and services."  (*Id.* ¶ 2.)

414.     The Superseding Information alleges that Weiner made "materially false statements during Examinations under Oath . . . regarding Bradley Pierre's role and involvement in Nexray Medical Imaging."  (*Id.* ¶ 4a.)

415.     Because (a) Pierre participated in the operation and control of Nexray, (b) Weiner and Pierre purposely caused Weiner to seek No-Fault reimbursement from American Transit (even though Nexray was not lawfully entitled to such reimbursement), and (c) Nexray used the U.S. Mail to seek reimbursement, Weiner, and Pierre committed mail fraud.

416.     Nexray's provision of unnecessary medical services to patients also rendered it ineligible to receive payment from American Transit under New York law.

417.     At all relevant times, Weiner and Pierre knew that Nexray, MRC, Nexray's billing companies, a patient, a claimant, an insurance carrier, patient's attorney, another medical provider, or American Transit would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon documentation mailed by Nexray.

418.     American Transit estimates that the unlawful operation of the Nexray enterprise generated thousands of mailings.

G. **Specific Allegations of Fraudulent Concealment and Representations Made to and Relied Upon by American Transit**

    i. **Fraudulent Concealment of Pierre's Control of the Rutland Enterprise**

419. Upon information and belief, Pierre and Moy agreed that Moy would register with the State of New York as Rutland's sole officer, director, and shareholder.

420. The documents created and filed with the State of New York forming Rutland and allowing it to do business deliberately omitted any reference to Pierre's involvement with or control over Moy or Rutland.

421. The documents created and filed with the State of New York related to Rutland did not indicate to American Transit or the general public that Pierre or his companies, including MRC, in any way maintained a controlling interest in Rutland.

422. Based on the representations contained in the documents filed with the State of New York on behalf of Rutland, American Transit—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Pierre's domination and control over Moy and Rutland, and Moy and the other Defendants' complicity in that domination and control.

423. Pierre, Moy and the other Defendants' purposeful concealment of Pierre's controlling interest in Rutland allowed Pierre to unlawfully control Rutland undetected.

424. At all relevant times during the operation of the Rutland enterprise, to induce American Transit to pay promptly charges for healthcare services billed by Rutland, Moy, and Pierre caused Rutland to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

425. Moy attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with the treatment and/or testing of Rutland patients.

426.     At all relevant times, Moy, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity.

427.     At all relevant times, Pierre and Moy actively concealed from American Transit facts regarding Rutland's true ownership and control to prevent American Transit from discovering that Rutland was unlawfully incorporated, owned, and controlled by non-physicians, and therefore ineligible to bill for or collect No-Fault benefits.

428.     These facts, including Pierre's involvement in the direction and control of the treatment and/or testing of Rutland's patients are not readily evident within the documents submitted to American Transit by these defendants and upon which American Transit in adjusting the claims and tendering payment in connection with each patient claim.

429.     Claims under New York's No-Fault laws can only be submitted, and reimbursed for treatment that was provided in accord with all applicable New York State licensing requirements.

430.     Thus, every time that Pierre and Moy caused Rutland to submit No-Fault reimbursement demands to American Transit, Pierre and Moy necessarily certified that Rutland was eligible to be reimbursed under New York's No-Fault laws.

431.     The full extent of Pierre's and Moy's fraudulent and unlawful acts relative to their control over the Rutland enterprise, including (a) Pierre's involvement in the direction and control of the treatment of Rutland's patients, (b) Pierre's participation in the operation and control of Rutland, and (c) the unlawful channeling of Rutland's professional proceeds to Pierre through phony arrangements that MRC maintained with Moy and Rutland, was not known to American Transit until shortly before it commenced this action.

ii.   **Fraudulent Concealment of Pierre's Unlawful Control of the Nexray Enterprise**

432.   Upon information and belief, Pierre and Weiner agreed that Weiner would register with the State of New York as Nexray's sole officer, director, and shareholder.

433.   The documents created and filed with the State of New York forming Nexray and allowing it to do business deliberately omitted any reference to Pierre's involvement with or control over Weiner or Nexray.

434.   The documents created and filed with the State of New York related to Nexray did not indicate to American Transit or the general public that Pierre or his companies, including MRC, in any way maintained a controlling interest in Nexray.

435.   Based on the representations contained in the documents filed with the State of New Yor on behalf of Nexray, American Transit—even acting with reasonable diligence—could not possibly have discovered the nature and extent of Pierre's domination and control over Weiner and Nexray and Weiner and the other Defendants' complicity in that domination and control.

