# EXHIBIT 6

O63KPIES

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                         22 CR 19 (PGG)

5   BRADLEY PIERRE,

6                                         Sentence
                   Defendant.
7   ------------------------------x

8
                                         New York, N.Y.
9                                        June 3, 2024
                                         2:00 p.m.
10

11  Before:

12                   HON. PAUL G. GARDEPHE,

13                                         District Judge

14                       APPEARANCES

15  DAMIAN WILLIAMS
         United States Attorney for the
16       Southern District of New York
    MATHEW ANDREWS
17       Assistant United States Attorney

18  SERCARZ & RIOPELLE, LLP
         Attorneys for Defendant
19  BY:  ROLAND RIOPELLE

20

21

22

23

24

25

O63KPIES

1       (Case called)

2              THE DEPUTY CLERK:  Counsel for the government, please

3       state your appearance.

4              MR. ANDREWS:  Good afternoon, your Honor.

5       Mathew Andrews, for the government.

6              THE DEPUTY CLERK:  And, counsel for defendant, please

7       state your appearance.

8              MR. RIOPELLE:  Roland Riopelle, of Sercarz & Riopelle,

9       for the defendant.  Good afternoon, your Honor.

10             THE COURT:  Good afternoon.

11             This matter is on my calendar for purposes of

12      sentencing.

13             In preparation for sentencing, I have read the revised

14      presentence report, which is dated March 4, 2024.  I've read

15      the defendant's submission, dated May 28, 2024, including all

16      of the attached letters.  I've also read the government's

17      submission, dated May 29, 2024.

18             Mr. Riopelle, have you read the presentence report,

19      its recommendation, and discussed it with Mr. Pierre?

20             MR. RIOPELLE:  I have, your Honor.

21             THE COURT:  Mr. Pierre, have you read the presentence

22      report and its recommendation, and discussed it with

23      Mr. Riopelle?

24             THE DEFENDANT:  Yes, your Honor.

25             THE COURT:  Mr. Riopelle, do you have any objections

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O63KPIES

```
1    to the factual portions of the presentence report?

2              MR. RIOPELLE:  We do not, your Honor.  I remind the

3    Court that we agreed to a statement of facts, which is really

4    regurgitated in the presentence report, so we have no

5    objections.

6              THE COURT:  Mr. Andrews, does the government have any

7    objections to the factual portions of the presentence report?

8              MR. ANDREWS:  No, your Honor.

9              THE COURT:  I hereby adopt the findings of fact set

10   forth in the presentence report.

11             Although I'm not required to impose sentence in

12   accordance with the sentencing guidelines, I am required to

13   consider what the guidelines recommend.

14             Here, Mr. Pierre pled guilty to Counts Four and Seven

15   of the S3 indictment.  Count Four charges him with conspiracy

16   to commit Travel Act bribery.  Count Seven charges Mr. Pierre

17   with conspiracy to defraud the Internal Revenue Service.

18             For Count Four, the Travel Act bribery conspiracy, the

19   base offense level is 12.  Because the offense involved more

20   than one bribe, the offense level is increased by two levels.

21   Because the value of the bribe or the improper benefit

22   conferred was between 1.5 million and 3.5 million dollars, the

23   offense level is increased by 16.  Because Mr. Pierre was an

24   organizer or a leader of a criminal activity that involved five

25   or more participants or was otherwise extensive, the offense
```

O63KPIES

1    level is increased by four levels.

2            Mr. Pierre's offense level is reduced by three levels

3    for his acceptance of responsibility.

4            These calculations result in a total offense level for

5    Count Four of 31.

6            As to Count Seven, conspiracy to defraud the IRS, the

7    base offense level is 20 because the tax loss is greater than

8    $550,000, but less than $1.5 million.  The offense level is

9    increased by two levels because Mr. Pierre failed to report or

10   to correctly identify the source of income exceeding $10,000 in

11   any one year.  Because the offense involved sophisticated

12   means, the offense level is increased by two levels.  Because

13   Mr. Pierre was an organizer or a leader of a criminal activity

14   that involved five or more participants, or was otherwise

15   extensive, the offense level is increased by four levels.

16           Finally, as to Count Seven, the offense level is

17   decreased by three levels for acceptance of responsibility.

18           These calculations result in an offense level of 25

19   for Count Seven.

20           The probation department concluded that Counts Four

21   and Seven are grouped for purposes of the sentencing guidelines

22   because the offense level for these offenses are determined

23   largely on the basis of the total amount of harm or loss, and

24   because the offense conduct for these offenses was ongoing and

25   continuous in nature.

O63KPIES

1         Because Count Four has a higher offense level than

2    Count Seven, the offense level for Count Four governs here.

3         As I've said, the total offense level for Count Four

4    is level 31.

5         As to criminal history, Mr. Pierre has no criminal

6    history points.  Accordingly, he falls within Criminal History

7    Category I.

8         Offense level 31, at Criminal History Category I,

9    results in a guidelines range of 108 to 135 months'

10   imprisonment.  However, the statutory maximum sentence for

11   Counts Four and Seven is 120 months.

12        Accordingly, the applicable guidelines range for

13   Counts Four and Seven is 108 to 120 months' imprisonment.

14        Mr. Riopelle, do you have any objection to the

15   accuracy of the guidelines calculation as I have reported them?

