**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

AMERICAN TRANSIT INSURANCE COMPANY,

Plaintiff,

- against –

BRADLEY PIERRE, MARVIN MOY, M.D.,
RUTLAND MEDICAL P.C., WILLIAM A. WEINER,
D.O., NEXRAY MEDICAL IMAGING, P.C. d/b/a
SOUL RADIOLOGY MEDICAL IMAGING and
JOHN DOES 1-15,

Defendants.

1:24-cv-00360-RPK-CLP

**Oral Argument Requested**

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PREJUDGMENT ATTACHMENT**

| | |
|---|---|
| **GREENBERG TRAURIG, LLP** | **SHORT & BILLY, P.C.** |
| One Vanderbilt Avenue | 217 Broadway Suite 300 |
| New York, New York 10017 | New York, New York 10007 |
| Tel: (212) 801-9200 | Tel: (212) 732-3320 |
| Fax: (212) 801-6400 | Fax: (212) 732-3326 |

*Attorneys for Plaintiff*

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND .................................................................................................... 3

    I.        Defendants' Unlawful Referral Scheme and Fraudulent Billing ............................. 4

    II.      Defendant Pierre's Illegal Operation and Control of Rutland and Nexray ............. 6

    III.    Relevant Procedural History ..................................................................................... 7

ARGUMENT ........................................................................................................................... 8

    I.        ATIC Has Stated a Claim for a Money Judgment. ................................................. 9

    II.      ATIC Has a Probability of Success on the Merits. ................................................. 9

          A.       RICO ............................................................................................................ 12

          B.       Violation of New York Public Health Law § 238-a ................................. 14

          C.       Common Law Fraud .................................................................................... 15

          D.       Unjust Enrichment ...................................................................................... 15

    III.    Defendants Are Subject to Prejudgment Attachment Under CPLR § 6201 ......... 16

          A.       Defendants Have Secreted Property with Intent to Defraud their Creditors ................................................................................................... 16

          B.       Moy Cannot Be Personally Served Despite Diligent Efforts to Do So. .............................................................................................................. 23

    IV.    The Amount Demanded from Defendants Is Greater than All Counterclaims .................................................................................................................. 23

    V.      There Is a Real Risk of Inability to Enforce a Future Judgment ......................... 24

    VI.    ATIC's Undertaking Should Be Low ..................................................................... 24

CONCLUSION ..................................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allstate Ins. Co. v. New Century Pharmacy Inc.*,
2021 U.S. Dist. LEXIS 155361 (E.D.N.Y. Aug. 13, 2021)....................................................13

*Allstate Ins. Co. v. Pierre et al.*,
C.A. No. 1:23-CV-06572 (E.D.N.Y.) ...................................................................................22

*Allstate Ins. Co. v. Rozenberg*,
2009 WL 9081080 (E.D.N.Y. Jan. 26, 2009) .......................................................................12

*In re Amaranth Nat. Gas Commodities Litig.*,
711 F. Supp. 2d 301 (S.D.N.Y. 2010)....................................................................................9

*Bank Leumi Trust Co. v. Istim, Inc.*,
892 F. Supp. 478 (S.D.N.Y. 1995).........................................................................................9

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey*,
448 F.3d 573 (2d Cir. 2006)..................................................................................................15

*BSH Hausgerate, GmbH v. Kamhi*,
282 F. Supp. 3d 668 (S.D.N.Y. 2017)...................................................................................24

*Cambridge Med., P.C. v. Allstate Ins. Co.*,
899 F. Supp. 2d 227 (E.D.N.Y. 2012) ..................................................................................14

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*,
2023 WL 8810142 (S.D.N.Y. Dec. 19, 2023) ........................................................................8

*Crigger v. Fahnestock & Co.*,
443 F.3d 230 (2d Cir. 2006)..................................................................................................15

*Eu Yan Sang, Int'l LTD. v. S & M Enterprises (U.S.A.) Enterprises Corp.*,
2010 WL 3806136 (E.D.N.Y. Sept. 23, 2010) ......................................................................11

*In re Firestar Diamond, Inc.*,
657 B.R. 730 (Bankr. S.D.N.Y. 2024)............................................................................10, 16

*Gov't Emps. Ins. Co. v. Grody*,
2023 WL 6307340 (E.D.N.Y. Sept. 28, 2023) ......................................................................23

*Hawkins v. Zoegall*,
2023 WL 4106645 (E.D.N.Y. June 20, 2023) ........................................................................9

*Kucherovsky v. Rutland Medical, P.C., et al.*,
   Index No. 609430/2023 (Sup. Ct. Nassau Cty.) ...................................................................19

*Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*,
   879 F. Supp. 2d 243 (E.D.N.Y. 2012) ...................................................................13

*Med. Soc'y of State v. Serio*,
   100 N.Y.2d 854 (2003) ...................................................................3

*Moss v. Morgan Stanley Inc.*,
   719 F. 2d 5 (2d Cir. 1983) ...................................................................12

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*,
   305 F. Supp. 2d 340 (S.D.N.Y. 2004) ...................................................................24

*Perrotta v. Giannoccaro*,
   141 Misc. 2d 155 (Sup. Ct. Monroe Cty. 1988) ...................................................................10

*Plaintiff Funding Holding, Inc. v. Carrera*,
   2017 WL 7411183 (E.D.N.Y. Feb. 6, 2017) ...................................................................9

*Sea Metro., S.A. v. DGM Commodities Corp.*,
   2013 WL 5502818 (E.D.N.Y. Oct. 2, 2013) ...................................................................10

*State Farm Mut. Auto. Ins. Co. v. Mallela*,
   372 F.3d 500 (2d Cir. 2004) ...................................................................3

*State Farm Mut. Auto. Ins. Co. v. Mallela*,
   4 N.Y.3d, 313, 320-321 (2005) ...................................................................4

*State Farm Mut. Auto. Ins. Co. v. Parisien*,
   352 F. Supp. 3d 215 (E.D.N.Y. 2018) ...................................................................3

*The Russell Friedman Law Group, LLP v. Rutland Medical, P.C., et al.*,
   Index No. 621026/2023 (Sup. Ct. Nassau Cty.) ...................................................................19

*U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*,
   62 F. Supp. 2d 915 (E.D.N.Y. 1999) ...................................................................10

*United States v. Pierre*,
   No. 1:22-cr-00019-PGG (S.D.N.Y.) ...................................................................1, 6

*Yong Xiong He v. China New Star Rest., Inc.*,
   2020 WL 6202423 (E.D.N.Y. Oct. 22, 2020) ...................................................................24

**Statutes**

18 U.S.C. §§ 1961-1968 ...................................................................9, 12, 13, 14

18 U.S.C. § 1962(c) ...............................................................................................................4, 12

18 U.S.C. § 1962(d) .....................................................................................................................4

28 U.S.C. § 2283 ..........................................................................................................................8

N.Y. Educ. Law § 6530(2), (32), (35) .........................................................................................3

N.Y. Ins. Law § 5101, *et seq* .......................................................................................................3

N.Y. Ins. Law § 5102 ...................................................................................................................3

N.Y. Ins. Law § 5102(a)(1) ..........................................................................................................6

