**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN TRANSIT INSURANCE COMPANY,<br><br>Plaintiff,<br><br>- against –<br><br>BRADLEY PIERRE, MARVIN MOY, M.D., RUTLAND MEDICAL P.C., WILLIAM A. WEINER, D.O., NEXRAY MEDICAL IMAGING, P.C. d/b/a SOUL RADIOLOGY MEDICAL IMAGING and JOHN DOES 1-15,<br><br>Defendants. | 1:24-cv-00360-RPK-CLP<br><br>**Oral Argument Requested** |

**DECLARATION OF CHERYL B. GLAZE IN SUPPORT OF AMERICAN TRANSIT INSURANCE COMPANY'S MOTION FOR PREJUDGMENT ATTACHMENT**

I, Cheryl B. Glaze, pursuant to 28 U.S.C. §1746, declare as follows:

1. I am employed by, and a Manager of, Plaintiff American Transit Insurance Company ("ATIC") and respectfully submit this Declaration in support of ATIC's motion, pursuant to Fed. R. Civ. P. 64 and NY CPLR § 6201 for an order granting a writ of prejudgment attachment against the assets of Defendants Bradley Pierre ("Pierre"), Marvin Moy, M.D. ("Moy"), Rutland Medical, P.C. ("Rutland"), William A. Weiner, D.O. ("Weiner"), and Nexray Medical Imaging, P.C., d/b/a Soul Radiology Medical Imaging ("Nexray," and, with Pierre, Moy, Rutland, and Weiner, "Defendants").

2. I have been employed by ATIC since 1990 and have been its No-Fault Manager for the last six years. In that capacity, I am fully familiar with ATIC's procedures for handling and processing No-Fault claims. I am also familiar with New York State's No-Fault system. On those bases, I also have personal knowledge of the facts set forth in this Declaration and would testify to them in a court of law if called upon to do so.

**Introduction: The Need for an Attachment Order**

3. ATIC seeks an attachment of Defendants' assets at this time because recent events indicate that Defendants have been transferring assets and taking steps to transfer other assets such that there is a risk that they will not be available for ATIC to satisfy a judgment in this matter. For example, even though Defendant Pierre acknowledged that he concealed his ownership and control of Defendants Rutland and Nexray, which made those providers ineligible to collect No-Fault insurance claims under New York law, Pierre, through his wholly owned company Medical Reimbursement Consultants, Inc. ("MRC"), is actively attempting to collect millions of dollars of those insurance claims payments made to Rutland. These facts were recently revealed in a state interpleader case where MRC is claiming it is entitled to recover these Rutland insurance claims payments, notwithstanding Pierre's admissions of guilt, which make the claims void as our lawyers show in the accompanying memorandum. It has also recently surfaced that Rutland payment proceeds are still being funneled through attorneys' bank accounts notwithstanding the disappearance of its principal years ago October 2022 and Rutland's shuttering operations. Likewise, Pierre acknowledged in his criminal case that he received over $10 million more than he should have in disguising his bribery scheme through fictitious loans. Defendant Weiner recently pled guilty to crimes perpetrated as part of the No-Fault conspiracy alleged in this case, and his assets are dwindling as he is subject to a yet to be determined restitution obligation and he and Nexray have settled claims with creditors in amounts that are not fully known, but which settlement includes placing a lien on Weiner's real property. While ATIC recognizes that Defendant Weiner is lawfully obliged to provide restitution and that settlement of claims is a reasonable goal, each of those commitments impairs Weiner's and Nexray's assets. ATIC therefore seeks protection against the harm that Defendants have caused to it by their unlawful

2

conduct. An attachment order will provide ATIC some protection by preventing further dissipation of Defendants' assets before ATIC can obtain a judgment in this case.

**Background of No-Fault Insurance in New York**

4. New York No-Fault laws are designed to ensure that motor vehicle accident victims have an efficient mechanism to obtain payment of fees for necessary professional healthcare services.

5. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, et seq.), and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. § 65, et seq.) (collectively the "No-Fault laws"), motor vehicle insurers are required to provide coverage to persons involved in motor vehicle accidents, regardless of fault. These benefits are known as "No-Fault benefits."

6. Each eligible insured person (i.e., "claimant") may use such No-Fault benefits as a source of compensation for any "basic economic loss" incurred as the result of a motor vehicle accident.

7. Under New York's No-Fault laws, "basic economic loss" is defined to include "all necessary expenses" for an array of professional healthcare services, including the evaluations, treatments, injections, and surgical procedures purportedly provided by Defendants. N.Y. Ins. Law § 5102(a)(1); 11 N.Y.C.R.R. § 65-1.1.

