# EXHIBIT A

# EXHIBIT A

## Expert Witness Report of Mark H. Zafrin, Esq

1. **Identity of Expert Witness:** Mark H, Zafrin, Esq., 214 East Ninth Street, New York, New York 10003; Phone: (212) 673-5505; Cell (917) 922-7120 -mail: mzafrin@me.com|

2. **Opinions and Reasons Therefore:** Based on the information presented at the current time and for the reasons set forth below, it is my **opinion** that the foundational business documents of Nexray Medical Imaging, P.C. (Nexray) do not exhibit any of the indicia that could lead an insurance company under the dictates of *State Farm Mutual Automobile Insurance Co. v. Mallela* to withhold reimbursement for no-fault claims that were "provided by fraudulently incorporated enterprises to which patients have assigned their claims." Specifically, the organizational documents, loan agreements, lease agreement, and UCC filings all suggest that Dr. Weiner owned and controlled his practice. The Financing Agreement between Nexray and Medical Reimbursement Consultants, Inc. (MRC), does not provide any mechanism that would have allowed MRC to assert control over Nexray or the practice of medicine.

   During my 35 years of practice, I have extensive experience with incorporating PCs and PLLCs. I am familiar with "doc-in-a-box" clinics (in which businessmen essentially pay for the use of physicians' licenses so that they can fraudulently incorporate as medical PCs, skirting State laws proscribing the corporate Practice of medicine). Nexray's foundational documents are not in any way similar to those of a "doc-in-a-box" clinic; rather, they appear to be consistent with a legitimate PC controlled by a physician.

3. **Data Considered in Forming the Opinion:** I relied upon the following documents in forming my opinion.

   a. Entity Information from the New York State Department of State indicating that Nexray Medical Imaging was formed on April 19th, 2011, by William A. Weiner, D.O., with an address at his home, 8 Leonard Drive, East Rockaway, New York, 11518

   b. Oxford Instruments Healthcare purchase agreement and Oxford Instruments Healthcare service agreement for an MRI Machine dated November 15th, 2015, between Oxford Healthcare and Nexray Medical Imaging.

   c. Sublease Agreement dated 2015 between Marvin Moy MD., P.C. and Nexray for a portion of premises 79-60 South Conduit Avenue, Howard Beach, New York, which JSB Realty No. 2, LLC owns the Automated City Register System.

   d. Six Hundred Fifty Thousand ($650,000.00) draw term loan from Valley National Bank dated February 2, 2016, with a personal loan guarantee by Dr. William Wiener, the proceeds designated explicitly for purchasing equipment and leasehold improvements.

e.  Financing Agreement (the "Agreement") dated as of November 15, 2016, between Nexray and MRC.

f.  UCC Search on the New York State Department of States Website which revealed the following UCC filings:

   i.  Filing # 201602125175402 dated 02/12/2016 between Valley National Bank as the lender and Nexray Medical Imaging, P.C, an all assets filing

   ii.  Filing # 201805175607269, dated 05/17/2018 between Philips Medical Capital, LL and Nexray Medical Imaging, P.C, securing a purchase by Nexray of One (11 Philips Ingenuity TF 128 PET/CT System, Serial No. 2078, as fully described on Philips Healthcare Quotation No. 1-1 RSRL2I and One (1) Siemens RS Magnetom Skyra Eco MR System as fully described on Siemens Quote No. 1-1 MLRWN8, together with all components, additions, upgrades, attachments, accessions, substitutions, replacements, and proceeds.

   iii.  Filing Number 20180928621231, dated 09/28/2018, benefiting TIAA COMMERCIAL FINANCE, INC, securing the purchase of 1 EXA PACS SOFTWARE, DELL RACK SERVER R730, 1 DUAL 3MP MONOCHROME DIAGNOSTIC WORKSTATION and all accessions thereto, substitutions and replacements therefor, and all proceeds of the preceding, including insurance proceeds.

   iv.  Filing Number 201908236085136, dated August 23, 2018, benefiting SIEMENS FINANCIAL SERVICES, INC. For the purchase of an MRI machine.

## OPINION

1) **STANDARDS FOR PRACTICE**. There is a standard practice followed by legal practitioners in the Healthcare Space that would be followed when forming a radiology practice to ensure that the Practice is compliant with all Anti-Kickback, Stark, and (when relevant) no-fault laws.

   a) Licensed medical professionals must own the PC or PLLC. The PC or PLLC is allowed for convenience's sake for the business activities of the Practice, but the Doctor is still personally responsible for all medical decisions.

   b) The Practice must have complete control over all of its assets and independent control over the management, policies, and disposition of assets. It must have the ability to incur debts, to enter into any agreements with third parties, and to hire and fire employees

   c) The Physician must make capital contributions and be the sole signatory on all loans and debts.

   d) The Physician must not share in the rewards of the Practice, and either seems to split medical fees or profits with a non-physician-physician.