436.   Pierre, Weiner, and the other Defendants' purposeful concealment of Pierre's controlling interest in Nexray allowed Pierre to unlawfully control Nexray undetected.

437.   At all relevant times during the operation of the Nexray enterprise, to induce American Transit to pay promptly charges for healthcare services billed by Nexray, Weiner and Pierre caused Rutland to falsely certify that it was, in all respects, eligible to be reimbursed under New York's No-Fault laws.

438.   Moy attested (or caused the attestation) to the medical necessity of the services that he (or persons under his direction and control) allegedly performed in connection with the treatment of Nexray patients.

439.     Pierre and Weiner also conspired to conceal the fact that Nexray was owned and controlled by Pierre in violation of New York law.

440.     At all relevant times, Weiner, as a duly licensed physician, was legally and ethically obligated to act honestly and with integrity.

441.     At all relevant times, Pierre and Weiner actively concealed from American Transit facts regarding Nexray's true ownership and control to prevent American Transit from discovering that Nexray was unlawfully incorporated, owned, and controlled by non-physicians, and therefore ineligible to bill for or collect No-Fault benefits.

442.     These facts, including Pierre's involvement in the direction and control of the treatment and/or testing of Nexray's patients are not readily evident within the documents submitted to American Transit by these defendants and upon which American Transit in adjusting the claims and tendering payment in connection with each patient claim.

443.     Claims under New York's No-Fault laws can only be submitted, and reimbursed for treatment that was provided in accord with all applicable New York State licensing requirements.

444.     Thus, every time that Pierre and Weiner caused Nexray to submit No-Fault reimbursement demands to American Transit, Pierre and Weiner necessarily certified that Nexray was eligible to be reimbursed under New York's No-Fault laws.

445.     The full extent of Pierre's and Weiner's fraudulent and unlawful acts relative to their control over the Nexray enterprise, including (a) Pierre's involvement in the direction and control of the treatment of Nexray's patients, (b) Pierre's participation in the operation and control of Nexray, and (c) the unlawful channeling of Nexray's professional proceeds to Pierre through phony arrangements that MRC maintained with Weiner and Nexray, was not known to American Transit until shortly before it commenced this action.

**H.    The Use of Counsel in the Scheme to Defraud**

446.    In order to perpetrate their fraudulent scheme on American Transit, Defendants worked in concert with attorneys registered to practice law in the State of New York to collect amounts they alleged were due and owing under bills they had presented to American Transit for payment.

447.    As alleged in the indictment in the Criminal Action, Pierre selected counsel to prosecute claims against insurance companies like American Transit to ensure they would be forced to pay the fraudulent bills.  Upon information and belief, Defendants well knew that given the high volume of claims that would be submitted, and the limited process in the no fault regime, they would be able to flood American Transit with invoices, threats of litigation and litigation to force it to pay.

448.    Therefore, to obtain payment from American Transit for Defendants' fraudulent charges for the medical evaluations, diagnostic testing, diagnostic medical imaging, and/or other treatment purportedly provided to patients of Rutland and Nexray, the Defendants hired attorneys to pursue collection of the fraudulent charges from American Transit, including the prosecution and defense of claims.  These attorneys routinely file time-consuming and expensive lawsuits and arbitration matters against American Transit.

449.    For example, the Law Office of Jason Tenenbaum, P.C., its principal, Jason Tenenbaum, an affiliated attorney, Roman Kravchenko, the Russel Friedman Law Group, LLP, among others (collectively, the "No-Fault Attorneys") appeared on behalf of Rutland and/or Nexray, to prosecute dozens of actions against American Transit.

450.    Many of these lawsuits involve the No-Fault Attorneys filing purported verifications on behalf of Rutland/Moy and Nexray/Weiner.  Even though Moy purportedly died

at sea more than a year ago,[1] certain No-Fault Attorneys have signed verifications on behalf of Rutland, which is questionable, as it does not account for how they could possibly obtain information about the cases from someone lost at sea. Indeed, when recently challenged on the issue Attorney Kravchenko admitted to bringing actions against American Transit on behalf of Rutland and Nexray without actually being engaged by them.