16        MR. RIOPELLE:  No, your Honor.  We've stipulated to

17   that in the plea agreement.

18        THE COURT:  Does the government have any objections to

19   the accuracy of the guidelines calculations as I've reported

20   them?

21        MR. ANDREWS:  No, your Honor.

22        THE COURT:  Based on my independent evaluation of the

23   sentencing guidelines, I find that the offense level is 31; the

24   criminal history category is I; and the applicable guidelines

25   range is 108 to 120 months' imprisonment.

O63KPIES

1          Mr. Riopelle, I'll hear from you as to an appropriate

2     sentence.

3          MR. RIOPELLE:  Your Honor, I have proposed a sentence

4     of 72 months in the written submission I made, which was made

5     just as the Court was sentencing a couple of other persons

6     associated with the criminal conduct at issue in this case to

7     84 months.

8          In light of that, I don't think I can fairly ask the

9     Court to impose a sentence of less than 84 months.  I think

10    what I can do is ask the Court not to impose a sentence of much

11    more than that.  I think the probation recommendation of

12    96 months is entirely appropriate in this case.

13         Many, many, many years ago, I worked for a really

14    terrific old criminal defense lawyer who said to me, an

15    indictment represents about 2 percent of the client, let's

16    represent the other 98.  I do not defend the conduct here as

17    harmless or that the guidelines overstate them, but I do think

18    that this man, with children to support, very significant

19    financial obligations to try to meet in this case, I don't see

20    how sentencing him to 120 months instead of 96 months would --

21    or 84 months will make any difference to anyone other than to

22    him.  Keep in mind that whatever sentence the Court imposes

23    will be followed by at least three years of supervised release,

24    so this man is going to be either incarcerated or supervised by

25    the government for ten years or more.  The chances that he will

O63KPIES

1    get back into trouble are small, and the chances that he will

2    be able to do something to work on these financial penalties

3    are great if the Court imposes a sentence something like that

4    recommended by the probation department or even less.

5              I would like to update the Court and let it know that

6    Mr. Pierre has settled with one of the insurance companies that

7    is the victim of the fraud in this case.  He is in very active

8    discussions with another insurance company that was a victim of

9    the fraud in this case to settle with them.  Those settlements

10   do require payments out from Mr. Pierre, as well as an

11   agreement not to try to enforce any claims.  And, by the way,

12   the claims at issue in those settlements all predate the

13   indictment in this case.

14             So he is trying to work through -- he's got a myriad

15   of financial issues, obviously, that need to be dealt with.

16   He's trying to work through them.  He's doing his best to do

17   what he can to make good on his financial obligations to his

18   family, to the government, to the victims of the fraud.  He is

19   a person who, I think, understands he's going to suffer a very

20   serious sentence today.  He's willing to accept it.  But I

21   just think a sentence of greater than what the probation

22   department has recommended is unnecessarily harsh in the

23   context of this case.

24             I know, from speaking to lawyers who have been before

25   your Honor in similar cases or cases related to this case, that

O63KPIES

1    your Honor is concerned about issues of general deterrence.  I

2    can tell the Court, I am really old, and the first time I

3    handled a case like this one, that involved the Mallela theory

4    of liability and fraud and that kind of thing, was about

5    30 years ago, and I've handled a good half dozen over the years

6    since then.  Until now, they were all in state court.  The

7    leaders of those cases all got state time and went to the state

8    penitentiary for two to six years or more, sometimes three to

9    nine, and here we are.  I don't think that -- you know, it's a

10   sad fact about life, but I don't think that a harsher

11   sentence — 120 months versus 96 months or 84 months — is going

12   to make a difference in terms of general deterrence.  I just

13   don't believe that.

14           Again, I share with the Court my own experience as a

15   criminal defense lawyer for going on 40 years now.  There's

16   really only one sort of organization or criminal that worries

17   about sentences, and that's a professional criminal.  The only

18   criminals I've ever represented who were familiar with the

19   sentencing process and worried about sentences are members of

20   the Cosa Nostra, and I represented a professional burglar once

21   who explained to me that he never carried anything but a

22   screwdriver on a job because he knew a gun could get him more

23   time.  It didn't stop the burglar from burglaring, and the fact

24   that the Mafia forbade drug-dealing didn't stop drug-dealing

25   from happening, and it didn't stop the Mafia from being the

O63KPIES

1    Mafia.  The way that worked is one brother would go in the drug

2    business and the other would be a bookie and launder the funds

3    for his drug-dealing brother.  The bookie would be the made

4    man, and the drug dealer would be an associate.

5         Professional criminals know this stuff, they act

6    accordingly, but it doesn't stop the crimes from happening.  So

7    it is my personal view, based on long experience, that arguing

8    for general deterrence, once you get past a sentence of

9    five years, six years, seven years, it doesn't matter anymore.