N.Y. Pub. Health Law § 238 .........................................................................................................4

N.Y. Pub. Health Law § 238-a ..............................................................................................4, 14

N.Y. Pub. Health Law § 238-a(1)(a) ..........................................................................................14

N.Y. Pub. Health Law § 238-a(1)(b) ..........................................................................................14

**Other Authorities**

11 N.Y. Comp. Codes R. & Regs. tit. § 65, *et seq* .......................................................................3

11 N.Y. Comp. Codes R. & Regs. tit. § 65-3.16(a)(12) ...............................................................6

Fed. R. Civ. P. § 64 ......................................................................................................................1

Fed. R. Civ. P. § 64(a) ..............................................................................................................1, 8

Fed. R. Civ. P. § 64(b) .................................................................................................................8

N.Y. CPLR § 6201 ........................................................................................................1, 8, 9, 15

N.Y. CPLR § 6201(1) ...................................................................................................................9

N.Y. CPLR § 6201(2) .................................................................................................................23

N.Y. CPLR § 6201(3) ...................................................................................................................9

N.Y. CPLR § 6212 ........................................................................................................................1

N.Y. CPLR § 6212(a) ...................................................................................................................9

N.Y. CPLR § 6212(b) .................................................................................................................24

Plaintiff American Transit Insurance Company ("ATIC") respectfully submits this memorandum in support of its motion, pursuant to Federal Rule of Civil Procedure 64, which applies New York Civil Practice Law and Rules ("C.P.L.R.") §§ 6201 and 6212, for an order granting a writ of prejudgment attachment against the assets of Defendants Bradley Pierre ("Pierre"), Marvin Moy, M.D. ("Moy"), Rutland Medical, P.C. ("Rutland"), William A. Weiner, D.O. ("Weiner"), and Nexray Medical Imaging, P.C., d/b/a Soul Radiology Medical Imaging ("Nexray" and, with Pierre, Moy, Rutland, and Weiner, "Defendants").

## PRELIMINARY STATEMENT

For years, Defendants have perpetrated a vast scheme to defraud ATIC and other no-fault insurance carriers out of tens of millions of dollars by filing, pursuing, and obtaining recovery for unlawful No-Fault insurance claims. Defendants caused, among other things, Rutland and Nexray to submit claim forms to ATIC.  In these forms, Defendants falsely certified the two companies were properly authorized to bill for No-Fault payments, when they were not because of Pierre's surreptitious unlawful involvement. As part of their scheme, Defendants also facilitated and/or submitted billing for medically unnecessary procedures and prohibited patient referrals. Defendants and their co-conspirators paid illegal kickbacks to steer patients to the unlawfully owned and operated medical providers. This same scheme resulted in the indictment and guilty pleas of two Defendants—Pierre and Weiner—in *United States v. Pierre*, No. 1:22-cr-00019-PGG (S.D.N.Y.) ("Criminal Action").

Despite exposure of this fraudulent scheme (and the suspicious disappearance of Defendant Moy), Defendants have continued efforts to collect monies not owed to them and to conceal the proceeds of these efforts and other assets. Consequently, to preserve ATIC's ability to recover for the damages Defendants have caused it, ATIC seeks an order granting a writ of prejudgment attachment against Defendants' assets.

1

ATIC meets the requirements for obtaining such an order. *First*, ATIC has asserted nine causes of action for a money judgment. *Second*, ATIC has satisfied the element of showing a probability of success on the merits of its claims through its well pled allegations of Defendants' scheme to defraud ATIC and the damages ATIC has suffered as a result (ECF No. 1, Complaint ("Compl.") ¶¶ 1-183, 382-458), supported by specific patient examples, admissions of the Defendants, and other evidence. (*Id*. ¶¶ 184-381; Exhs. A-J.) On the preliminary injunction motion this Court found that ATIC was likely to succeed on the merits of its claims and, when pleading guilty in the Criminal Action, Pierre and Weiner acknowledged facts that establish liability for many of the claims asserted here. *Third*, statutory grounds for attachment under New York law exist, as Defendants have secreted property through bribes, kickbacks, and other unlawful transfers with intent to defraud ATIC. Additional grounds exist as to Moy because he cannot be served given his suspicious disappearance. *Fourth*, there are no counterclaims by Defendants, and thus, ATIC's damages are greater than all known counterclaims. *Fifth*, there is a real risk of an inability to enforce a future judgment, as Defendants fraudulent scheme involves using shell companies to hide assets, using fictitious loans to launder money, and continuing to pursue collection of No-Fault claims notwithstanding Pierre's and Weiner's admissions of guilt.

Recently, ATIC learned that Pierre's counsel has alleged that there is more than $4 million of unaccounted for no-fault claims payments collected in the name of Rutland that passed through the hands of its collection lawyers; it further learned that Pierre, through his wholly owned company Medical Recovery Consultants, Inc. ("MRC") is trying to collect those funds, notwithstanding his acknowledgement that his concealed involvement in Rutland was illegal; meaning, the Rutland claims are void and not collectible. For these reasons, the Court should grant ATIC's motion.

## FACTUAL BACKGROUND

New York's No-Fault laws provide medical expense coverage to persons injured in automobile accidents. *See* N.Y. Ins. Law § 5101, *et seq*.; 11 N.Y.C.R.R. § 65, *et seq*. New York law prohibits licensed healthcare services providers from paying or accepting kickbacks in exchange for patient referrals. *See, e.g.*, N.Y. Pub. Health Law § 238. Further, under New York's No-Fault laws and regulations, medical providers are not eligible to seek or receive payment under Insurance Law § 5102 if they fail to meet any New York State licensing requirement. It is professional misconduct for a licensed physician to practice fraudulently, order excessive tests or treatment not warranted by the condition of the patient, or to fail to maintain a record for each patient that accurately reflects the evaluation and treatment of the patient. *See* N.Y. Educ. Law § 6530(2), (32), (35). *See* further discussion in the Complaint ("Compl.") ¶¶ 53-62, 66-73; Declaration of Cheryl Glaze dated November 12, 2024 ("Glaze Decl.") at ¶ 10.

The No-Fault framework was designed "to ensure prompt compensation for losses incurred by accident victims without regard to fault or negligence, to reduce the burden on the courts and to provide substantial premium savings to New York motorists." *Med. Soc'y of State v. Serio*, 100 N.Y.2d 854, 860 (2003). Since the mid-1990s, New York's No-Fault coverage system has been targeted by perpetrators of fraud, who have exploited the No-Fault system. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 507 (2d Cir. 2004) (recognizing that "[f]raud under the no-fault scheme" has been a "serious, and growing, problem in New York"); *State Farm Mut. Auto. Ins. Co. v. Parisien*, 352 F. Supp. 3d 215, 232 (E.D.N.Y. 2018) (noting that "[n]o-fault fraud accounted for more than half of all fraud reports received by the State Department of Financial Services") (internal quotation marks and citation omitted)).

As one of the largest No-Fault insurers for taxi and livery commercial automobiles in New York, ATIC has increasingly become the target of significant insurance fraud. (Compl. ¶¶ 18-19.)