8. A claimant may assign their No-Fault benefits to third parties, such as professional healthcare service providers.

9. However, New York law prohibits licensed healthcare services providers from paying or accepting kickbacks in exchange for patient referrals. *See, e.g.*, N.Y. Pub. Health Law 238.

10. Therefore, under the New York No-Fault laws, a healthcare services provider is not eligible to receive personal injury protection ("PIP") benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments rendered, or if it allows unlicensed laypersons to share in the fees for the professional services. *See* 11 NYCRR 65–3.16(a)(12) ("A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement ..."); *see also* N.Y. Pub. Health Law 238 (prohibiting referral payments); N.Y. Educ. Law § 6530(2), (32), (35) (prohibiting practicing fraudulently, ordering unnecessary tests or treatments, or failing to maintain proper records).

**The Federal Government Indictments of Pierre, Moy, and Weiner**

11. On January 11, 2022, Pierre, Moy, Weiner, and non-parties Andrew Prime and Arthur Bogoraz were charged in connection with a criminal scheme to exploit New York's No-Fault laws. (*United States v. Pierre*, No. 1:22-cr-00019(PGG) (S.D.N.Y.) (the "Criminal Action"), ECF No. 1.) According to the indictment, Defendants engaged in unlawful conduct such that prevents them from recovering PIP.

12. Defendants in the Criminal Action were indicted on charges of conspiracy to commit healthcare fraud, conspiracy to commit money laundering, conspiracy to commit Travel Act bribery, and aggravated identify theft. A superseding indictment was filed on June 26, 2023 (the "Superseding Indictment"), a true and correct copy of which is attached hereto as **Exhibit A**.

13. As set forth in the Superseding Indictment, Pierre has no medical or other licenses that would permit him to own or operate a medical provider within New York state. It further states that Pierre nonetheless recruited medical providers to open No-Fault clinics from at least 2008 through 2021. (*See* Exhibit B, *infra*, at 20-21.)

4

14. According to the Superseding Indictment these No-Fault clinics "were not owned, operated, and controlled by licensed medical practitioners as is required by law." (Exh. A ¶ 15.) In fact, Pierre "was the actual owner, operator, and controller" of the No-Fault clinics. (*Id*.) Pierre "received the majority of the [c]linics' proceeds and decided how much the nominal owners would be paid." (*Id*.) Pierre "possessed the checkbooks and pre-signed checks from the [c]linic's bank accounts; controlled the debit and credit cards for the [c]linics." (*Id*.) Pierre "controlled hiring and firing of the [c]linic's employees; invested the initial funds to establish the Clinics." (Exh. A ¶ 15.) Pierre "identified the locations for the [c]linics; negotiated the rent for the [c]linics' leases." (*Id*.) Pierre "chose the attorneys that would represent the [c]linics in arbitration, litigation, and sworn depositions before insurance companies." (*Id*.) Pierre arranged for the No-Fault clinics to use Weiner and Moy "to conduct painful and medically unnecessary electrodiagnostic testing" on patients including electromyography and nerve conduction velocity testing. (*Id*. ¶ 16.)

15. Pierre "profited every step of the way." (Exh. A ¶ 17.) In addition to receiving the majority of the proceeds of the No-Fault clinics, Pierre required the No-Fault clinics to refer patients to a network of pharmacies, attorneys, and medical specialists "handpicked" by Pierre for one reason: "they paid [Pierre] millions of dollars for illegal referrals." (*Id*.) Pierre arranged for physicians, including Weiner and Moy, "to lie under oath to insurance companies to conceal the healthcare fraud scheme." (*Id*. ¶ 21.)

16. As set forth in the Superseding Indictment, Pierre, Weiner, and Moy were aware that insurance companies would deny reimbursement for the No-Fault clinics if Weiner and Moy testified truthfully about the medical necessity of treatments and Pierre's control of the Clinics. (*Id*. ¶ 21.) It further charges that Pierre arranged for Weiner and Moy to falsely state under oath, among other things, that Pierre was solely a lender for Nexray and Rutland and Pierre played no

5

role in referring patients to the clinics. (*Id*.) Pierre, Weiner, and Moy laundered the proceeds of the No-Fault scheme to conceal the operation. (*Id*. ¶ 22.)