2) **STANDARD CONSTRUCTION RULES WHERE A NON- PHYSICIAN WANTS TO ENGAGE IN PRACTICE MANAGEMENT OF A RADIOLOGY CLINIC.** Many times, I and other attorneys in this area have been approached by entrepreneurs who believe they can team up

with a radiologist and actively be involved in a radiology practice as a non-physician owner. The challenge that the attorney faces in advising the client is to encourage and guide the client into an arrangement with a physician that is a genuine management agreement without the appearance of or actual impropriety. However, the Practice is often still a "doc in a box". These arrangements are made through the mechanism of the non-physician-physician promoter doing the following:

a) The non-physician promoter will form a Management Services Company and enter into a contract with the PC where the Doctor who owns the PC is effectively an employee of the non-physician's-physician's management company.

b) The Management Services Company handles all of the financial aspects of the business

   i) The Management Services Company arranges for and sometimes guarantees bank loans and equipment leases.

   ii) The Management Services Company arranges equipment leases or purchase equipment in their name and re-lease them to the Practice at an inflated price over and above the actual cost.

   iii) The Management Services Company enters into leases for space in the name of the Management Company and then subleases the space to the Practice at an inflated rate while charging for incidentals on a cost-plus basis, such as cleaning, air conditioning, heat, etc.

   iv) The management agreement provides that all income from the Practice is deposited in an account totally under the control of the Management Services Company from which they make payments to all the employees, including mid-level medical and x-ray techs.

   v) The Management Services Company charges for billing and accounting services at an inflated rate.

c) The above is an example of the facts and circumstances among others that existed in the *Mallela* case and *United States v. Gabinskaya*, 829 F.3d 127 (2d Cir. 2016). The Management Services Company structure is problematic because it creates numerous opportunities for the Management Company to exercise control over the assets of the PC.

## 3) NEXRAY FOLLOWED AN EXTREMELY DIFFERENT MODEL.

a) Dr. Weiner incorporated Nexray on April 19th, 2011, five years before he entered into the Sublease with Marvin Moy M.D., P.C., and the Financing Agreement (the "Agreement") with MRC.

b) Notably, there is no Management Services Agreement between Dr. Weiner and MRC. In the absence of such an Agreement, Dr. Weiner retained complete authority to control hiring, firing, borrowing, spending, and every other aspect of the Practice.

c) I am not aware of any evidence to suggest that Dr. Weiner was an absentee doctor, which, of course, is unlike to the fact patterns in *Mallela* and *Gabinskaya*.

d) Dr. Weiner assumed the entire financial risk of the success or failure of the Practice as conclusively demonstrated by his formation of Nexray and the lending agreements with Valley National Bank and others for MRI Equipment, computers, and other assets. The UCCs filed by Valley National Bank and the sellers of the equipment, either on leases or financed purchases, demonstrate that the liens were for loans or equipment purchased solely by Nexray on Dr. Weiner's own credit. No one else was obligated to pay these debts.

e) The cost of the fit-out and construction of the offices appear to have been financed by Nexray and Dr. Weiner personally, as demonstrated by the Six Hundred Fifty Thousand ($650,000.00) draw term loan from Valley National Bank, which Dr. Weiner personally guaranteed.

f) The sublease for office space is between Nexray and Marvin Moy M.D., P.C. The only party responsible for payment is Dr. Weiner. The lease has specific and fixed provisions regarding the payment of rent, taxes, and electricity, and all payments were made to Marvin Moy M.D. PC.

   i) A check of the City of New York's electronic real estate filing system demonstrated that the owner of the building was in no way related to MRC, Bradley Pierre, or any of the other parties to this matter.

   ii) The use clause of the sublease restricted the use to a radiology practice and specifically excluded its use for physical medicine, rehabilitation, and other ancillary uses.

   iii) The work to fit out the space was either done by the Prime Landlord as part of the prime lease or by Nexray Medical Imaging at their sole cost and expense.

g) In my opinion, Nexray's foundational documents and business structure are neither consistent with nor suggestive of a possible *Malella* violation.

4) **THE FINANCING AGREEMENT BETWEEN NEXRAY AND MRC IS USUAL AND CUSTOMARY**

a) Many medical practices use factoring or other forms of lending to accelerate collections.

b) Healthcare providers widely use factoring or funding agreements. These types of agreements can often be the least expensive capital for such providers. In addition, factoring or funding agreements are often used by providers who are reliant on payment from insurance companies. Because insurance companies can and often do refuse to pay in a timely manner (if at all) or raise issues as to whether or not the procedure was medically necessary, many providers seek to mitigate their risks through funding arrangements.

c) The Funding Agreement here provided that MRC would advance payment on accounts receivable. Per the Agreement, the accounts receivable served as collateral for the advances. Nexray was obligated to repay the amounts funded plus interest, but only to the extent that it actually collected the accounts receivable.

d)  The Finance agreement did not grant MRC any form of legal control over Nexray.

5) **CONCLUSION:**  It is my **opinion** based upon my expert knowledge in this area that:

a)  Nexray's foundational business documents do not exhibit any of the indicia that could lead an insurance company under the dictates of *State Farm Mutual Automobile Insurance Co. v. Mallela*, to withhold reimbursement for no-fault claims that were "provided by fraudulently incorporated enterprises to which patients have assigned their claims."

b)  Specifically, the organizational documents, loan agreements, lease agreement, and UCC filings all suggest that Dr. Weiner owned and controlled his practice. The Financing Agreement between Nexray and Medical Reimbursement Consultants, Inc. (MRC), does not provide any mechanism that would have allowed MRC to assert control over Nexray or the practice of medicine.

c)  Nexray's foundational documents are not in any way similar to those of a "doc-in-a-box" clinic; rather, they appear to be consistent with a legitimate PC controlled by a physician.

Respectfully submitted,

*Mark Zafrin*

Mark H. Zafrin, Esq.