451. The No-Fault Attorneys have attempted to confirm master arbitration awards pursuant to CPLR § 7510 on behalf of Defendants, and to obtain judgments with full knowledge that American Transit has already paid all or part of the arbitration award and, therefore, that there was no basis for a judgment or to enforce the later-obtained judgment. Upon information and belief, the No-Fault Attorneys have pursued these claims solely to recover attorneys' fees against American Transit, ignoring American Transit's payments of judgments and refusing to provide it with partial satisfactions of judgment pursuant to CPLR § 5020(a).

452. Kravchenko has admitted in award enforcement litigation that he has no contact with the medical services providers themselves at all and only received the engagements through the attorneys handling the arbitrations. Attorney Kravchenko has also admitted in testimony in such litigation to fee splitting. Upon information and belief, the referring attorneys are working in concert with the No-Fault Attorneys to prosecute No-Fault claims on behalf of Defendants to obtain payment from American Transit for false and medically unnecessary services, procedures, and tests, and otherwise legally unenforceable claims.

453. In addition to obtaining recovery for Defendants' medically unnecessary procedures and services and fraudulent billing, the No-Fault Attorneys profit from the scheme by seeking fees well in excess of any reasonable amount for work performed in connection with the

---

[1] *See supra* ¶ 26; https://www.nytimes.com/2022/12/22/nyregion/marvin-moy-boat-missing.html.

CPLR § 7510 proceedings, even though they use substantially the same form filings in each case. New York courts have started to notice this scheme and have been drastically slashing their fees as inappropriate.

454.    Tenenbaum, Kravchenko and the Tenenbaum firm are also defendants in separate litigation brought by American Transit in New York Supreme Court, captioned *American Transit Insurance Company v. The Law Office of Jason Tenenbaum, P.C.*, (Index No. 619985/2023) (Sup. Ct. Nassau Cnty.).  They represented American Transit for years in hundreds of cases of No-Fault litigation, helped develop American Transit's litigation strategies, and are now using that confidential information to litigate No-Fault cases against American Transit in breach of their obligations to American Transit.

## I.    Damages

455.    The Defendants' pattern of fraudulent conduct injured American Transit in its business and property by reason of violations of federal and state law.  American Transit's injury includes, but is not limited to, compensatory damages for payments made to Rutland and Nexray.

456.    American Transit seeks compensatory damages for payments made to Rutland for false and fraudulent No-Fault claims in excess of $1,300,000.00, the exact amount to be determined at trial.  The chart annexed at Exhibit G sets forth representative examples of American Transit's payments to Rutland in connection with No-Fault claims determined to be fraudulent and non-compensable.

457.    American Transit seeks compensatory damages for payments made to Nexray for false and fraudulent No-Fault claims in excess of $1,000.000.00, the exact amount to be determined at trial.  The chart annexed at Exhibit H sets forth representative examples of American Transit's payments to Nexray in connection with No-Fault claims determined to be fraudulent and non-compensable.

458.   American Transit seeks compensatory damages made to others in reliance on Rutland, Nexray, Moy, and Weiner's representations that the Rutland and Nexray were owned or controlled by a person who is a licensed physician.

### FIRST CAUSE OF ACTION
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202**
**Against All Defendants)**

459.   American Transit incorporates each and every allegation set forth above as though fully set forth herein.

460.   There is an actual case and controversy between American Transit and Defendants regarding paid and unpaid billing for the services and treatment purportedly provided by Rutland, Nexray, Moy, and Weiner that Defendants have submitted to American Transit.

461.   Defendants had and have no right to receive payment from American Transit on the paid and unpaid billing because the services and treatment purportedly provided by Rutland, Nexray, Moy, and Weiner were not medically necessary and were provided—to the extent that they were provided at all—pursuant to pre-determined protocols that serve to financially enrich Defendants, rather than to treat or otherwise benefit their patients.

462.   Rutland and Nexray had and have no right to receive payment from American Transit on the paid and unpaid billing because they are not in fact owned or controlled by a licensed physician, but by Pierre and the unlicensed John Doe Defendants, and are thus ineligible for payment under New York law.

463.   Rutland and Nexray had and have no right to receive payment from American Transit on the paid and unpaid billing because the billing codes used for the services and treatment purportedly provided by Rutland, Nexray, Moy, and Weiner misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to American Transit.

464.    Defendants had and have no right to receive payment from American Transit on the paid and unpaid billing because the services and treatment provided by Rutland, Nexray, Moy, and Weiner were provided—to the extent that they were provided at all—pursuant to illegal kickback and self-referral arrangements amongst Defendants and others.