10   That's a long sentence, that's a long time.  The man is

11   45 years old.  He's going to be either in jail or supervised by

12   the government for ten years or more now.  He's going to be 55

13   or 60 by the time he comes out from under the government's

14   supervision in one form or another.  I don't think it makes a

15   difference to the world, to the government, whether he does one

16   more year in jail or one less year in jail.  It makes an

17   enormous difference to him and his family and his ability to do

18   something about the enormous financial penalties the Court is

19   going to impose.

20        We were just signing the preliminary order of

21   forfeiture and the consent order of restitution.  It's

22   5 million bucks.  Big numbers.  He's doing his best to settle

23   with the insurance companies, get his financial house in order,

24   so that he can pay those or at least some part of them.  He is

25   doing what he can to make this better.  And, for that reason,

O63KPIES

1     your Honor, I just don't think that the 120 months that the

2     government argues for is really necessary in this case.

3             And I would note that we've submitted to the Court the

4     statistics that show that in a typical healthcare fraud case,

5     the sentences are around 30 months to 50 months. We've already

6     proposed a sentence way in excess of that, and I know we're

7     going to get a sentence today way in excess of the average.

8     That's probably appropriate, given that this man has admitted

9     he's a leader of a nonviolent criminal enterprise, that

10    committed what is significant fraud, but, again, it is not the

11    kind of fraud that is as damaging as like a Ponzi scheme or

12    something like what Sam Bankman-Fried did, stealing from

13    clients. It's not fraud that leaves people penniless and

14    without their life's savings and things like that. It's not a

15    good thing. I'm not here to explain away my client's conduct.

16    It was reprehensible, it was wrong, we admit that. He's taken

17    a guilty plea. But it is not the kind of fraud that is so

18    damaging as something like a Ponzi scheme is.

19            And that's another thing to consider here. That's why

20    typical healthcare frauds get a sentence of somewhere between

21    20 and 30 months, and that's why we've proposed a sentence

22    significantly in excess of that. That's why bribery cases

23    typically get a sentence in the 18-month, 24-month range. We

24    pled guilty to bribery. We didn't even plead guilty to

25    healthcare fraud. We've asked for a sentence of three, four

O63KPIES

1  times that.

2         So we understand that a very serious penalty has to be

3  paid here.  We're willing to accept it.  I would submit that

4  84 months or 96 months is plenty in a case like this, plenty.

5         I really don't have more to say on behalf of my

6  client, your Honor.  I simply want to remind the Court that

7  we've asked for a recommendation that the client be housed at

8  the satellite camp at the Lewisburg, Pennsylvania penitentiary,

9  that he be recommended for the RDAP program, because he does

10 have a drinking problem, and that no fine be imposed because he

11 has signed documents today agreeing to have judgments entered

12 against him in the amount of $5 million.  I don't think it's

13 realistic to expect him to pay a fine on top of that.  And

14 we've asked that the Court waive any interest on the $5 million

15 he's agreed to pay.

16        Other than that, your Honor, I'm here to answer any

17 questions you have, take any arrows you want to shoot at me,

18 and get on with the proceedings.

19        What can I do for you?  Sit down and shut up?  Okay.

20        Okay, I will.

21        THE COURT:  Mr. Pierre, is there anything you wish to

22 say before the Court imposes sentence?

23        THE DEFENDANT:  I would just like to apologize to the

24 Court for any actions that I may have engaged in, and that's

25 totally what I want to apologize for with respect to that.  And

O63KPIES

1  I want to apologize to you, your Honor, for wasting your time

2  on this matter.

3          Okay.  Thank you.

4          THE COURT:  Mr. Andrews?

5          MR. ANDREWS:  Briefly, Judge.

6          We spent an extensive amount of time on the sentencing

7  submission, so I'm not going to rehash all of it, but I do want

8  to push back on the idea that somehow general deterrence is

9  something that's just incapable of being sought or accomplished

10  in cases like this.

11          THE COURT:  Well, I think Mr. Riopelle's point is a

12  little different.  His point is, to meet the objective of

13  general deterrence, the ten-year sentence the government is

14  seeking is unnecessarily harsh.  His argument is that a

15  sentence of eight years or seven years or six years, those are

16  all long sentences, and his argument is that they would be

17  sufficient to accomplish the objective of general deterrence,

18  and to serve as appropriate punishment for Mr. Pierre's crime.

19          I guess the question to you is:  Why is ten years the

20  right number, as opposed to one of the numbers that

21  Mr. Riopelle just suggested?

22          MR. ANDREWS:  And to use language that your Honor has

23  used before, because of the unprecedented integrated nature of

24  this scheme.  Bradley Pierre is not some schmo off the street.