ATIC commenced this action on January 17, 2024, seeking redress for one such scheme by which Defendants submitted and continued to submit to ATIC thousands of fraudulent No-Fault insurance reimbursement claims. (*See, e.g.*, Compl. ¶ 2.) Moreover, as established in the Criminal Action, Defendant Bradley Pierre, a mastermind of the scheme, surreptitiously owned and controlled medical providers including Rutland and Nexray in violation of law because he is an unlicensed person. Thus, every invoice Rutland or Nexray tried to collect was illicit because providers operated by unlicensed persons may not collect No-Fault claims. *See State Farm Mut. Auto. Ins. Co. v. Mallela*, 4 N.Y.3d, 313, 320-321 (2005). Based on the Complaint's detailed allegations, ATIC asserts claims against Defendants for civil RICO under 18 U.S.C. § 1962(c) and (d), common law fraud, violations of New York Public Health Law § 238-a, and unjust enrichment. ATIC also seeks a declaratory judgment confirming that Defendants had and have no right to receive payment for fraudulent bills submitted to ATIC. (*See generally* Compl.)

## I.      Defendants' Unlawful Referral Scheme and Fraudulent Billing

**Illegal Control of Rutland and Nexray.**   Pierre controlled Rutland and Nexray in violation of New York law because non-physicians—like Pierre—cannot own or control medical professional corporations. (Compl. ¶¶ 7, 74-95.) *See infra* Argument, Section II.

**Illegal Referral Scheme.** Defendants perpetrated their scheme by using medical professional corporations, Rutland and Nexray, to generate and process a high volume of patients for unnecessary treatment by paying referral sources hundreds of thousands of dollars in illegal kickbacks. (*See* Compl. ¶¶ 4-5, 10-12, 36, 45-47, 66, 83-84,86, 96-381; *see also* N.Y. Pub. Health Law 238.)

**Phony Initial Examinations.** Rutland provided virtually every patient with a purported initial examination designed to generate phony diagnoses as a gateway to performing more

expensive procedures, such as chiropractic services, injections, electrodiagnostic testing, and related services. (Compl. ¶¶ 97-99.)

**Fraudulent Chiropractic Care.** To increase billing to ATIC, Rutland and Moy provided patients (and billed ATIC for) a highly templated and generic regimen of medically unnecessary chiropractic care accompanied by a barrage of overlapping, redundant, and unnecessary diagnostic tests, the results of which Rutland and Moy routinely ignored. (*Id.* ¶¶ 100-103.)

**Fraudulent Electrodiagnostic Testing.** A central part of Defendants' scheme was also to fraudulently provide and bill for unnecessary and excessive electrodiagnostic ("EDX") testing, which is generally used in the clinical evaluation of patients with disorders of the peripheral and/or central nervous system—not, as Rutland did, to evaluate all patients regardless of age, gender, or medical histories. (*Id.* ¶¶ 104, 106, 114-124, 125-153.)

**Fraudulent Diagnostic Imaging.** As Defendant Pierre acknowledged he "used his control" to "steer patients to seek MRIs" at Nexray and agreed with Weiner "that Weiner would falsely report injuries in MRI reports . . . to bill insurance companies for additional unnecessary medical services[.]" (*See* Glaze Decl. Ex. 1 at 22.) Rutland patients were routinely ordered to undergo immediate medically unnecessary MRIs—including one who received 13 MRIs in less than four months—without first receiving a course of conservative treatment, even though there was no justification for early imaging (*e.g.*, concern for fracture, a dislocated joint, spinal injury, infection, or malignancy). (*Id.* ¶¶ 168-183, 210-224.)

**Specific Examples of Fraudulent Billing by Defendants.** ATIC provided numerous examples of fraudulent billing in its extensive Complaint. (Compl. ¶¶ 184-381.)

## II.     Defendant Pierre's Illegal Operation
##          and Control of Rutland and Nexray

Rutland and Nexray not only rendered unnecessary medical treatments to patients, they also fraudulently held themselves out to ATIC as properly licensed professional corporations entitled to reimbursement under Article 51 of the Insurance Law even though they were unlawfully owned and controlled by Pierre—an unlicensed layperson. (*See* Compl. ¶¶ 6-7, 77-84, 388-391, 419-445; Glaze Decl. ¶¶ 16-18.) Rutland and Nexray were nominally owned by licensed medical professionals Moy and Weiner, respectively, but they were actually owned and controlled by Pierre through wholly- owned MRC. (*Id.*) As charged in the Criminal Action, Pierre "received the majority of the clinics' proceeds and decided how much the nominal owners would be paid," controlled their finances, hired and fired clinics' employees, established the clinics including their locations, and selected their attorneys. (*Id.* ¶¶ 78-82.) This unlawful arrangement violates New York law and renders Rutland and Nexray ineligible to collect No-Fault payments because non-physicians are prohibited from owning or controlling medical professional corporations in New York. *See United States v. Weiner*, No. 1:22-cr-00019-PGG at ECF 367 (S.D.N.Y. Jan. 11, 2024); *see also* (Compl. ¶ 67; Glaze Decl. ¶ 40); N.Y. Ins. L. § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).

When pleading guilty in the Criminal Action, Pierre acknowledged that he unlawfully owned and operated Rutland and Nexray, rendering them ineligible to bill insurance companies for no-fault benefits. (*See* Glaze Decl. Ex. B at 20-25, 28.) Pierre knew medical clinics "are unable to bill insurance companies for no-fault benefits if the medical facilities are controlled by non-physicians," but "nonetheless, agreed with others to submit bills to insurance companies, falsely representing that the Clinics were owned and operated by licensed medical practitioners, and for medical practitioners to lie under oath during Examinations Under Oath ('EUOs') about the

ownership, control, and finances of the Clinics." (*Id.* at 21, 25.) Pierre acknowledged that he used Rutland and Nexray in this manner to generate revenue through alleged patient care and presentation of resulting invoices to providers, and taking over $20 million from providers through phony loans, including to Nexray and Rutland, and then transferring funds under his control or using their bank accounts to pay his expenses. (*Id.* at 21:12-16.)

During allocution, Weiner admitted that "he made false statements under oath about Mr. Pierre's role in his medical practice, Nexray, to obtain reimbursements from insurance companies." (Glaze Decl. Exh. C at 19:14–20:24). Dr. Weiner stated that he both had an "overall understanding with Mr. Pierre" and "a more specific agreement with the attorney representing [him] during the examination under oath" that Dr. Weiner would "falsely minimize[] [Mr. Pierre's] role in [Dr. Weiner's] medical practice to facilitate the payment of claims." (*Id.*) When asked whether he was "saying that the attorney was aware that as a result of Bradley Pierre's role in your medical practice, that it was not lawful to obtain medical reimbursement from the insurance company?" Dr. Weiner replied, "[t]hat's fair to say, your Honor." (*Id.* at 21:6–10.)