17. As alleged in the Superseding Indictment, to conceal his receipt of the No-Fault scheme proceeds, Pierre caused the No-Fault clinics to transfer the proceeds from the scheme to his own company, MRC. (*Id*. ¶ 24.) Further, the payments were falsely described as loan repayments. (*Id*. ¶ 25.) It summarizes: "All told, the Pierre and his conspirators billed insurance companies for more than $70 million in fraudulent medical treatments." (*Id*. ¶ 4.)

18. The Indictment further discusses Defendants' money laundering as follows:

> In addition, in order to conceal the above-described healthcare fraud scheme, BRADLEY PIERRE, the defendant, caused the No-Fault Clinics to transfer the proceeds from the scheme to Medical Reimbursement Consultants ("MRC"), a company he controlled. The payments were falsely described as loan repayments.
>
> In order to conceal his receipt of the No-Fault Scheme proceeds, BRADLEY PIERRE, the defendant, caused the No-Fault Clinics to transfer the proceeds from the scheme to MRC, a company he controlled. The payments were falsely described as loan repayments.
>
> As part of these phony financing arrangements, BRADLEY PIERRE, the defendant, purportedly gave loans to MARVIN MOY and WILLIAM WEINER, the defendants, in return for a percentage of any money later paid by insurance companies. In reality, MOY and WEINER directly paid BRADLEY PIERRE in excess of at least $2.4 million of what BRADLEY PIERRE was entitled to receive under the phony agreements.
>
> BRADLEY PIERRE, the defendant, further concealed payments from the No-Fault Clinics to MRC by using check cashers, and arranging for funds to be paid to shell companies under the control of JEAN PIERRE [Bradley Pierre's brother], the defendant.

(*Id*. at ¶¶ 24-27.)

19. A second superseding indictment was filed on December 6, 2023, that, among other things, added a substantive health care fraud count against Pierre and Weiner. *United States v. Pierre*, No. 1:22-cr-00019(PGG) (S.D.N.Y.), Dkt. No. 282.

6

**Moy Disappears in Suspicious Boating Accident**

20. Following his indictment, on or about October 13, 2022, Moy allegedly disappeared during a fishing trip onboard a recreational vessel approximately 16 miles off the coast of Long Island, New York. (ECF No. 1, Complaint, ("Compl.") ¶ 26.) Moy was never found in the search that followed his disappearance. (*Id.*)

21. Despite Moy's disappearance and alleged sole ownership and control of Rutland, attorneys in the name of Rutland nonetheless continued to prosecute and defend insurance collection claims against ATIC thereafter, collecting payments in the hundreds of thousands, if not millions of dollars. (*Id.* ¶ 27.) As detailed further below (*see* Paragraphs 39 to 48), despite Moy's disappearance and no one in control of Rutland (Pierre's unlawful control was exposed and Pierre is now serving a prison sentence), at least two law firms continued to collect payments allegedly due to Rutland that were obtained as part of Defendants' No-Fault scheme. Yet it is unclear whether these law firms even have authority to make such collections, and the amounts allegedly due Rutland have been a moving target. As detailed in the accompanying Perkins Declaration in Support, ATIC recently learned that approximately $4.4 million in unaccounted for Rutland insurance payments may be in the possession of one or more of these firms.

**Defendants Pierre and Weiner Plead Guilty to Crimes Arising from The No-Fault Scheme**

22. On December 18, 2023, Pierre pled guilty to two counts for conspiracy to commit Travel Act bribery and conspiracy to defraud the IRS. A copy of the December 18, 2023, plea hearing for Bradley Pierre in the Criminal Action is attached as **Exhibit B**. This transcript was not publicly available until April 4, 2024. (Criminal Action, ECF No. 344 Docket Entry.)

23. Pierre, in pleading guilty to the charges, swore before the District Court that he did not dispute the facts below showing Defendants developed an elaborate scheme to obtain funds from No-Fault insurers by submitting false claims and laundering the proceeds:

7

- "From at least in or about 2008, up to and including in or about 2021, the defendant agreed, with others, (collectively, the 'Clinic Controllers') to unlawfully own and run clinics located in the New York area including, among others, . . . Rutland Medical, which are referred to as the 'Clinics'. The defendant knew that Clinics are unable to bill insurance companies for no-fault benefits if the medical facilities are controlled by non-physicians. The defendant, nonetheless, agreed with others to submit bills to insurance companies, falsely representing that the Clinics were owned and operated by licensed medical practitioners, and for medical practitioners to lie under oath during Examinations Under Oath ('EUOs') about the ownership, control, and finances of the Clinics. The defendant personally coached medical practitioners to lie under oath." (Exh. B. at 20:22-21:11.)