465.    Accordingly, American Transit is entitled to judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Defendants had and have no right to receive payment for bills submitted to American Transit.

**SECOND CAUSE OF ACTION**
**(Violation of RICO, 18 U.S.C. § 1962(c)**
**Against Rutland)**

466.    American Transit incorporates each and every allegation set forth above as though fully set forth herein.

467.    Rutland is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

468.    Pierre, Moy and others knowingly conducted and/or participated, directly or indirectly, in the conduct of Rutland's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than six years seeking payments that Rutland was not entitled to receive under New York No-Fault laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; and (v) the billed-

for-services were performed by a company that was not owned and controlled by a licensed physician, and was thus ineligible to receive payment under New York law.  Representative examples of the fraudulent charges and corresponding mailings submitted to American Transit that comprise, in part, the pattern of racketeering activity identified are set forth in the chart annexed hereto as Exhibit I.

469.    Rutland's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Pierre, Moy and others operated Rutland, insofar as Rutland is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Rutland to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does Pierre's continued attempt to collect on the fraudulent billing submitted through Rutland to the present day.

470.    Rutland is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to American Transit and other insurers. These inherently unlawful acts are taken by Rutland in pursuit of inherently unlawful goals— namely, the theft of money from American Transit and other insurers through fraudulent No-Fault billing.

471.    American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,640,000.00 because of the fraudulent bills submitted through Rutland.

472.    By reason of its injury, American Transit is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), against Rutland and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**(Violation of RICO, 18 U.S.C. § 1962(c)**
**Against Nexray)**

473. American Transit incorporates each and every allegation set forth above as though fully set forth herein.

474. Nexray is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

475. Pierre, Weiner, and others knowingly conducted and/or participated, directly or indirectly, in the conduct of Nexray's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for more than six years seeking payments that Rutland was not entitled to receive under New York No-Fault laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) the billed-for-services were performed pursuant to illegal kickback and referral schemes in violation of law; and (v) the billed-for-services were performed by a company that was not owned and controlled by a licensed physician, and was thus ineligible to receive payment under New York law. Representative examples of fraudulent charges and corresponding mailings submitted to American Transit that comprise, in part, the pattern of racketeering activity identified are set forth in the chart annexed hereto as Exhibit J.

476. Nexray's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the

regular way in which Pierre, Weiner, and others operated Nexray, insofar as Nexray is not engaged in a legitimate medical practice, and acts of mail fraud therefore are essential in order for Nexray to function.  Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Pierre continues to attempt to collect on the fraudulent billing submitted through Rutland to the present day.

477.    Nexray is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to American Transit and other insurers. These inherently unlawful acts are taken by Nexray in pursuit of inherently unlawful goals— namely, the theft of money from American Transit and other insurers through fraudulent No-Fault billing.

478.    American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 because of the fraudulent bills submitted through Nexray.

479.    By reason of its injury, American Transit is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), against Nexray and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
#### (Violation of RICO, 18 U.S.C. § 1962(d)
#### Against Pierre and Moy)

480.    American Transit incorporates each and every allegation set forth above as though fully set forth herein.

481.    Rutland is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

482.    Pierre and Moy are employed by or associated with the Rutland enterprise.

483.    Pierre and Moy knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Rutland's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for years seeking payments that Rutland was not eligible to receive under the New York No-Fault laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Rutland obtained its patients through the Defendants' illegal kickback scheme; and (v) the billed-for-services were performed by a company that was not owned and controlled by a licensed physician, and was thus ineligible to receive payment under New York law. Representative examples of fraudulent bills and corresponding mailings submitted to American Transit that comprise the pattern of racketeering activity identified are set forth in the chart annexed hereto as Exhibit I.

484.    Pierre and Moy knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud American Transit and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to American Transit.

485.    American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,640,000.00 because of the fraudulent bills submitted through Rutland.

486.    By reason of its injury, American Transit is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), Pierre, Moy, and Weiner and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**(Violation of RICO, 18 U.S.C. § 1962(d)**
**Against Pierre and Weiner)**

487.    American Transit incorporates each and every allegation set forth above as though fully set forth herein.

488.    Nexray is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

489.    Pierre and Weiner are employed by or associated with the Rutland enterprise.

490.    Pierre and Weiner knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Nexray's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for years seeking payments that Nexray was not eligible to receive under the New York No-Fault laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (iv) Rutland obtained its patients through the Defendants' illegal kickback scheme; and (v) the billed-for-services were performed by a company that was not owned and controlled by a licensed physician, and was thus ineligible to receive payment under New York law. Representative examples of fraudulent bills and corresponding mailings submitted to American Transit that comprise the pattern of racketeering activity identified are set forth in the chart annexed hereto as Exhibit J.