25  He was the leader of a scheme that lasted 13 years.  And it

O63KPIES

```
 1    wasn't just a single scheme — it wasn't a bribery scheme, it
 2    wasn't a healthcare fraud scheme — it was all of it.  It was a
 3    fully integrated scheme in which Bradley Pierre paid hundreds
 4    of thousands of dollars in bribes to send patients to medical
 5    clinics under his control with the understanding that these
 6    patients were having phony injuries rather than their MRIs so
 7    that they could get unnecessary treatments.  But then going one
 8    step beyond that, which was not even precedented in the
 9    Gulkarov case, he was sending these people to his wife's law
10    firm, where he was the, quote-unquote, general manager, and his
11    wife was making millions of dollars from this and paying him
12    millions of dollars.
13            So we have the bribery, we have the healthcare fraud
14    scheme, but now he's corrupting the law firms as well.  And
15    he's laundering this money out of these clinics, using these
16    phony arrangements, these phony loan arrangements, which are
17    incredibly sophisticated.  It's incredibly difficult for
18    insurance companies to be able to discover these types of
19    frauds.
20            And on top of that, he also tried to intimidate a
21    witness, as the Court is aware from the PSR, the statement of
22    admitted facts, and also from the government's submission.  If
23    he had been successful and was able to stop the witnesses
24    working at these clinics speaking to the government, we
25    wouldn't have a case.  And I distinctly remember this happening
```

O63KPIES

1    when we were talking to this witness, and this witness was

2    terrified because she didn't know what to do because she was

3    afraid she was going to lose her job.  The defendant had

4    repeatedly told her, don't speak to the Feds, don't speak to

5    the Feds, if you speak to the Feds, you're not going to be able

6    to come back to work.

7            So this isn't just a man who's the leader of a fully

8    integrated scheme.  This is a man who deliberately tried to

9    tamper with the government's investigation, tamper with a

10   witness who was a recipient of a grand jury subpoena.  And

11   that's not even getting to the complexity of the tax charges,

12   which involved a multiyear scheme, multiple different people, a

13   dirty accountant, multiple different shell companies, in order

14   to not pay taxes on millions and millions of dollars of illicit

15   activity.

16           So, you asked me what's the difference between a

17   five-year sentence and a six-year sentence or a

18   ten-year sentence, and the answer is that this case will be the

19   way the cases in the future are judged for the purposes of

20   sentencing.  Your Honor knows better than anybody that whatever

21   the sentence is in this case, defense counsel will use that in

22   future cases to say, well, judge, it's not as bad as

23   Bradley Pierre.  The answer is Bradley Pierre has engaged in

24   extraordinary conduct, and it needs to be made clear to other

25   people, future defendants, people who would engage in similar

O63KPIES

1    schemes as the defendant, that when you engage in these complex

2    integrated frauds, you will face significant time in jail.  And

3    that really is what distinguishes this case from the prior

4    cases that defense counsel was referencing.  Those were cases

5    that were brought in the state.  The defense counsel even said,

6    oh, the sentences were between three and five years or three

7    and six years or even up to nine years, but never as

8    significant as a case like this, with so many aggravating

9    factors in a case like this.

10         And I can say from speaking to cooperating witnesses,

11   that this prosecution actually has had significant impact on

12   this industry.  It used to be before that referral, a legal

13   referral, to a clinic, you'd pay $1,500 to $3,000, but because

14   of these types of prosecutions and the dangers that arise if

15   you're caught, it has pushed down the value of those legal

16   referrals because people know if they get caught, they will

17   face significant time and significant punishment.

18         But that's even putting -- that's only talking about

19   the seriousness of the offense and general deterrence.  You

20   also have to have a comparative analysis between this defendant

21   and the other defendants that your Honor has sentenced.  And

22   your Honor sentenced Roman Israilov — I believe it was last

23   week or the week before that — and our submission goes to great

24   lengths to distinguish how the defendant's conduct was, in

25   fact, much worse than Mr. Israilov's conduct.  I'm not going to

O63KPIES

1    go through every single point, because it's all set forth in

2    the submission, but you can't just take the defendant in

3    isolation, you also have to take him in the context with the

4    rest of the sentencings.

5            Unless your Honor has any other questions, we'll rest

6    on our submission.

7            THE COURT:  Mr. Riopelle?

8            MR. RIOPELLE:  I would like to respond briefly.

9            I will say that all this stuff about witness tampering

10   and all that is kind of sandbagging.  There's no mention of

11   that in the presentence report.  The government never sought an

12   upward adjustment for that in the plea agreement.  And they saw

13   fit to lay this out on the eve of sentencing.

14           I don't know why we didn't hear about it until now, if

15   it was so terrible, but it's not an adjustment in the Court's

16   own guidelines calculations, which track what's in the plea

17   agreement.  And my client, of course, has a different view, and

18   I think you can just set that to the side.  I don't think it

19   justifies 120-month sentence as opposed to 84 or 96 or some

20   other terribly long sentence.

21           THE COURT:  Well, are you disputing that this

22   happened?  The government's submission goes into some detail

23   about what was said.

24           MR. RIOPELLE:  I don't dispute it because I don't want

25   to have a hearing on it, your Honor.  I confess, I don't want

O63KPIES

1      to have a hearing on it.  I don't know how that would work out.

2      And because I've never spoken to the witness myself, and I want

3      to get the client through the process today, I would waive any

4      right to a hearing on that, but I do note that this is the

5      first time it's come up, after the case has been pending for

6      two years, and it was not included in the plea agreement --

7               THE COURT:  Well, but the problem, Mr. Riopelle, is

8      it's in the PSR.  The whole story is laid out at paragraph 53

9      of the PSR.