Weiner also admitted that because of Pierre's role in his medical practice that Weiner "understood that [he] had a right to make claims to the insurance company but that they would contest [Pierre's] role in my medical practice to deny the payments." (Exh. C at 21:11-22.)  When the Court asked, "And because of that, you did not disclose to insurance companies Bradley Pierre's role in your medical practice," Weiner responded, "That's correct." (*Id.*)

### III.    Relevant Procedural History

To date, Weiner and Nexray are the only Defendants to answer the Complaint. Neither interposed counterclaims.  Rutland and Pierre failed to answer the Complaint, and the clerk entered a default as to each of them. Following ATIC's motion for a default judgment against each, Pierre's counsel entered an appearance and later sought an extension of time to answer, which the Court

rejected. (ECF No. 69.) Pierre then moved to vacate the default, and Magistrate Judge Pollak issued a Report and Recommendation that the Court grant his motion on the condition that Pierre pay ATIC  its reasonable attorney fees. (ECF No. 77.) ATIC has filed an Objection to that Report and Recommendation, which remains pending before the Court. (ECF No. 79.)[1] Pierre remains in default. Further, because of Moy's purported disappearance, ATIC obtained from the Court an order permitting service by alternative means. (ECF No. 42.) Even after alternative service, Moy did not appear and the Clerk entered a default against him.[2] (ECF No. 64.)

Separately, ATIC moved for injunctive relief against Rutland and Nexray and their agents. (ECF 25.) On May 16, 2024, the Court granted the motion in significant part, finding that ATIC was likely to succeed on the merits of its claims, particularly in view of the guilty pleas and allocutions in the Criminal Action (ECF No. 52 at 2-5), and enjoining them "from filing additional no-fault arbitrations and lawsuits against ATIC and from prosecuting no-fault arbitrations against ATIC during the pendency of this action." (ECF No. 52 at 1.) Pending state court actions were not enjoined considering the Anti-Injunction Act. (*Id.*)

**ARGUMENT**

**<u>AN ORDER OF ATTACHMENT IS NECESSARY AND APPROPRIATE</u>**

Under Fed. R. Civ. P. 64(a), "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment," including attachment. Fed. R. Civ. P. 64(b). "Under New York law, to obtain an order of attachment, the moving party must demonstrate that (1) it has a cause of action for a money judgment, (2) there is a probability of success on the merits, (3) one or more of the

---

[1] ATIC contends that Pierre failed to meet his burden to show why the default should be vacated. (ECF No. 79.)

[2] The motion for a default judgment against Rutland is pending.

enumerated statutory grounds for attachment under N.Y. CPLR § 6201 exists, and (4) the amount demanded exceeds the amount of all counterclaims known to the party seeking the attachment." *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 2023 WL 8810142, at *2 (S.D.N.Y. Dec. 19, 2023)[3]; *see also* CPLR 6212(a). The Court must give ATIC, as the party seeking attachment, "the benefit of all legitimate inferences that can be drawn from the facts." *Bank Leumi Trust Co. v. Istim, Inc.*, 892 F. Supp. 478, 482 (S.D.N.Y. 1995).

Additionally, when an attachment is sought for security purposes, there is "an additional showing that something, whether it is a defendant's financial position or past and present conduct, poses a real risk of the enforcement of a future judgment." *Plaintiff Funding Holding, Inc. v. Carrera*, 2017 WL 7411183, at *3 (E.D.N.Y. Feb. 6, 2017) (alterations in original).

## I.    ATIC Has Stated a Claim for a Money Judgment.

ATIC's Complaint contains nine causes of action seeking monetary judgments against each of the Defendants. (*See* ECF No. 1 at Prayer for Relief.) ATIC seeks actual damages of $3,240,000, which when trebled under the RICO statute equals $9,720,000. (*Id.*) The Court has already concluded that ATIC is likely to succeed in establishing the merit of its claims. (ECF No. 52.)

## II.    ATIC Has a Probability of Success on the Merits.

"Probability of success 'requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case' but 'all legitimate inferences should be drawn in favor of the party seeking attachment.'" *Hawkins v. Zoegall*, 2023 WL 4106645, at *6 (E.D.N.Y. June 20, 2023) (quoting *In*

---

[3] Under N.Y. CPLR § 6201, an order of attachment may be granted when, among other things, " . . . the defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so" or where "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." N.Y. CPLR § 6201(1), (3).

*re Amaranth Nat. Gas Commodities Litig.*, 711 F. Supp. 2d 301, 306 (S.D.N.Y. 2010)). The well-pled Complaint, the Glaze Declaration, and documentary evidence submitted with this application establish ATIC's probability of success on the merits of its claims.

As discussed, ATIC already established a likelihood of success through its motion for a preliminary injunction against the Defendants. *See, e.g.*, *U.S. Fid. & Guar. Co. v. J. United Elec. Contracting Corp.*, 62 F. Supp. 2d 915, 923 (E.D.N.Y. 1999) (applying finding of likelihood of success on preliminary injunction motion to motion for prejudgment attachment).[4]

As this Court held in granting the injunction, ATIC "will likely succeed in demonstrating that defendants are not eligible for no-fault reimbursements and that defendants' no-fault claims against them are part of a fraudulent scheme." (ECF No. 52 ("Order") at 2.) The Court continued:

> Based on the sworn statements of Dr. Weiner and Mr. Pierre, it is likely that plaintiff will demonstrate that Rutland and Nexray were not eligible to receive no-fault reimbursements in New York. Dr. Weiner and Mr. Pierre have pleaded guilty to conspiring to commit health care fraud and bribery, respectively. Weiner Plea Tr. 3:3–9, 25:22–24 (Dkt. #44-4); Pierre Plea Tr. 4:1–5, 28:18–20 (Dkt. #44-3). At his change-of-plea hearing, Mr. Pierre acknowledged that (i) he is not a licensed medical provider, Pierre Plea Tr. 21:2–10; (ii) he agreed with others to unlawfully own and run medical clinics, including Rutland, *id.* 20:22–21:2; (ii) [sic] he knew that medical clinics were unable to bill insurance companies for no-fault benefits if they were controlled by non-physicians, *id.* 21:2–5; (iii) he nevertheless agreed with others to submit bills to insurance companies and falsely represented that the clinics were owned and operated by licensed medical practitioners, *id.* 21:5–8; (iv) he coached medical practitioners to lie during examinations under oath about the ownership, control, and finances of the clinics, *id.* 21:8–11; (v) he used his control of the clinics to steer patients to seek MRIs at Nexray, a medical facility over which he also exercised substantial control, *id.* 21:25–22:4; (vi) Mr. Pierre agreed with Dr. Weiner that Dr. Weiner would falsely report injuries in MRI reports and that Dr. Weiner would lie about Mr. Pierre's role in Nexray, *id.* 22:4–11; (vii) Mr. Pierre agreed to pay bribes to hospital employees, 911 dispatchers, and others who would help induce victims to receive medical treatment at Rutland and other clinics, *id.*

---

[4] *See also Sea Metro., S.A. v. DGM Commodities Corp.*, 2013 WL 5502818, at *2 (E.D.N.Y. Oct. 2, 2013) (because "[t]he terms 'likelihood' and 'probability' are synonyms," the "definition of likelihood of success appears equally germane to the preliminary injunction portion" as to attachment); *In re Firestar Diamond, Inc.*, 657 B.R. 730, 746 (Bankr. S.D.N.Y. 2024) (citing *Perrotta v. Giannoccaro*, 141 Misc. 2d 155, 157 (Sup. Ct. Monroe Cty. 1988) for the proposition that "the showing required [for prejudgment attachment] is comparable to that required when evaluating a preliminary injunction") (granting motion for attachment).