- "The defendant used his control of the Clinics for personal profit. Between 2008 and 2021, the defendant took over $20 million from the clinics by either transferring the funds directly to bank accounts under his control, or using the Clinics' bank accounts to pay his personal finances. . ." (*Id.* at 21:12-16.)

- "The defendant used his control of the Clinics, and his managerial role at the law firm, to also steer patients to seek MRIs at a medical facility over which he exercised substantial control, Nexray Medical Imaging, which is referred to as 'Nexray.' The defendant agreed with William Weiner, the purported sole owner of Nexray, that Weiner would falsely report injuries in MRI reports. These falsified injuries allowed the Clinics to bill insurance companies for additional unnecessary medical services and allowed attorneys to falsely claim injuries in lawsuits against insurance companies. The defendant and Weiner agreed that Weiner would lie under oath about the defendant's role in Nexray." (*Id.* at 21:25-22:11.)

- "The defendant hid his control over several of the Clinics and Nexray using phony loan agreements. These agreements claimed that the defendant was making non-recourse loans to the Clinics and Nexray, which would only have to be paid back if the insurance companies paid the medical practices' claims. . .. However, in reality, the defendant took almost $10 million in excess of what these purported loan agreements permitted." (*Id.* at 22:12-20.)

- "The defendant further agreed to pay bribes to fill the Clinics and Nexray with patients. From at least in or about 2015, up to and including 2021, the defendant agreed, with others, to pay bribes to hospital employees, 911 dispatchers, and other individuals collectively referred to as the Lead Sources, for the confidential names and numbers of motor vehicle accident victims." (*Id.* at 22:21-23:2.)

- "The defendant also agreed to bribe medical officers to send patients to Nexray for MRIs." (*Id.* at 23:25-1.)

- "The defendant then engaged in tax evasion. The defendant utilized two companies in connection with the healthcare fraud and bribery schemes: Medical Reimbursement Consultants, or 'MRC,' and Marketing 4 You or 'M4Y.' The

8

> defendant hid income from the IRS by concealing multiple bank accounts for MRC and using a series of check cashers for checks made out to MRC and M4Y. The defendant also paid personal expenses from MRC and M4Y's bank accounts but improperly reported these payments as business expenses. These included payments for his wedding, home renovations, jewelry, furniture, luxury clothing, travel, and gifts." (*Id*. at 24:7-17.)

24. Following recitation of these facts, District Judge Gardephe reiterated to Pierre, "as I told you at the outset, this is what the government says you did" and asked him, "[d]o you dispute anything that I just read?" (*Id.* at 25:12-14.) Pierre responded, "[n]o, your Honor." (*Id.* at 25:15.).

25. Among the facts that Pierre did not dispute where that he: (a) agreed "to unlawfully own and run clinics in the New York area" including Defendant Rutland; (b) "used control of the Clinics for personal profit," (c) "exercised substantial control over" Defendant Nexray and (d) "hid his control over several of the Clinics and Nexray using phony loan agreements." (*Id*. at 20-22.) Pierre further acknowledged that he agreed with Rutland, Nexray and others to defraud insurance carriers out of millions of dollars by steering patients to them for unnecessary treatment and by bribing medical officers and others to obtain those referrals. (*Id*. at 21-24.)

26. Ultimately, Pierre was sentenced to 10-years imprisonment. (ECF No. 74-5 at 28:23-29:1.) Pierre was also ordered to pay a money judgment of $3.5 million and $1,563,558 as restitution, a total far less than the "over $20 million from the clinics [Pierre took] by either transferring the funds directly to bank accounts under his control, or using the Clinics' bank accounts to pay his personal finances." (*Id*. at 31:14-16.). The restitution and disgorgement obligations of Pierre, totaling approximately $5 million, do not explain what happened to the balance of the $20 million he does not deny that he transferred out of Rutland, Nexray, and other providers with which he conspired to bilk insurance carriers like ATIC out of millions of dollars of false claims payments. (Exh. B. at 20:22-21:11; 22:12-20.)

9

27. On January 16, 2024, Weiner pled guilty to conspiracy to commit healthcare fraud and conspiracy to commit tax fraud. A copy of the January 16, 2024, plea hearing for Weiner in the Criminal Action is attached as **Exhibit C**.