491.    Pierre and Weiner knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud American Transit and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to American Transit.

492.    American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,000.00 because of the fraudulent bills submitted through Nexray.

493.    By reason of its injury, American Transit is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), Pierre and Weiner and any other relief the Court deems just and proper.

**SIXTH CAUSE OF ACTION**
**(Violation of RICO, 18 U.S.C. § 1962(c)**
**Against Defendants)**
**(Association In Fact Enterprise)**

494.    American Transit incorporates each and every allegation set forth above as though fully set forth herein.

495.    At all times relevant to this complaint, Defendants Pierre, Moy, Weiner, Rutland, Nexray and the John Doe Defendants constituted a separate associated in fact enterprise within the meaning of 18 U.S.C. § 1961(4), which engaged in, and the activities of which affect interstate commerce (the "Associated In Fact Enterprise").  Such enterprise was formed with the common purpose of engaging in fraudulent activities, including but not limited to using the No-Fault system in New York State as a tool for committed improper acts against American Transit to enrich the enterprise.

496.    At all times relevant to this Complaint, such Defendants were "persons" associated with an enterprise within the meaning of 18 U.S.C. §§ 1961(3) and 1965(c), with an existence separate and apart from the Associated In Fact Enterprise.

497.     The Defendants conducted or participated, directly or indirectly, in the conduct of the Associated In Fact Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).  Pierre is an architect of a scheme involving paying bribes to 911 operators, hospital employees, among others, in exchange for the referral of automobile accident victims to Rutland, a No-Fault medical mill in New York.   Rutland, in turn, referred patients to Nexray, an MRI and x-ray provider, for unnecessary diagnostic imaging.  On paper, Moy is the owner of Rutland and Weiner the owner of Nexray, and in that capacity, Moy and Weiner enabled Rutland and Nexray to regularly recommend unnecessary procedures so that they could bill for inflated charges to maximize billing even though those procedures were not necessary and could have harmed patients.  The alleged acts herein constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961, to wit, in violation of 18 U.S.C. §§ 1341 and 1343:

a.  Such Defendants devised and executed a scheme and artifice to defraud American Transit of its money and property by means of false and fraudulent pretenses, representations, and promises and by concealment of material facts regarding the health care claims for payment;

b.  Pursuant to this scheme, such Defendants submitted to American Transit false and fraudulent claims and information in that such Defendants concealed that the Nexray was not eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme.

c.  Pursuant to this scheme, such Defendants submitted to American Transit false and fraudulent claims and information in that such Defendants concealed that Rutland was not eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme.

d.  Pursuant to this scheme, such Defendants submitted to American Transit false and fraudulent claims and information in that such Defendants concealed that Nexray was not eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme.

e.  Pursuant to this scheme, such Defendants submitted to American Transit false and fraudulent claims and information in that such Defendants concealed that Nexray

and Rutland's representations that the billed-for services were medically necessary were false, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to fraudulent scheme to profit off the No-Fault system and particularly American Transit.  These fraudulent and medically unnecessary services included, but were not limited to, improper and medically unnecessary medical examinations and consultations, provision of medically unnecessary chiropractic services, and electrodiagnostic testing.

    f.    Pursuant to this scheme, such Defendants submitted to American Transit false and fraudulent claims and information in that such Defendants concealed that Nexray and Rutland's representation that the billed-for services were properly billed in accordance with the Fee Schedule were false, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to American Transit.

    g.    Pursuant to this scheme, such Defendants submitted to American Transit false and fraudulent claims and information in that such Defendants concealed that Nexray and Rutland were not eligible to receive payments from American Transit in that they were not owned or controlled by a licensed physician.

    h.    For the purpose of executing this scheme and artifice to defraud, such Defendants submitted such false and fraudulent claims and information to American Transit by use of the mail and interstate wire facilities and caused American Transit to make payments for said fraudulent claims by use of the mail and interstate wire facilities.