10              MR. RIOPELLE:  And it is not an adjustment to the

11     guidelines.

12              THE COURT:  Oh, well, you're right about that, it's

13     not an adjustment, but the whole story, which Mr. Andrews went

14     into in his sentencing submission, it's all laid out in the

15     PSR, at paragraph 53.  I mean the PSR, the final version, that

16     came out in March --

17              MR. RIOPELLE:  I withdraw that.

18              THE COURT:  -- but I'm sure there were earlier

19     versions long before March.

20              So it doesn't seem like sandbagging to me.

21              MR. ANDREWS:  And, Judge, I would just clarify for the

22     record, it was actually paragraph 9 of the statement of

23     agreed-upon facts from the plea agreement.  So the defendant

24     has agreed not to dispute any of those.

25              MR. RIOPELLE:  All right.  Well, I withdraw my

O63KPIES

1    objection to that, your Honor.  And I agree that tampering with

2    a witness is a valid reason to enhance a sentence, although it

3    is not included in the guidelines calculation in this case.

4            Other than that, I don't have -- I just don't see -- I

5    will say, I do not see what value a 120-month sentence has in

6    terms of deterrence.  I will remind the Court that in the

7    *Madoff* case, Bernie Madoff got a sentence of 150 years, and we

8    still see Ponzi schemes coming down the pike every other day.

9            I am sure that a severe sentence of 72 or 84 or

10   96 months in this case will send all the signal that needs to

11   be sent, particularly when it is combined with a $5 million

12   financial obligation.

13           So I just don't see any virtue in sentencing this

14   defendant to more than 96 months, as recommended by the

15   probation department, but I rely on the Court to see it my way,

16   I hope.

17           Thank you.

18           THE COURT:  In deciding upon an appropriate sentence,

19   I have considered all the factors listed in Title 18, United

20   States Code, Section 3553(a), including the nature and

21   circumstances of Mr. Pierre's offenses, his personal history

22   and characteristics, the need for the sentence imposed to

23   reflect the seriousness of the offense, the need to promote

24   respect for the law, to provide just punishment, and to afford

25   adequate deterrence, both general and specific.

O63KPIES

1          Beginning with the nature and circumstances of the

2     offenses:  Mr. Pierre played a leading role in what was a

3     massive, multilayered no-fault insurance fraud conspiracy that

4     continued for 13 years, and resulted in tens of millions of

5     dollars in fraudulent billings to insurance companies.

6          As I've recounted on prior occasions, the scheme began

7     with the bribing of hospital workers and NYPD 911 operators,

8     who had access to the confidential information of motor vehicle

9     accident victims.  The confidential information of the accident

10    victims was then provided to coconspirators who operated call

11    centers.  Using the accident victims' confidential information,

12    call center employees called the accident victims, pretending

13    to be New York State employees who were offering a service to

14    accident victims, helping them secure appropriate medical

15    treatment and legal representation.

16         The medical clinics and law firms recommended by the

17    call center employees were corrupt, however, and the medical

18    clinics were actually controlled by Mr. Pierre and other

19    nonphysicians.  The doctors at these clinics had surrendered

20    control over the clinics to Mr. Pierre.  It was, for example,

21    Mr. Pierre who received the majority of the clinics' proceeds

22    and decided how much the nominal physician owners would be

23    paid.  It was Mr. Pierre who possessed the clinic checkbooks

24    and presigned checks for the clinics' bank accounts.  It was

25    Mr. Pierre who controlled the debit and credit cards for the

O63KPIES

1    clinics and who made the hiring and firing decisions, and it

2    was Mr. Pierre who invested the initial funds to set up the

3    corrupt clinics.  It was him who decided where they would be

4    located.  It was Mr. Pierre who negotiated the rent for the

5    clinics' leases.  And it was Mr. Pierre who decided which

6    attorneys would represent the clinics in litigation.

7          Under New York law, however, it is unlawful for

8    clinics operated by nonphysicians to seek reimbursement from

9    insurance companies for the medical treatment they provide.

10   This law exists precisely because experience has shown that

11   clinics operated by nonphysicians are more commonly associated

12   with fraud.  This case bears out the legislature's concern.

13         The doctors at Mr. Pierre's clinics prescribed

14   unnecessary treatments and ordered unnecessary tests in order

15   to overbill the insurance companies.

16         Mr. Pierre also required the clinics to refer patients

17   to a network of pharmacies, attorneys, and medical specialists

18   that he chose.  These entities and individuals, all of whom

19   were handpicked by Mr. Pierre, paid him millions of dollars in

20   kickbacks.

21         Once the insurance companies paid on the claims,

22   Mr. Pierre had to devise ways to get the fraud proceeds out of

23   the corrupt medical clinics.  One device that Mr. Pierre used

24   to disguise his receipt of these funds was phony loan

25   agreements.  In these phony loan agreements, Mr. Pierre

1    purported to be making nonrecourse loans to the clinics, which

2    would be paid back only if insurance companies paid on the

3    clinics' claims.  But these agreements set Mr. Pierre's

4    so-called fee at the twice the amount of the loan to the

5    practices, and, in reality, Mr. Pierre took almost $10 million

6    more out of the clinics than he was authorized to receive under

7    the purported loan agreements.