22:21–24:6; and (viii) Mr. Pierre agreed to bribe medical officers to send patients to Nexray for MRIs, *id*. 23:25–24:6.

For his part, in his plea allocution, Dr. Weiner admitted that he made false statements under oath about Mr. Pierre's role in his medical practice, Nexray, to obtain reimbursements from insurance companies. Weiner Plea Tr. 19:14–20:24. Dr. Weiner stated that he both had an "overall understanding with Mr. Pierre" and "a more specific agreement with the attorney representing [him] during the examination under oath" that Dr. Weiner would "falsely minimize [Mr. Pierre's] role in [Dr. Weiner's] medical practice in order to facilitate claim reimbursement." *Id*. 20:2–24. When asked whether he was "saying that the attorney was aware that as a result of Bradley Pierre's role in your medical practice, that it was not lawful to obtain medical reimbursement from the insurance company?" Dr. Weiner replied, "[t]hat's fair to say, your Honor." *Id*. 21:6–10. While Dr. Weiner equivocated as to whether he "understood at the time" that Dr. Pierre's involvement in his practice made Nexray ineligible to obtain no-fault reimbursements, *id*. 21:11– 18, Dr. Weiner's admissions, along with Mr. Pierre's comprehensive allocution, make it likely that plaintiff will succeed in proving that Nexray and Rutland were ineligible to recover no-fault benefits from America Transit.

(*Id*. at 3-4.) The Court also concluded that, "These sworn statements also make it likely that Mr. Pierre and Dr. Weiner engaged in common law fraud." (*Id*. At 4.)

Further, the defaults of Moy and Rutland "constitute[] an admission of both liability as well as the truth of all the well-pleaded allegations contained in the complaint" and thus ATIC "has not merely demonstrated a high probability of success on the merits, but has in effect, achieved actual success on the merits." *See Eu Yan Sang v. S&MK Enters. Corp. (U.S.A.)*, 2010 WL 3824129, at *3 (E.D.N.Y. Sept. 8, 2010) (granting permanent injunction and associated fees), *report and recommendation adopted sub nom. Eu Yan Sang, Int'l LTD. v. S & M Enterprises (U.S.A.) Enterprises Corp*., 2010 WL 3806136 (E.D.N.Y. Sept. 23, 2010). ATIC's claims are also supported by credible evidence, including the statement of facts that Pierre acknowledged at his plea agreement hearing, and the evidence and admissions disclosed during Pierre's and Weiner's guilty plea hearings. (Glaze Decl. Exhs. B and C.) These facts, which are to be given all legitimate inferences by the Court for purposes of this motion, further indicate that it is probable that ATIC will succeed on the merits of its claims.

11

A.    RICO

The RICO statute, 18 U.S.C. § 1962(c), makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ." To establish a RICO violation under 18 U.S.C. § 1962(c), a plaintiff must show: "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Allstate Ins. Co. v. Rozenberg*, 2009 WL 9081080, at *2 (E.D.N.Y. Jan. 26, 2009) (quoting *Moss v. Morgan Stanley Inc.*, 719 F. 2d 5, 17 (2d Cir. 1983)).

Given the record, ATIC is likely to succeed on its RICO claims against the Defendants. The comprehensive factual allegations in ATIC's Complaint—supported by detailed, specific representative patient and claim examples—set forth sufficient evidence of Defendants' violation of RICO statutes, in addition to the other claims pled in the Complaint. ATIC has also provided substantial and credible evidence of Defendants' scheme to exploit the No-Fault system by maximizing the bills they submit to ATIC without regard for medical necessity or patient safety. The Complaint provides a detailed overview of the No-Fault system, Defendants' scheme to defraud ATIC, and the damages ATIC has suffered as a result (Compl. ¶¶ 1-183, 382-458), supported by specific patient examples and exhibits. (*Id.* ¶¶ 184-381; Exhs. A-J; *see also* Glaze Decl. at ¶¶ 38-46.)

Rutland and Nexray's No-Fault claims are also ineligible for reimbursement because both entities during the relevant period were surreptitiously owned and controlled by Defendant Pierre—an unlicensed layperson—in violation of New York law. This disqualified them both from collecting no-fault reimbursement claims and their submissions made to ATIC seeking to collect

them were false and fraudulent. Pierre and Moy have pled guilty to criminal charges stemming from this very scheme, and Moy has disappeared. (*Id.* ¶¶ 4, 23, 26, 30, 413, 450; Glaze Decl. ¶¶ 22-33.)

ATIC has shown it is likely to succeed on its RICO claims against Nexray and Winer. Rutland and Nexray are professional service corporations providing physician services under New York law. ATIC has shown that both are enterprises affecting interstate commerce for purposes of RICO and they have repeatedly performed acts of racketeering within a ten-year period. *See Allstate Ins. Co. v. New Century Pharmacy Inc.*, 2021 U.S. Dist. LEXIS 155361, at *25 (E.D.N.Y. Aug. 13, 2021) (holding that professional services corporation qualifies as enterprise under RICO). Rutland and Nexray induced ATIC to pay medical bills via U.S. Mail, containing charges for treatments tests, and services that were medically unnecessary (Compl. ¶¶ 4-5, 10-12, 36, 45-47, 83, 96-381), billed using a pre-determined fraudulent treatment and billing protocol (*id*.), used billing codes that misrepresented and/or exaggerated the services provided to inflate charges (*id*. ¶¶ 463, 468, 475, 483, 490, 497), and were performed pursuant to illegal kickback and referral schemes in violation of the law. (*Id*. ¶¶ 3, 66-67, 86.)  (*See also* Glaze Decl. at ¶¶ 40-46.)

Pierre's confessed guilt also meets the RICO elements:

- he owned and controlled professional corporations, including Rutland and Nexray, constituting an enterprise. *See Liberty Mut. Ins. Co. v. Excel Imaging, P.C.*, 879 F. Supp. 2d 243, 274 (E.D.N.Y. 2012) ("RICO requirements are most easily satisfied when the enterprise is a formal legal entity" and "[c]orporations are expressly included in the definition of enterprise");

- he, Rutland, and Nexray participated in a scheme to defraud insurance companies "by seeking reimbursement they attested, at least implicitly, that their medical clinics were owned and operated by licensed physicians when in fact they were not." *Smirnov*, 2014 U.S. Dist. LEXIS 127541, at *19; and

- by submitting bills to insurance companies, including [ATIC], between about 2008 and 2021, his scheme involved related "acts of racketeering" with "the same or similar purposes, results, participants, victims, or methods of commission, or

otherwise are interrelated by distinguishing characteristics and are not isolated events." *Smirnov*, 2014 U.S. Dist. LEXIS 127541, at \*19 (citation omitted).

This conduct constitutes a RICO violation. *Id*. at \*22.

In sum, ATIC's well-pled allegations, patient examples, and exhibits, the Criminal Action record and the Glaze Declaration are substantial and demonstrate that it is probable that ATIC will succeed on the merits of its RICO claim.