28. In Weiner's allocution, Weiner admitted that he made false statements under oath about Mr. Pierre's role in his medical practice, Nexray, to obtain reimbursements from insurance companies. (*See* Exh. C at 19:14–20:24). Dr. Weiner stated that he both had an "overall understanding with Mr. Pierre" and "a more specific agreement with the attorney representing [him] during the examination under oath" that Dr. Weiner would "falsely minimize[] [Mr. Pierre's] role in [Dr. Weiner's] medical practice to facilitate the payment of claims." (*Id*.) When asked whether he was "saying that the attorney was aware that as a result of Bradley Pierre's role in your medical practice, that it was not lawful to obtain medical reimbursement from the insurance company?" Dr. Weiner replied, "[t]hat's fair to say, your Honor." (*Id*. at 21:6–10.)

29. Weiner also admitted that because of Pierre's role in his medical practice that Weiner "understood that [he] had the right to make claims to the insurance company but that they would contest [Pierre's] role in my medical practice to deny the payments." (Exh. C at 21:11-22.) When the Court asked, "And because of that, you did not disclose to insurance companies Bradley Pierre's role in your medical practice," Weiner responded, "That's correct." (*Id*.)

30. In a recent filing in the Criminal Action the federal government observed that Pierre's wholly owned company MRC had a false loan agreement with Nexray to launder money. A true and correct copy of this letter, dated August 9, 2024, is attached hereto as **Exhibit D**.

31. The government noted in its letter that during his plea allocution, Weiner "admitted to 'falsely minimiz[ing] Bradley Pierre's role in my medical practice' in two examinations under oath 'to facilitate the payment of claims.'" (*Id*. at 3.) Weiner "acknowledged conspiring with Pierre and with this then-attorney with respect to these false statements . . . and that the insurance

10

companies would deny the insurance claims if Pierre's true role were disclosed." (*Id*.) The Federal Government pointed to the "lack of documentation" including any "documents or communications between the two companies [i.e. MRC and Nexray] that would be ordinarily incident to a loan agreement, such as what insurance claims had been submitted, for what insurance claims funds had been advanced, what insurance claims had been paid, what amount of loan principal had been paid, what amount of loan interest had been paid, or how much money remained owing to MRC." (*Id*. at 5.) The government further observed that the "loan agreement" between MRC and Nexray Medical Imaging was "<u>not genuine, but was a tool to create the impression that MRC was simply a funder of Nexray and to conceal the true business relationship between [Weiner] and Pierre</u>." (*Id*. at 3 (emphasis added).) And according to the government, the defendants used the "loan agreement between Nexray and MRC" as a conduit by which "Weiner effectively sold his medical license to Pierre to conceal that Pierre in fact owned and controlled the radiology practice to which Weiner lent his name." (*Id*.)

32. Further implicating Defendants, Weiner's attorney asserted in a letter filed in the Criminal Action that Weiner was "victimized by Pierre, and that [Pierre's accountant Albert Haft] knowingly and intentionally aided and abetted that fraud [Pierre and Haft's fraud relating to a phony financing agreement]," including by falsifying the payments between MRC and Nexray. A true and correct copy of the August 9, 2024, letter from Weiner's counsel is attached hereto as **Exhibit E**.

33. On September 19, 2024, Defendant Weiner was sentenced to time served with a two-year probation period, plus yet to be determined restitution. A copy of the Judgment setting forth Weiner's sentence and a copy of the order deferring determination of restitution to October 18, 2024 are attached hereto as **Exhibit F** and **Exhibit G**, respectively.

**Other Defendants in the Criminal Action Plead Guilty**

34. In addition to Pierre, Weiner, and Moy, Andrew Prime and Anthony Bogoraz were also charged as part of the criminal enterprise, and ultimately pled guilty to crimes arising from the No-Fault scheme.

35. On April 14, 2023, Prime pled guilty to Travel Act Bribery. At his allocution, a copy of which is attached as **Exhibit H**, Prime admitted that he "agreed with others to commit Travel Act bribery by paying money to 9-1-1 operators in exchange for confidential information regarding injuries that occurred during motor vehicle accidents[.]" (Exh. H at 17.) According to Prime, for a fee, he sent the accident information to Pierre. (*Id*. at 19.) Prime also acknowledged that, at Pierre's direction, Prime opened a shell company to receive the illegal referral fees to hide the source of the payments. (*Id*. at 11.) In total, Prime acknowledged receiving $800,000 in illegal payments from Pierre as part of the scheme. (*Id*. at 20.)