498.    The Defendants have engaged in this scheme from 2009 and up to the present and continuing if the Court does not provide relief, the fraudulent enterprise will continue to seek and submit and collect fraudulent claims.  Every singly claim submitted by Defendants associated with this enterprise has been fraudulent.

499.    A list of the various mailings constituting a substantial number of the requisite predicate acts is annexed hereto as Exhibit I and Exhibit J.

500.    The Associated In Fact Enterprise is distinct from, and has an existence beyond, the pattern of racketeering that is described herein, namely by recruiting, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a variety of administrative and professional functions beyond the acts of mail fraud (i.e. the submission of the fraudulent bills to American Transit), by providing benefits for the staff

of the enterprise, by creating and maintaining files and other records and by negotiating and executing various facility lease agreements.

501.    By reason of its injury, American Transit is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) in an amount no land any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**(New York Public Health Law § 238-a**
**Against All Defendants)**

502.    American Transit incorporates each and every allegation set forth above as though fully set forth herein.

503.    Section 238-a of the New York Public Health Law provides, in relevant part:

> Prohibition of financial arrangements and referrals. 1. (a) A practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.

> (b) A health care provider or a referring practitioner may not present or cause to be presented to any individual or third party payor or other entity a claim, bill, or other demand for payment for clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services furnished pursuant to a referral prohibited by this subdivision.

> 7. If a referring practitioner or a health care provider furnishing clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services or any other person or entity collects any amounts that were billed in violation of this section, such referring practitioner and health care provider and other person or entity shall be jointly and severally liable to the payor for any amounts so collected.

504.    Moy and Weiner are practitioners as that term is defined under Section 238(1l) of the New York Public Health Law.

505.    Moy and Weiner regularly made referrals to entities they had financial relationships with including referrals for physical therapy services and x-ray or imaging services.

506.    Rutland and Nexray are each "health care providers" as that term is defined under Section 238(6) of the New York Public Health Law.

507.    Moy and Weiner had a "financial relationship" with Rutland and Nexray as that term is defined under Section 238(3) of the New York Public Health Law.

508.    The referrals by Moy and Weiner violate Section 238-a(9) of the New York Public Health Law which prohibits arrangements or schemes which a practitioner or health care provider knows or should know has a principal purpose of assuring referrals to a particular health care provider which, if the practitioner directly made referrals to such health care provider, would be in violation of Section 238-a(l) of the Public Health Law.

509.    American Transit has made payments to Rutland and Nexray in an amount to be determined at trial, for services billed in violation of Section 238-a of the Public Health Law and, pursuant to Section 238-a(7) of the Public Health Law, are entitled to recover such amounts from Rutland, Nexray, Moy, and Weiner who, as health care providers and practitioners are jointly and severally liable to such plaintiffs for the amounts they received in violation of New York Public Health Law§ 238-a.

510.    Plaintiffs are also entitled to an order and judgment against all Defendants declaring all amounts billed as violative of New York Public Health Law§ 238-a and not eligible for payment.

### EIGHTH CAUSE OF ACTION
**(Common Law Fraud**
**Against Rutland, Pierre, and Moy)**

511.    American Transit incorporates each and every allegation set forth above as though fully set forth herein.

512.     Rutland, Pierre, and Moy intentionally and knowingly made false and fraudulent statements of material fact to American Transit and concealed material facts from American Transit in the course of their submission of fraudulent bills seeking payment for the services and treatments provided by Rutland and Moy.

513.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Rutland was properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to a fraudulent scheme to profit off the No-Fault system and particularly American Transit; (iii) in every claim, the representation that the billed-for services were properly billed, when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in order to inflate the charges submitted to American Transit; and (iv) in every claim, the representation that Rutland was owned or controlled by a licensed physician and was eligible to receive payment under New York law.

514.     Rutland, Pierre, and Moy intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce American Transit to pay charges submitted through Rutland that were not compensable under the New York No-Fault laws.

515.     American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,640,000.00 because of the fraudulent bills submitted through Rutland.

516.     Rutland, Pierre, and Moy's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles American Transit to recover punitive damages.

517.     American Transit is entitled to compensatory and punitive damages, together with interests and costs, against Rutland, Pierre, and Moy and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### (Common Law Fraud
### Against Nexray, Pierre, and Weiner)

518.     American Transit incorporates each and every allegation set forth above as though fully set forth herein.

519.     Nexray, Pierre, and Weiner intentionally and knowingly made false and fraudulent statements of material fact to American Transit and concealed material facts from American Transit in the course of their submission of fraudulent bills seeking payment for the services and treatments provided by Nexray and Weiner.