8         But Mr. Pierre was not content with simply receiving

9    the fraud proceeds.  He wanted to keep the money and not pay

10   any taxes on it.

11        To accomplish that separate objective, he set up shell

12   companies, who provided phony services to the clinics and were

13   paid in checks that were invariably cashed at check-cashing

14   companies.

15        Mr. Pierre used the shell companies' cash for his

16   personal expenses, including for his wedding, for home

17   renovations, for jewelry, furniture, luxury clothing, travel,

18   and gifts.  Although the expenses were personal in nature, they

19   were used to claim business expense deductions on the shell

20   companies' tax returns.

21        Over a 13-year period between 2008 and 2021,

22   Mr. Pierre took more than $20 million in fraudulent proceeds

23   from the medical clinics he controlled, either by transferring

24   the funds directly to bank accounts under his control or using

25   the clinics' bank accounts to pay his personal expenses.

O63KPIES

1        As to Mr. Pierre's personal history and

2   characteristics:  He is 45 years old.  He was born in Brooklyn.

3   His father was a taxi driver and later owned a business that

4   sold taxi medallions.  His mother is a social worker.  Both his

5   parents were born in Haiti and became naturalized U.S.

6   citizens.

7        Mr. Pierre reports that he had a happy childhood

8   growing up under middle class circumstances in a household that

9   was free of abuse and neglect.

10        Mr. Pierre has two daughters from a marriage that

11   ended in divorce in 2006.  The daughters are currently ages 15

12   and 23, and reside with their mother.  He has another daughter,

13   aged 14, from another prior relationship.

14        In 2018, Mr. Pierre remarried to a woman who was a

15   personal injury lawyer.  He referred countless accident victims

16   to her as a result of the corrupt referrals I discussed

17   earlier.

18        The couple have a home in Closter, New Jersey, and

19   also utilize a penthouse apartment on East 54th Street in

20   Manhattan.

21        As to education:  Mr. Pierre graduated from high

22   school in Brooklyn.  He later attended Brooklyn College, and

23   then Queens College, but did not obtain a degree.

24        In 2015, he obtained a Bachelor's degree from

25   Grand Canyon University in Phoenix, Arizona, which is an online

O63KPIES

1    school.

2            As to employment, prior to 2008, the defendant reports

3    only that he operated a management company.  He declined to

4    provide any other information to the probation officer.

5            Since 2008, the defendant has been self-employed as

6    the CEO of Medical Reimbursement Consultants, Inc., which he

7    describes as a finance company that purchases claims from

8    medical offices at a discounted rate and then seeks payment

9    from insurance companies.  This is one of the companies through

10   which Mr. Pierre perpetrated the fraud that brings us here

11   today.

12           As to medical condition:  Mr. Pierre reports no

13   serious illnesses or medical conditions.

14           As to substance abuse:  Mr. Pierre has abused alcohol

15   in the past.

16           Finally, Mr. Pierre has no criminal record.

17           To summarize, the guidelines recommend a sentence

18   between 108 and 120 months' imprisonment.  The probation

19   department has recommended a variance down to eight years'

20   imprisonment.  The government seeks a sentence of ten years'

21   imprisonment.  The defendant seeks a sentence below what the

22   probation department has recommended.

23           With all this in mind, I'll now describe the reasons

24   for the sentence I intend to impose, and then I'll ask the

25   parties if there's anything further they wish to say.

O63KPIES

1          I have sentenced dozens of defendants who were

2    involved in the insurance fraud I've described a moment ago.

3    None of them approach the level of culpability of Mr. Pierre.

4    That is because Mr. Pierre was involved in this massive fraud

5    at every stage, in a critical fashion, and because he was a

6    genius at extracting money and preserving his ill-gotten

7    proceeds every step of the way.

8          As I have discussed, Mr. Pierre operated a number of

9    corrupt medical clinics at nearly a dozen locations.  Because

10   these clinics were actually run by Mr. Pierre, who is not a

11   physician, they could not lawfully submit claims for

12   reimbursement to insurance companies.  Accordingly, every claim

13   submitted by these clinics was fraudulent.

14         But Mr. Pierre did so much more than that.  He

15   personally bribed 911 operators and others to disclose the

16   confidential information of motor vehicle accident victims.  He

17   paid another individual $800,000 to bribe other 911 operators

18   and hospital employees.  He paid a coconspirator, Anthony Rose,

19   $800,000 to bribe still other 911 operators and the hospital

20   employees to disclose the confidential information of motor

21   vehicle accident victims.

22         He used his control of the corrupt medical clinics to

23   steer patients to seek MRI examinations at an MRI facility that

24   he also controlled, Nexray Medical Imaging, and he urged the

25   doctor who purportedly ran Nexray, Dr. William Weiner, to

O63KPIES

1    falsely report injuries on MRI reports.

2            When the radiologists employed at Nexray did not

3    report enough injuries for Mr. Pierre's taste, he vigorously

4    complained to Weiner.