**B.**    Violation of New York Public Health Law § 238-a

Under New York Public Health Law § 238-a(1)(a) practitioners may not make referrals for, among other things, x-ray or imaging serves to an authorized provider where "such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider" and they may not issue claims or bills pursuant to such a prohibited referral. New York Public Health Law § 238-a(1)(b). Health providers that collect bills in violation of these laws "shall be jointly and severally liable to the payor for any amounts so collected." *Id*. § 238(a)(7).

As detailed in the Complaint, the plea allocutions, and Section II.A, *infra*, Rutland and Nexray, which had a financial relationship through their common owner, Pierre, referred patients among themselves, particularly by Moy sending patients to Nexray for an MRI. (Glaze Decl. Exh. B at 20:22-22:20 (detailing Pierre's unlawful control over Rutland and Nexray).) These facts present a clear violation of the above-referenced provisions. *See Cambridge Med., P.C. v. Allstate Ins. Co*., 899 F. Supp. 2d 227, 232 (E.D.N.Y. 2012) ("such financial relationships are thought to taint the health care process . . . [if] Section 238–a is violated, neither the referring provider nor the provider of the service are entitled to payment from a third-party insurer"). Thus, it is probable that ATIC will succeed on the merits of its claim under New York Public Health Law § 238-a.

C.    Common Law Fraud

"[T]he five elements of a fraud claim must be shown by clear and convincing evidence: (1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006).

As alleged, Rutland and Nexray presented ATIC with false claims for no-fault reimbursement in that (a) the services allegedly provided were unnecessary or did not occur at all, and (b) they represented that they were bona fide, when in fact neither was entitled to such reimbursement. (Compl. ¶¶ 512-514.) Pierre and Weiner have admitted to making or causing to be made false statements to No-Fault insurance companies, like ATIC, knowing that Pierre's illegal role in operating Rutland and Nexray. Thus, these claims presented to ATIC were illegitimate. (Glaze Decl. Exh. B. at 20:22-22:11; Exh. C at 19:14-20:24.) Relying on Defendants' statements, ATIC paid out millions of dollars in claims to Rutland and Nexray, enriching Pierre, Moy, and Weiner with unlawful gain under false pretense.

D.    Unjust Enrichment

"To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of New Jersey*, 448 F.3d 573, 586 (2d Cir. 2006). Defendants received millions of dollars at ATIC's expense by

providing fraudulent and unnecessary medical services. *See* Sections II.A-C, *supra*. Equity and good conscience require that Defendants make ATIC whole. (*See* Compl. ¶ 529.)

### III.    Defendants Are Subject to Prejudgment Attachment Under CPLR § 6201

### A.    Defendants Have Secreted Property with Intent to Defraud their Creditors.

CPLR § 6201(3) provides that an order of attachment may be granted where "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." Because direct proof of intent to defraud rarely exists, courts look to "badges of fraud" to determine intent, including:

> "(1) lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction."

*In re Firestar Diamond, Inc.*, 657 B.R. 730, 755 (Bankr. S.D.N.Y. 2024) (finding intent to defraud where defendant assigned his residency to his wife for no consideration).

Here, there are several instances showing Defendants have "assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." There are also ample badges of fraud that signal an intent and effort to make such transfers to frustrate any potential judgment.

*First*, as shown in the Criminal Action and as alleged in the Complaint, the individual Defendants have set up elaborate networks of shell companies to hide the proceeds of their illegal conduct, demonstrating their ability to shield movement of assets. As alleged in the Superseding Indictment in the Criminal Action, "[t]he Pierre Conspirators laundered the proceeds of the fraud

through phony lending agreements, check-cashing entities, and shell companies. All told, the

Pierre and his conspirators billed insurance companies for more than $70 million in fraudulent

medical treatments." (Glaze Decl. ¶¶ 13-21, Exh. A). It continues:

> In addition, in order to conceal the above-described healthcare fraud scheme, BRADLEY PIERRE, the defendant, caused the No-Fault Clinics to transfer the proceeds from the scheme to Medical Reimbursement Consultants ("MRC"), a company he controlled. The payments were falsely described as loan repayments.
>
> In order to conceal his receipt of the No-Fault Scheme proceeds, BRADLEY PIERRE, the defendant, caused the No-Fault Clinics to transfer the proceeds from the scheme to MRC, a company he controlled. The payments were falsely described as loan repayments.
>
> As part of these phony financing arrangements, BRADLEY PIERRE, the defendant, purportedly gave loans to MARVIN MOY and WILLIAM WEINER, the defendants, in return for a percentage of any money later paid by insurance companies. In reality, MOY and WEINER directly paid BRADLEY PIERRE in excess of at least $2.4 million of what BRADLEY PIERRE was entitled to receive under the phony agreements.
>
> BRADLEY PIERRE, the defendant, further concealed payments from the No-Fault Clinics to MRC by using check cashers, and arranging for funds to be paid to shell companies under the control of [Pierre's brother], the defendant.

(*Id*. ¶¶ 24-27.)

Pierre, in pleading guilty to other charges, swore before the District Court that he did not

dispute the facts below showing Defendants developed an elaborate scheme to obtain funds from

No-Fault insurers by submitting false claims and laundering the proceeds:

> • "From at least in or about 2008, up to and including in or about 2021, the defendant agreed, with others, (collectively, the 'Clinic Controllers') to unlawfully own and run clinics located in the New York area including, among others, . . . Rutland Medical, which are referred to as the 'Clinics'. The defendant knew that Clinics are unable to bill insurance companies for no-fault benefits if the medical facilities are controlled by non-physicians. The defendant, nonetheless, agreed with others to submit bills to insurance companies, falsely representing that the Clinics were owned and operated by licensed medical practitioners, and for medical practitioners to lie under oath during Examinations Under Oath ('EUOs') about the ownership, control, and finances of the Clinics. The defendant personally coached medical practitioners to lie under oath." (Glaze Decl. Exh. B. at 20:22-21:11.)

- "The defendant used his control of the Clinics for personal profit. Between 2008 and 2021, the defendant took over $20 million from the clinics by either transferring the funds directly to bank accounts under his control, or using the Clinics' bank accounts to pay his personal finances. . ." (*Id.* at 21:12-16.)

- "The defendant used his control of the Clinics, and his managerial role at the law firm, to also steer patients to seek MRIs at a medical facility over which he exercised substantial control, Nexray Medical Imaging, which is referred to as 'Nexray.' The defendant agreed with William Weiner, the purported sole owner of Nexray, that Weiner would falsely report injuries in MRI reports. These falsified injuries allowed the Clinics to bill insurance companies for additional unnecessary medical services and allowed attorneys to falsely claim injuries in lawsuits against insurance companies. The defendant and Weiner agreed that Weiner would lie under oath about the defendant's role in Nexray." (*Id.* at 21:25-22:11.)

- "The defendant hid his control over several of the Clinics and Nexray using phony loan agreements. These agreements claimed that the defendant was making non-recourse loans to the Clinics and Nexray, which would only have to be paid back if the insurance companies paid the medical practices' claims. . .. However, in reality, the defendant took almost $10 million in excess of what these purported loan agreements permitted." (*Id.* at 22:12-20.)