36. According to the Superseding Indictment and later guilty plea, one of the main referral sources for the scheme was Anthony Rose, who obtained information on accident victims by bribing hospital workers and fire department employees. Rose was indicted in *United States v. Rose*, No. 1:19-cr-00789-PGG (S.D.N.Y.). He pled guilty on November 17, 2021, to seven counts, including conspiracy to commit money laundering. At his allocution, a copy of which is attached as **Exhibit I**, Rose admitted that he received bribes from medical offices and attorneys to refer victims to those practices and those practices then "made payments to shell companies under [his] control to pay [his] sources and [his] co-conspirators." (Exh. I at 30-31.)

37. In *Allstate Ins. Co. et. al v. Pierre, et. al*, No. 1:23-cv-06572-NGG-LB (E.D.N.Y.) ("*Allstate*"), in which Allstate asserted similar claims against the Defendants, both Weiner and Pierre settled the claims against them, and part of the settlement pledged their assets to secure

12

payment of settlement amounts payable to Allstate. (*Allstate*, ECF Nos. 74-1, 75-1.) Presumably they are now making significant payments as part of their settlement obligations.

**ATIC's Claims Against Defendants**

1. Overview

38. Following on the allegations of the Superseding Indictment in the Criminal Action, ATIC filed its Complaint on January 17, 2024. (ECF No. 1.) ATIC seeks damages from Defendants for RICO violations in connection with their participation in the operation and management of an enterprise and scheme orchestrated by the Defendants. ATIC also sues Defendants for violation of New York Public Health Law § 238-a, common law fraud, and unjust enrichment. (*See generally* Compl.)

39. ATIC seeks damages totaling no less than $3,240,000.00, which when trebled under the RICO statutes are $9,720,000. (*See generally* Compl.) This damages calculation is based on the amounts ATIC has paid because of the fraudulent bills submitted by Defendants, including payments to Nexray and Rutland themselves and associated legal fees and costs. (*See id*. ¶¶ 455-457, Exhs. G, H.)

2. Defendants' Unlawful Referral Scheme and Fraudulent Billing

40. **Illegal Control of Rutland and Nexray.** Pierre controlled Rutland and Nexray in violation of New York law because non-physicians—like Pierre—are prohibited from owning or controlling medical professional corporations in New York. (Compl. ¶¶ 6-7, 74-95, 388-391, 419-445.) During his allocution in the Criminal Action, Pierre acknowledged (by stating he did not dispute the specific facts of) his surreptitious ownership and control of Rutland and Nexray. It is unlawful in New York for Pierre to own or control either provider and, thus, as a matter of law, any No-Fault claims of such providers are invalid. (*Id.*) Given Pierre's acknowledgment of these facts, this Court entered a preliminary injunction against Rutland and Nexray, concluding it was

"likely that plaintiff will demonstrate that Rutland and Nexray were not eligible to receive no-fault reimbursements in New York" (ECF No. 52 at 3) and that in particular, "Pierre's role in Rutland and Nexray made those companies ineligible to receive no-fault benefits." (*Id.* at 5.)

41. **Illegal Referral Scheme.** Defendants perpetrated their scheme by using medical professional corporations, Rutland and Nexray, to generate and process a high volume of patients for unnecessary treatment by paying referral sources hundreds of thousands of dollars in illegal kickbacks. (*See* Compl. ¶¶ 4-5, 10-12, 36, 45-47, 66, 83-84, 86, 96-381; *see also* N.Y. Pub. Health Law 238.)

42. **Phony Initial Examinations.** Rutland provided virtually every patient with a purported initial examination designed to generate phony diagnoses as a gateway to performing more expensive procedures, such as chiropractic services, injections, electrodiagnostic testing, and related services. (Compl. ¶¶ 97-98.) For example, multiple claimants went to the emergency room after motor vehicle accidents only to be released after diagnoses showed no material injury, no surgery, no prescriptions for pain medication, and no referrals for imaging or testing. (*Id.* ¶ 99.) Yet after visiting Rutland, many of these same patients were suddenly referred for expensive imaging, physical therapy, neurological testing, and other services. (*Id.*)

43. **Fraudulent Chiropractic Care.** To increase billing to ATIC, Rutland and Moy provided patients (and billed ATIC for) a highly templated and generic regimen of often unnecessary chiropractic care accompanied by a barrage of overlapping, redundant, and unnecessary diagnostic tests, the results of which Rutland and Moy routinely disregarded and ignored. (*Id.* ¶¶ 100-103.) Defendants administered these tests and services not based on any medical necessity or request of the patient, but to maximize Rutland's profits through submitting fraudulent billing to ATIC and to justify the provision of additional medically unnecessary treatments. (*Id.*)

14

44. **Fraudulent Electrodiagnostic Testing.** A central part of Defendants' scheme was also to fraudulently provide and bill for unnecessary and excessive electrodiagnostic ("EDX") testing, which is generally used in the clinical evaluation of patients with disorders of the peripheral and/or central nervous system. (*Id.* ¶ 104.) Even though EDX testing should not be administered uniformly across a patient population, Rutland performed the same services on all patients regardless of their age, gender, or medical histories. (*Id.* ¶¶ 104, 106, 114-124, 125-153.)