520.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Nexray was properly licensed, and therefore, eligible to receive No-Fault benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was not properly licensed in that it obtained patients through an illegal kickback scheme; (ii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary and were performed and billed pursuant to fraudulent scheme to profit off the No-Fault system and particularly American Transit; (iii) in every claim, the representation that the billed-for services were properly billed when in fact the billing codes used for the billed-for services misrepresented and exaggerated the level and type of services that purportedly were provided in

order to inflate the charges submitted to American Transit.; and (iv) in every claim, the representation that Nexray was owned or controlled by a licensed physician and was eligible to receive payment under New York law.

521.    Nexray, Pierre, and Weiner intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce American Transit to pay charges submitted through Nexray that were not compensable under the New York No-Fault laws.

522.    American Transit has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,600,00.00 pursuant to the fraudulent bills submitted through Nexray.

523.    Nexray, Pierre, and Weiner's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles American Transit to recover punitive damages.

524.    American Transit is entitled to compensatory and punitive damages, together with interests and costs, Nexray, Pierre, and Weiner and any other relief the Court deems just and proper.

### TENTH CAUSE OF ACTION
**(Unjust Enrichment
Against All Defendants)**

525.    American Transit incorporates each and every allegation set forth above as though fully set forth herein.

526.    As set forth above, Rutland, Nexray, Pierre, Moy, and Weiner have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of American Transit.

527.    Based on Defendants' improper, unlawful, and/or unjust acts, all of which were concealed from American Transit, when American Transit received and then paid the bills,

including the charges submitted by or on behalf of Rutland and Nexray, it reasonably believed that it was legally obligated to make such payments.

528.     Defendants have been enriched at American Transit's expense by American Transit's payments, which constituted a benefit that Rutland and Nexray voluntarily accepted and distributed amongst themselves notwithstanding their improper, unlawful, and unjust billing scheme.

529.     Rutland and Nexray's retention of American Transit's payments violates fundamental principles of justice, equity, and good conscience.

530.     By reason of the above, Defendants have been unjustly enriched in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff American Transit Insurance Company respectfully requests that judgment enter in its favor as follows:

A.     On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Rutland and Nexray have no right to receive payment for any prior, pending or future bills they submitted or attempt to submit to American Transit, and an order that Defendants must disgorge all monies they received from American Transit in payment of these bills;

B.     On the Second Cause of Action against Rutland, for compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of $1,640,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against Nexray, for compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of $1,600,000.00, together

with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Pierre and Moy, for compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of $1,640,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against Pierre and Weiner, for compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of $1,600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.      On the Sixth Cause of Action against all Defendants for compensatory damages in favor of American Transit in an amount to be determined at trial but in excess of $3,240,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against all Defendants, a declaratory judgment declaring that American Transit has no obligation to pay pending or future No-Fault claims submitted to it by Rutland and Nexray, an order obligating Defendants to disgorge the monies American Transit paid to them in an amount no less than, and a money judgment in such amount.

H.      On the Eighth Cause of Action against Rutland, Pierre, and Moy, a money judgment in its favor and against such defendants for compensatory damages in an amount to be determined at trial but in excess of $1,640,000.00, together with punitive damages, costs, and interest;

I.      On the Ninth Cause of Action against Nexray, Pierre, and Weiner, a money judgment in its favor and against such defendants for compensatory damages in an amount to be

determined at trial but in excess of $1,600,000.00, together with punitive damages, costs, and interest;

  J.  On the Tenth Cause of Action against all Defendants, a money judgment in its favor and against such Defendants for compensatory damages in an amount to be determined at trial but in excess of $2,300,000.00, together with costs, and interest; and

  K.  Such other and further relief as the Court deems to be just and proper.

## JURY DEMAND

  American Transit hereby demands a jury trial on all issues so triable.

Dated: New York, New York
   January 17, 2024

         GREENBERG TRAURIG, LLP


       By: */s/ James W. Perkins*
         James W. Perkins
         Francis J. Serbaroli
         John C. Molluzzo, Jr.
         One Vanderbilt Avenue
         New York, New York 10017
         (212) 801-9200
         perkinsj@gtlaw.com
         serbarolif@gtlaw.com
         molluzzoj@gtlaw.com

         *Attorneys for American Transit*
         *Insurance Company*