5            Mr. Pierre required his medical clinics to use

6    specific pharmacies, which, of course, paid him more than a

7    million dollars in kickbacks.  He bribed other medical clinics,

8    likewise controlled by nonphysicians, to refer patients to

9    Nexray.

10           Because it was necessary to hide the fact that he

11   controlled the medical clinics, Mr. Pierre counseled the

12   doctors, who were the purported owners of these clinics, to

13   lie, and to commit perjury, on nearly a dozen occasions when

14   questioned at deposition about who owned the clinics.

15           Mr. Pierre also committed money laundering on a

16   massive scale.  Because it was necessary to get the money out

17   of the clinics once the insurance companies paid on the claims,

18   Mr. Pierre devised schemes to achieve that objective.  As I

19   noted earlier, he created phony loan agreements for this

20   purpose.

21           The payments from the clinics went to shell companies

22   that he controlled.  The checks were cashed at a check-cashing

23   service in order to avoid a paper record, and they were cashed

24   in amounts under $10,000 in order to evade the cash transaction

25   reporting requirement.

O63KPIES

1         He caused hundreds of patients to be steered to his

2    wife's personal injury firm, which itself laundered millions of

3    dollars in fraud proceeds through a phony marketing arrangement

4    between Mr. Pierre's shell companies and the wife's law firm.

5         Mr. Pierre saw no need to pay taxes on the huge amount

6    of fraudulent income he received.  While he used the fraud

7    proceeds to fund a lavish lifestyle, he deducted all the

8    payments as business expenses.  And when his fraud scheme came

9    under investigation and the government began issuing grand jury

10   subpoenas, Mr. Pierre threatened a witness who had received a

11   grand jury subpoena, telling her that she would likely be fired

12   if she testified as directed.

13        The litany of crimes that Mr. Pierre committed, in the

14   context of this scheme, is staggering, and that is what

15   distinguishes him from other defendants I've sentenced to date.

16        Among the crimes he committed — healthcare fraud,

17   bribery, perjury, money laundering, tax fraud, witness

18   tampering — it's a staggering, vast panoply of criminal

19   activity that went on for 13 years.  Every criminal act was the

20   product of careful thought, planning, and preparation, all with

21   the goal to extract as much money as possible from this

22   fraudulent scheme.  And Mr. Pierre, of course, was the primary

23   beneficiary of the criminal activity, to the tune of tens of

24   millions of dollars.

25        As I noted a moment ago, the probation office has

O63KPIES

1    stated that a variance from the guidelines range is

2    appropriate, and it has recommended an eight-year sentence

3    based on the fact that Mr. Pierre is a first offender, that,

4    for the most part, he has complied with the terms of his

5    pretrial release, and because of his education and vocational

6    skills.  I believe that the probation department's

7    recommendation is misguided.

8         As to the first offender point, that argument has

9    little persuasion here because the defendant intentionally and

10   deliberately committed a vast array of crimes over a 13-year

11   period knowing full well that his conduct was illegal.  And in

12   citing the defendant's education and vocational skills, the

13   probation office has ignored the fact that the defendant chose

14   to use his considerable intelligence and organizational

15   abilities to commit serious crimes, and to greatly enrich

16   himself in the process.

17        While I do believe that a robotic application of the

18   sentencing guidelines can, in some cases, result in injustice,

19   this is not such a case.  The facts here cry out for a severe

20   sentence, and given that Mr. Pierre is the most culpable

21   defendant I have sentenced to date, his sentence must be

22   greater than what I have imposed in other cases.

23        Having carefully considered all the circumstances, I

24   see no basis for a variance here.  I intend to impose an

25   aggregate sentence of ten years, the top of the guidelines

O63KPIES

1   range.

2          With respect to supervised release:  I intend to

3   impose an aggregate term of three years on the following

4   conditions:

5          Mr. Pierre will not commit another federal, state, or

6   local crime;

7          He will not illegally possess a controlled substance;

8          He will refrain from the unlawful use of a controlled

9   substance.

10         I intend to suspend the mandatory drug testing

11  condition in favor of a special condition requiring substance

12  abuse treatment and testing.

13         Mr. Pierre will cooperate in the collection of DNA, as

14  directed by the probation officer.

15         I intend to impose the standard conditions of

16  supervised release set forth in the presentence report, along

17  with the following special conditions:

18         Mr. Pierre will participate in an outpatient treatment

19  program approved by the U.S. Probation Office, to include

20  testing to determine whether he has reverted to use of alcohol.

21         I authorize the release of any available substance

22  abuse treatment evaluations and reports to the substance abuse

23  treatment provider.

24         Mr. Pierre will submit his person and any property,

25  residence, vehicle, papers, computer or other electronic

O63KPIES

1    communication or data storage device, cloud storage or media

2    and effects to a search by any U.S. probation officer where

3    there is a reasonable suspicion that a violation of the

4    conditions of his supervised release may be found.  Failure to

5    submit to a search may be grounds for revocation.

6          Mr. Pierre will warn any other occupants that the

7    premises may be subject to search pursuant to this condition.

8    Any search shall be conducted at a reasonable time and in a

9    reasonable manner.