- "The defendant further agreed to pay bribes to fill the Clinics and Nexray with patients. From at least in or about 2015, up to and including 2021, the defendant agreed, with others, to pay bribes to hospital employees, 911 dispatchers, and other individuals collectively referred to as the Lead Sources, for the confidential names and numbers of motor vehicle accident victims." (*Id.* at 22:21-23:2.) "The defendant also agreed to bribe medical officers to send patients to Nexray for MRIs." (*Id.* at 23:25-1.)

- "The defendant then engaged in tax evasion. The defendant utilized two companies in connection with the healthcare fraud and bribery schemes: Medical Reimbursement Consultants, or 'MRC,' and Marketing 4 You or 'M4Y.' The defendant hid income from the IRS by concealing multiple bank accounts for MRC and using a series of check cashers for checks made out to MRC and M4Y. The defendant also paid personal expenses from MRC and M4Y's bank accounts but improperly reported these payments as business expenses. These included payments for his wedding, home renovations, jewelry, furniture, luxury clothing, travel, and gifts." (*Id.* at 24:7-17.)

Following these statements, the Court reiterated to Pierre, "as I told you at the outset, this is what the government says you did" and asked him, "[d]o you dispute anything that I just read?" (*Id.* at 25:12-14.) Pierre responded, "[n]o, your Honor." (*Id.* at 25:15-16.) As discussed above,

Weiner likewise acknowledged in his allocution that Pierre's involvement in Nexray was unlawful and meant "it was not lawful to obtain medical reimbursement from the insurance company." (Glaze Decl. Exh. C at 21:6–10.)

The federal government provided specific facts about Pierre's MRC using a false loan agreement with Nexray to launder money, as it has with other companies. (Glaze Decl. Exh. D.) It noted the "lack of documentation" including any "documents or communications between the two companies [i.e. MRC and Nexray] that would be ordinarily incident to a loan agreement, such as what insurance claims had been submitted, for what insurance claims funds had been advanced, what insurance claims had been paid, what amount of loan principal had been paid, what amount of loan interest had been paid, or how much money remained owing to MRC." (*Id.* at 5.) The government further observed that this "loan agreement" was "<u>not genuine, but was a tool to create the impression that MRC was simply a funder of Nexray and to conceal the true business relationship between [Weiner] and Pierre</u>." (*Id.* at 3 (emphasis added).) The government, concluded that Defendants used the "loan agreement between Nexray and MRC" as a conduit by which "Weiner effectively sold his medical license to Pierre to conceal that Pierre in fact owned and controlled the radiology practice to which Weiner lent his name." (*Id.*) By this and similar false loan structures, Pierre fraudulently transferred at least $20 million from Nexray and other medical providers to himself. (Glaze Decl. Exh. B at 22:12-20.)

Further implicating Defendants, Weiner's attorney recently asserted that Weiner was "victimized by Pierre, and that [Pierre's accountant Albert Haft] knowingly and intentionally aided and abetted that fraud [Pierre and Haft's fraud relating to a phony financing agreement]," including by falsifying the payments between MRC and Nexray. (Glaze Decl. Ex. D at 6.)

*Second*, even though Pierre and Weiner have acknowledged the material facts of their wrongdoing, including Pierre's illicit involvement in Rutland and Nexray, Defendants continue to attempt to obtain the proceeds of that unlawful scheme. In two interpleader actions in Nassau County, New York, Supreme Court, Pierre by MRC alleges it is a claimant to the proceeds of Rutland no-fault insurance payments that two law firms collected on behalf of Rutland. *See Kucherovsky v. Rutland Medical, P.C., et al.*, Index No. 609430/2023 (Sup. Ct. Nassau Cty.) ("*Kucherovsky*") and *The Russell Friedman Law Group, LLP v. Rutland Medical, P.C., et al.*, Index No. 621026/2023 (Sup. Ct. Nassau Cty.) ("*Russell Friedman*"). Notwithstanding Pierre's guilty plea and allocution showing that he used his wholly owned company MRC to launder proceeds of the no-fault scheme through "phony lending agreements," MRC alleges it is a proper claimant to the proceeds of Rutland No-Fault insurance payments that the two law firms collected on behalf of Rutland.  Pierre claims he has priority rights in those interplead funds based on the terms of those false loans. (*See, e.g.*, *Kucherovsky*, NYSCEF No. 9; *Russell Friedman*, NYSCEF No. 43; *see also* Glaze Decl. ¶¶ 48-53.) Although one of the presiding Justices has ordered that the *res* must be deposited with the court clerk, MRC's counsel continues to demand that the funds to be transferred to Pierre's control. *See, e.g.*, *Russell Friedman*, NYSCEF No. 69 at 10 ("WHEREFORE, it is respectfully requested that the Court deny [ATIC]'s motion in its entirety and with prejudice and issue an Order directing Plaintiff to transfer all escrow funds collected to date to MRC c/o my law firm's escrow account…"). Russell Friedman alleges it holds in excess of a hundred thousand dollars of no-fault insurance payments that firm collected on behalf of Rutland.  (*See Russell Friedman*, NYSCEF No. 43 ¶ 18.)

The amount of the interplead funds is a moving target, however, suggesting that Rutland funds continue to be transferred. In the initial interpleader complaint, dated June 14, 2023,

Kucherovsky alleged collecting $159,913.01 on behalf of Rutland. *Kucherovsky*, (NYSCEF Doc. No. 1). Yet by January 23, 2024, this sum had grown to $173,165.05 (*id.* at NYSCEF Doc. No. 49) and on February 14, 2024, it had grown to $217,635.12 in escrow, with Kucherovsky then disclosing that an additional $221,886.69 remained to be collected. (*Id.* at NYSCEF Doc. No. 65.) On July 29, 2024, Kucherovsky asserted that he was holding $219,154.74 with only $103,718.17 remaining for collection. (*Id.* at NYSCEF Doc. No. 126.)[5] And on September 24, 2024, Kucherovsky moved the target once again, stating that the firm holds $226,239.34, with $96,898.23 left for collection. These discrepancies suggest significant Rutland assets continue to be transferred surreptitiously, even though its owner has disappeared. (*See* Glaze Decl. ¶¶ 40-46.)

More evidence that Rutland assets are being concealed was recently discovered in the *Kucherovsky* matter, in which ATIC has moved to join as an intervenor. Since at least July 2024, counsel for Pierre's MRC has been communicating with counsel for the Kucherovsky firm concerning the amount of Rutland funds and demanding payment. Declaration of James W. Perkins dated November 12, 2024 ("Perkins Decl.") Exh. 7. MRC's counsel excluded ATIC from those communications, even though some were with the court. ATIC first learned of them on September 13, 2024, after the *Kucherovsky* court copied ATIC's counsel on an email about an upcoming conference. (*Id.*) In that email MRC/Pierre's lawyer stated:

> Over the course of several years, the plaintiff was sent approximately $6.4 million dollars in collections from Rutland for which MRC has a lien and funded the accounts receivable and based upon the last records we received from the plaintiff, which was a long time ago, the plaintiff had paid out approximately $1.6M and there remains a balance of approximately $4.4M that is unaccounted for.

---

[5] It is unclear why the amount of Rutland money to be collected shrank by over $100,000 from February to July 2024, even though the amount Kucherovsky holds in escrow grew by less than $2,000.