45. **Fraudulent Diagnostic Imaging.** As Defendant Pierre acknowledged in connection with his guilty plea in the Criminal Action, he "used his control" to "steer patients to seek MRIs" at Nexray and agreed with "Weiner, the purported sole owner of Nexray, that Weiner would falsely report injuries in MRI reports" in order "to bill insurance companies for additional unnecessary medical services[.]" (*See* Glaze Decl. Ex. 1 at 22.) Rutland patients were routinely ordered to undergo immediate medically unnecessary MRIs, without first receiving a course of conservative treatment, even though there was no justification for early imaging (*e.g.*, concern for fracture, a dislocated joint, spinal injury, infection, or malignancy). (Compl. ¶¶ 168-183.) In one documented instance, a patient received 13 MRI's in less than four months, even though she presented no serious injury when examined at the hospital following the alleged accident. (*Id.* ¶¶ 210-224.)

46. **Specific Examples of Fraudulent Billing by Defendants**. ATIC provided numerous examples of fraudulent billing in its extensive Complaint. (Compl. ¶¶ 184-381.)

**The State Court Interpleader Actions Reveal Significant Rutland Payment Streams**

47. Two state court interpleader actions show there is Rutland insurance payments money in play and Pierre's company MRC is trying to obtain those funds even though he acknowledged that his involvement in Rutland and other providers was unlawful. On June 15, 2023, attorney Leon Kucherovsky filed an interpleader action in New York Supreme Court,

15

Nassau County against Rutland and MRC. *See Kucherovsky v. Rutland Medical, P.C., et. al*, Index No. 609430/2023 (Sup. Ct. Nassau Cty.) (*Kucherovsky*). *See* Declaration of James W. Perkins in Support of the Motion ("Perkins Decl.") Exh 1. Kucherovsky alleges his firm holds hundreds of thousands of dollars of No-Fault insurance payments that firm collected on behalf of Rutland.

48. On December 28, 2023, law firm The Russell Friedman Law Group LLP filed an interpleader action in New York Supreme Court, Nassau County against Rutland and MRC. *The Russell Friedman Law Group, LLP v. Rutland Medical, P.C., et. al*, Index No. 621026/2023 (Sup. Ct. Nassau Cty.) ("*Russell Friedman*"). Russell Friedman alleges it holds in excess of a hundred thousand dollars of No-Fault insurance payments that firm collected on behalf of Rutland.

49. Notwithstanding Pierre's guilty plea and allocution showing that he used his wholly owned company MRC to launder proceeds of the No-Fault scheme through "phony lending agreements," MRC alleges it is a proper claimant to the proceeds of Rutland No-Fault insurance payments that the two law firms collected on behalf of Rutland. MRC claims it has priority rights in those interplead funds based on the terms of those false loans. *See, e.g.*, Perkins Decl. Exhs. 2, 9.

50. ATIC has moved to intervene in each of these cases, but was denied intervention, without prejudice, in the *Russell Friedman* matter and is awaiting decision in the *Kucherovsky* matter. ATIC paid each of these firms well over a hundred thousand dollars of Rutland claims and so is a proper claimant. It has moved to reargue the incorrect decision in the *Russell Friedman* matter. *See Russell Friedman*, NYSCEF Nos. 58-64.

51. Although the Russell Friedman court has ordered that the *res* of the interpleader actions must be deposited with the court clerk, MRC's counsel continues to demand that the court order the funds to be transferred to Pierre's control. *See, e.g.*, Perkins Decl. Exh. 10 at 10 ("WHEREFORE, it is respectfully requested that the Court deny [ATIC]'s motion in its entirety

16

and with prejudice and issue an Order directing Plaintiff to transfer all escrow funds collected to date to MRC c/o my law firm's escrow account…").