10          Mr. Pierre will provide the probation officer with

11    access to any requested financial information, and he will not

12    incur new credit charges or open additional lines of credit

13    without the approval of the probation officer.

14          I do not intend to impose a fine because I find, after

15    taking into account the other financial penalties I intend to

16    impose, that Mr. Pierre lacks the ability to pay a fine.

17          I am required to impose a $200 special assessment.

18          As to forfeiture:  I have been given a proposed

19    consent preliminary order of forfeiture that the parties have

20    executed.

21          Mr. Pierre, is this your signature on the consent

22    preliminary order of forfeiture?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  And did you discuss it with Mr. Riopelle

25    before you signed it?

O63KPIES

1          THE DEFENDANT:  Yes, your Honor.

2          THE COURT:  And do you understand that it obligates

3     you to forfeit $3.5 million to the United States?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  It is my intention to sign the proposed

6     consent preliminary order of forfeiture.

7          As to restitution, the parties have submitted a

8     proposed consent order of restitution that they have executed.

9          Mr. Pierre, is this your signature on the consent

10    order of restitution?

11         THE DEFENDANT:  Yes, your Honor.

12         THE COURT:  And did you discuss it with Mr. Riopelle

13    before you signed it?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  And do you understand it requires you to

16    make restitution to the Internal Revenue Service in the amount

17    of $1,563,558?

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  I intend to sign the consent order of

20    restitution.

21         Mr. Riopelle, is there anything further you wish to

22    say?

23         MR. RIOPELLE:  No, your Honor.  I apologize for making

24    that mistake as to the obstruction issue.

25         THE COURT:  Mr. Pierre, is there anything further you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O63KPIES

1    wish to say?

2              THE DEFENDANT:  No, your Honor.  Thank you so much.

3              THE COURT:  Mr. Andrews, anything else for the

4    government?

5              MR. ANDREWS:  No, your Honor.

6              THE COURT:  Mr. Pierre, for the reasons I just stated,

7    it is the judgment of this Court that you be sentenced to

8    five years' imprisonment on each of Counts Four and Seven, with

9    those sentences to run consecutively.

10             You are sentenced to three years' supervised release

11   on each of Counts Four and Seven, with those terms to run

12   concurrently.

13             Your terms of supervised release will be subject to

14   the mandatory, standard, and special conditions I just

15   mentioned.

16             You are also ordered to pay a special assessment of

17   $200.

18             You are ordered to forfeit $3.5 million to the

19   United States, as set forth in the consent preliminary order of

20   forfeiture.

21             You are ordered to make restitution to the

22   Internal Revenue Service in the total amount of $1,563,558, as

23   set forth in the consent order of restitution.

24             Mr. Andrews, does the government move to dismiss any

25   open counts?

O63KPIES

1          MR. ANDREWS:  Yes, your Honor.

2          THE COURT:  As to designation, the defendant has

3    requested that I recommend to the Bureau of Prisons that he be

4    designated to the federal prison camp at Lewisburg,

5    Pennsylvania, and I do make that recommendation to the Bureau

6    of Prisons.

7          The defendant has also requested he be considered for

8    entry into the Bureau of Prisons' RDAP program.  Given the

9    defendant's abuse of alcohol in the past, I likewise make that

10   recommendation to the Bureau of Prisons.

11         As to the surrender date, the defendant has requested

12   eight weeks to surrender, which would bring us to July 22nd,

13   2024.

14         Does the government have any objection to that

15   request?

16         MR. ANDREWS:  No, your Honor.

17         THE COURT:  Then I will direct, and I do direct,

18   Mr. Pierre to surrender to the designated institution by

19   July 22nd, 2024, at 2:00 p.m.  If Mr. Pierre has not been

20   designated to an institution by that date, he is directed to

21   surrender to the U.S. Marshal for this district by 2:00 p.m. on

22   July 22nd, 2024.

23         Mr. Pierre, I do want you to be aware that if you do

24   not surrender by that date and time, you would be committing a

25   separate federal offense, for which you could receive a

O63KPIES

1    separate and consecutive sentence.

2            Mr. Pierre, I am obligated to advise you of your

3    appeal rights.  You can appeal your conviction if you believe

4    that your guilty plea was unlawful or involuntary or if there

5    was some other fundamental defect in the proceedings that was

6    not waived by your guilty plea.

7            You also have a statutory right to appeal your

8    sentence under certain circumstances.  With few exceptions, any

9    notice of appeal must be filed within 14 days of judgment being

10   entered in your case.  Judgment will likely be entered

11   tomorrow.  Mr. Riopelle will discuss with you whether or not

12   you wish to file a notice of appeal.

13           If you're not able to pay the costs of an appeal, you

14   may apply for leave to appeal in forma pauperis.  If you

15   request, the Clerk of Court will prepare and file a notice of

16   appeal on your behalf.

17           Mr. Andrews, is there anything else from the

18   government?

19           MR. ANDREWS:  Nothing from the government.

20           THE COURT:  Mr. Riopelle, anything else for the

21   defense?

22           MR. RIOPELLE:  No, your Honor.

23           THE COURT:  We are adjourned.

24           THE DEFENDANT:  Thank you, your Honor.

25           (Adjourned)