(*Id.*) Reacting to MRC's concealment from ATIC, the court stated: "The Court was under the impression all parties were included in discussions regarding the next conference. While ATIC has not yet been joined as an interpleader, they have been appearing at conferences and should be included on all communications at this point." (*Id.*)

Thus, for months, Pierre/MRC's counsel has been seeking to collect hundreds of thousands (if not millions) of dollars at ATIC's expense by excluding it from these communications. And all along Pierre/MRC has been pursuing these funds despite Pierre's conviction and acknowledgement of the facts that show MRC has no legal right to recover them. Pierre, by MRC's willingness to obfuscate and hide Rutland's assets, even further establishes that a prejudgment attachment order is necessary and appropriate here.

*Third*, as alleged in the Criminal Action and acknowledged by Pierre, Pierre hid income by concealing multiple bank accounts for MRC using a series of check cashers for checks made out to MRC and other entities. For example, between 2008 and 2021, Pierre took over $20 million from clinics and transferred those funds in part to "bank accounts under his control" (Glaze Aff. Exh. B at 21:13-16) and he hid income "by concealing multiple bank accounts for MRC and using a series of check cashers for checks made out to MRC and M4Y." (*Id.* at 24:7-15.)

*Fourth,* Defendants assets are being dissipated. ATIC knows Pierre and Weiner are subject to disgorgement and restitution obligations in the Criminal Action and that both have pledged and are presumably paying significant amounts to civil litigants to settle claims. *See Allstate Ins. Co. v. Pierre et al.*, C.A. No. 1:23-CV-06572 (E.D.N.Y.) ("*Allstate*"). For example, in *Allstate*, both Pierre and Weiner settled the claims against them, and part of the settlement pledged their assets to secure payment of settlement amounts payable to Allstate. (*Allstate*, ECF Nos. 74-1, 75-1.) However, the restitution and disgorgement obligations of Pierre, totaling approximately $5

million, do not explain what happened to the balance of the $20 million he acknowledges that he transferred out of Rutland, Nexray, and other providers through which he conspired to bilk insurance carriers like ATIC out of millions of dollars of false claims payments. (Glaze Decl. Exh. B. at 21:12-16.)

In sum, Defendants have created an elaborate network of companies and transaction structures through which they have laundered tens of millions of dollars, a significant part of which continues to flow, as shown by the continued collection of funds in the interpleader actions referenced above and Pierre's attempt to obtain the proceeds of Defendants' no-fault insurance scheme through these actions. Defendants' pattern of using shell companies to hide their assets mandates a prejudgment attachment order to prevent them from further frustrating any potential judgment.

**B.**    Moy Cannot Be Personally Served Despite Diligent Efforts to Do So.

Under CPLR § 6201(2), an order of attachment may be granted where "the defendant resides or is domiciled in the state and cannot be personally served despite diligent efforts to do so." This Court has already determined that Moy cannot be served personally despite ATIC's diligent efforts to do so. ECF No. 42 at 4. Therefore, prejudgment attachment as to Moy's assets, including Rutland, is warranted because ATIC has been unable to personally serve him.

**IV.    The Amount Demanded from Defendants Is Greater than All Counterclaims.**

Defendants have filed no counterclaims against ATIC. Only Weiner and Nexray have answered the Complaint to date, with neither filing counterclaims. *See* ECF No. 40. Moy and Rutland have not answered the Complaint and the clerk has entered a default against them. Even if Pierre is successful in having the default vacated against him, any counterclaims he might assert would not in good faith exceed ATIC's damages. Therefore, the amount demanded by ATIC is greater than all counterclaims known to ATIC.

## V.    There Is a Real Risk of Inability to Enforce a Future Judgment

When Defendants are in a "tenuous financial position" or "their actions suggest they will hide assets to evade satisfaction of a future judgment," there is a real risk of enforcement of a future judgment warranting prejudgment attachment as security. *Gov't Emps. Ins. Co. v. Grody*, 2023 WL 6307340, at *5 (E.D.N.Y. Sept. 28, 2023).

As discussed above, Defendants have a long history of setting up networks of shell companies to disguise the location of assets. *See* Section III.A, *supra*. Moreover, Pierre, by his company MRC, is actively and surreptitiously seeking to obtain millions of dollars from Rutland's former attorneys. Finally, Moy's disappearance under suspicious circumstances is further evidence of the risks to enforcement of any future judgment. *See* Criminal Action, Dkt. 268 (noting the "the widely reported, unusual circumstances of the boating accident and possible incentives for the defendant to create an appearance of death").

## VI.    ATIC's Undertaking Should Be Low

"CPLR § 6212(b) requires a plaintiff seeking an order of attachment to provide an 'undertaking' as security for (1) costs and damages incurred by the defendant in the event that the court subsequently determines that the plaintiff was not entitled to an attachment or if defendant ultimately recovers judgment; and (2) certain fees incurred by the sheriff." *Yong Xiong He v. China New Star Rest., Inc*., 2020 WL 6202423, at *15 (E.D.N.Y. Oct. 22, 2020) (internal citations and quotations omitted). The amount of the undertaking must be at least $500 but otherwise is within the discretion of the court. *BSH Hausgerate, GmbH v. Kamhi*, 282 F. Supp. 3d 668, 672 n.2 (S.D.N.Y. 2017). Courts often set the undertaking at a fraction of a percent of the value of the attachment or at the minimum. *See, e.g*., *Yong Xiong He*, 2020 WL 6202423, at *15 (setting

undertaking at $500); *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 305 F. Supp. 2d 340, 348 (S.D.N.Y. 2004) (setting undertaking at 0.04% of the value of the attachment).

The likelihood that ATIC will obtain a substantial judgment against Defendants is high, given that two Defendants have acknowledged the scheme, and Moy, Rutland and Pierre have defaulted. And in ruling on ATIC's motion for a preliminary injunction, the Court already determined that ATIC is likely to succeed on the merits. (ECF No. 52.) In comparison, the possibility that Defendants will obtain any money judgment against ATIC is remote. Accordingly, ATIC requests that the undertaking be set at the $500 minimum amount for the writ of attachment.

## CONCLUSION

For the reasons detailed above, ATIC respectfully requests that the Court grant its motion for an order issuing a writ of prejudgment attachment against the assets of defendants Rutland Medical, P.C., and Bradley Pierre, Marvin Moy, William Weiner, Rutland Medical, P.C., and Nexray Medical Imaging, P.C., d/b/a Soul Radiology Medical Imaging.

Dated: New York, New York
     November 13, 2024

          GREENBERG TRAURIG, LLP

          By: /s/ *James W. Perkins*
              James W. Perkins
              Francis J. Serbaroli
              John C. Molluzzo, Jr.
              Elizabeth J. Sullivan
              One Vanderbilt Avenue
              New York, New York 10017
              (212) 801-9200
              perkinsj@gtlaw.com
              serbarolif@gtlaw.com
              molluzzoj@gtlaw.com
              sullivanel@gtlaw.com

SHORT & BILLY, P.C.
Skip Short
Ioanna Zevgaras
217 Broadway Suite 300
New York, New York 10007
(212) 732-3320
sshort@shortandbilly.com
ioanna@shortandbilly.com

*Attorneys for American Transit
Insurance Company*