52. Even the amount of the interplead funds are a moving target, suggesting that Rutland funds continue to be transferred. In the initial interpleader complaint, dated June 14, 2023, Kucherovsky alleged collecting $159,913.01 on behalf of Rutland. *Kucherovsky*, (Perkins Decl. Exh. 1). Yet by January 23, 2024, this sum had grown to $173,165.05 (*id*. at Exh. 3.) and less than a month later on February 14, 2024, it had grown to $217,635.12 in escrow with Kucherovsky then disclosing that an additional $221,886.69 remained to be collected. (*Id*. at Exh. 4.) On July 29, 2024, Kucherovsky asserted that he was holding $219,154.74 with only $103,718.17 remaining for collection. (*Id*. at Exh. 5.)[1] And on September 24, 2024, Kucherovsky moved the target once again, stating that the firm holds $226,239.34, with $96,898.23 left for collection. (*Id*. at Exh. 6.) These discrepancies suggest significant Rutland assets continue to be transferred surreptitiously, even though its owner has disappeared.

53. More evidence that significant amounts of the Rutland claims payments are being concealed was recently discovered in the *Kucherovsky* case. Unknown to ATIC until recently, since at least July 2024, counsel for Pierre's company MRC has been communicating with counsel for the Kucherovsky firm about the amount of Rutland funds and demanding payment. MRC's counsel has excluded ATIC from those communications, even though some were with the court. (*See* Perkins Decl., Exh. 7.) ATIC first learned of them on September 13, 2024, after the *Kucherovsky* court copied ATIC's counsel on an email about an upcoming conference. (*Id*.) In that email MRC/Pierre's lawyer stated:

---

[1] It is unclear why the amount of Rutland money still to be collected shrank by over $100,000 from February to July 2024, even though the amount Kucherovsky holds in escrow grew by less than $2,000.

17

> Over the course of several years, the plaintiff was sent approximately $6.4 million dollars in collections from Rutland for which MRC has a lien and funded the accounts receivable and based upon the last records we received from the plaintiff, which was a long time ago, the plaintiff had paid out approximately $1.6M and there remains a balance of approximately $4.4M that is unaccounted for.

(*Id.*) Reacting to MRC's concealment from ATIC, the court stated: "The Court was under the impression all parties were included in discussions regarding the next conference. While ATIC has not yet been joined as an interpleader, they have been appearing at conferences and should be included on all communications at this point." (*Id.*)

54. This revelation of Pierre's counsel that approximately $4.4 million of insurance payments to Rutland remain unaccounted for confirms ATIC's concerns about the proceeds of insurance payments were being hidden. (*Id.*) MRC/Pierre continues to claim MRC is entitled to these funds notwithstanding Pierre's acknowledgement of his own misconduct that makes Rutland's and Pierre's (including MRC's) claim to these funds not only invalid, but unlawful.

**ATIC's Need For Prejudgment Attachment of Defendants' Assets**

55. ATIC seeks prejudgment attachment of the real property and personal assets of the Defendants up to $9,720,000, including Rutland and Nexray's No-Fault accounts receivable, as well as an estimated $1 million in attorney's fees, for a total of $10,720,000. These types of orders have been issued by the Court in the past.

56. In *Allstate Insurance Company, et al. v. Alexander Rozenberg, M.D., et al.*, United States District Court, Eastern District of New York, C.A. No. 08-cv-565 (ADS)(ETB), Allstate was granted a $3,000,000.00 attachment that applied not only to the defendants' real and personal property, but also the provider defendants' accounts receivable.

57. Here, given the facts discussed above, assets to pay any judgment in this case may not be available if Defendants are permitted to continue to move assets without any limitation.

18

Even though Pierre and Weiner have acknowledged facts underlying their wrongdoing (including Pierre's unlawful control of Rutland and Nexray), Defendants continue to have control over No-Fault insurance claims payments. As noted above, through interpleader actions, Pierre through MRC has tried to collect the proceeds of Rutland's No-Fault insurance payments collected by two law firms on its behalf, based on a purported right to those payments under phony loan agreements. Moreover, the amounts to be collected by these law firms have been a moving target and continue to be transferred to various holders. And within the last few weeks, ATIC discovered not only that Pierre/MRC's counsel has been engaged in *ex parte* communication with counsel for one of its law firms in an attempt to shield its activities, but that there may be approximately $4.4 million in funds that are unaccounted for that passed through one law firm alone. As also discussed above, defendants have operated their fraudulent scheme that was surfaced through the Criminal Action through a series of shell companies, making the transfer of funds harder to detect.

58. Neither I nor anyone at ATIC are aware of any liability insurance in favor of the Defendants that could be used to satisfy any recovery.

59. I am unaware of any pending or potential counterclaims available to the Defendants and certainly not in amounts that would exceed ATIC's claims.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 13, 2024.
Brooklyn, New York

_____
Cheryl Glaze

19